Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
P. Solange Hilfinger-Pardo (SBN 320055)
shilfingerpardo@edelson.com
EDELSON PC
150 California St., 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Sejal Zota (*pro hac vice* forthcoming)
sejal@justfutureslaw.org
Dinesh McCoy (*pro hac vice* forthcoming)
dinesh@justfutureslaw.org
Daniel Werner (SBN 322310)
daniel@justfutureslaw.org
JUST FUTURES LAW
95 Washington Street, Suite 104-149
Canton, MA 02021
Tel: 617.812.2822

*Counsel for Plaintiffs and the Proposed Class and Subclasses*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NELSON SEQUIERA, ORSAY ALEGRIA, ISMAEL CORDERO, and RAUL LOPEZ, individually and on behalf of all others similarly situated,<br><br>     *Plaintiffs,*<br><br>  *v.*<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; THE WESTERN UNION COMPANY, a Delaware corporation; CONTINENTAL EXCHANGE SOLUTIONS, INC., a Kansas corporation, d/b/a RIA FINANCIAL SERVICES and AFEX MONEY EXPRESS; VIAMERICAS CORPORATION, a Delaware Corporation; and DOLEX DOLLAR EXPRESS, INC., a Texas corporation,<br><br>     *Defendants.* | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

1.     This case challenges an unlawful dragnet surveillance program targeting immigrants and communities of color and violating the financial privacy rights of hundreds of thousands of people.  Plaintiffs Nelson Sequiera, Orsay Alegria, Ismael Cordero, and Raul Lopez, individually and on behalf of a proposed class, bring this Class Action Complaint against the United States Department of Homeland Security and Immigration and Customs Enforcement (together, "Federal Government Defendants"), The Western Union Company, Continental Exchange Solutions, Inc., D/B/A Ria Financial Services and AFEX Money Express, Viamericas Corporation, and DolEx Dollar Express, Inc. (together, "Money Transfer Business Defendants" or "MTB Defendants"), seeking damages, restitution, an injunction, and other appropriate relief from Defendants' unlawful sharing and accessing of private financial information and personal records, in violation of the Right to Financial Privacy Act, 12 U.S.C. §§ 3401, *et seq.*, and California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief.

## I.    <u>PARTIES</u>

1.     Plaintiff Nelson Sequiera is a natural person domiciled in California.  He resides in Concord, California.

2.     Plaintiff Orsay Alegria is a natural person domiciled in California.  He resides in San Bruno, California.

3.     Plaintiff Ismael Cordero is a natural person domiciled in California.  He resides in San Jose, California.

4.     Plaintiff Raul Lopez is a natural person domiciled in California.  He resides in San Rafael, California.

5.     Defendant United States Department of Homeland Security ("DHS") is a United States federal executive department responsible for public security.  It is headquartered in Washington, D.C.

6.     Defendant United States Immigration and Customs Enforcement ("ICE") is an agency within DHS responsible for enforcing federal immigration laws.  It is headquartered in

1   Washington, D.C.  Homeland Security Investigations ("HSI") is a sub-component of ICE
2   responsible for conducting law enforcement investigations.

3          7.      Defendant The Western Union Company ("Western Union") is a multinational
4   financial services company incorporated in the State of Delaware.  Its headquarters are in
5   Denver, Colorado.  It regularly transacts business throughout California, including in this district,
6   with over 20 locations in San Francisco alone.  The consumer financial services it provides
7   include money transfer and lending services.

8          8.      Defendant Continental Exchange Solutions, Inc. is a Kansas corporation with its
9   headquarters in Buena Park, California, and which regularly does business under fictitious
10  names, including but not limited to Ria Financial Services and AFEX Money Express
11  ("Continental," "Ria," or "AFEX").  It regularly transacts business throughout California,
12  including in this district, with dozens of locations in the Bay Area and at least six in San
13  Francisco alone.  The consumer financial services it provides include money transfer and check
14  cashing services.

15         9.      Defendant Viamericas Corporation ("Viamericas") is a Delaware corporation with
16  its headquarters in Bethesda, Maryland, and which regularly does business under fictitious
17  names, including but not limited to Vianex.  It regularly transacts business throughout California,
18  including in this district, with numerous locations in the Bay Area.  The consumer financial
19  services it provides include money transfer services.

20         10.     Defendant DolEx Dollar Express, Inc. ("DolEx") is a Texas corporation with its
21  headquarters in Arlington, Texas.  It regularly transacts business throughout California, including
22  in this district, with dozens of locations in the Bay Area alone.  The consumer financial services
23  it provides include money transfer, personal lending, check cashing, money order, bill pay, and
24  other services.

25                          II.     **JURISDICTION AND VENUE**

26         11.     This Court has subject matter jurisdiction over Plaintiffs' claims arising under the
27  laws of the United States pursuant to 28 U.S.C. § 1331, and, as to all other claims, 28 U.S.C.
28  § 1367.  The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)

1  because the amount in controversy exceeds $5 million, there are over 100 members in the

2  proposed Class, and at least one member of the proposed Class is a citizen of a state or country

3  different from at least one Defendant.

4         12.    This Court has personal jurisdiction over Defendants because Defendants

5  regularly transact business in this District and have committed wrongful acts here.

6         13.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1391(e)(1)(B)

7  because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

8  and emanated from this District.  In addition, with respect to the Federal Government

9  Defendants, venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Plaintiffs

10 reside within this District and no real property is involved in the action.

### III.    DIVISIONAL ASSIGNMENT

12        14.    Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San

13 Francisco Division because a substantial part of the events or omissions giving rise to the claim

14 occurred within the County of San Francisco.

### IV.    INTRODUCTION

16        15.    The Federal Government and Money Transfer Business Defendants have violated

17 the financial privacy rights of hundreds of thousands of people, secretly collecting and sharing

18 intimate details of millions of financial transactions for nearly a decade.  This mass surveillance

19 program was coordinated by the Transaction Record Analysis Center ("TRAC"), a collaboration

20 of law enforcement agencies, including several federal government agencies like Defendant ICE.

21 Until press reports exposed the program earlier this year, consumers had no idea that money

22 transfer companies were indiscriminately sharing their private financial information with the

23 federal government.  Worse, public records obtained by Plaintiffs' counsel suggest that the

24 program's primary purpose is to target immigrants and communities of color.

25        16.    This type of surreptitious surveillance of financial records is precisely what

26 Congress sought to protect against when it passed the Right to Financial Privacy Act ("RFPA")

27 in 1978, 12 U.S.C. §§ 3401, *et seq.*  The RFPA prohibits consumer finance institutions like the

28 MTB Defendants from disclosing consumers' financial information to the federal government

without a valid court order or subpoena, and, even then, consumers must be notified and provided an opportunity to object before the information in question may be disclosed.  The Act also prohibits the federal government from having access to such information unless these statutory protections are honored.

17.     Yet Defendants ignored these requirements when they devised a program to regularly collect, scrutinize, and share millions of financial records from unknowing consumers in the Southwest border states.  According to TRAC Board Meeting Minutes obtained by Plaintiffs' counsel, by 2021, the TRAC database contained over 145 million financial records from unsuspecting consumers.  Beginning at least as early as 2014, TRAC began collecting and disseminating records from the MTB Defendants and other money transfer companies about money transfers over $300 sent to or from the Southwest border region.  And since as early as at least 2015, TRAC, with the participation of federal government agencies, has been gathering and accessing consumer financial records from the MTB Defendants and other money transfer companies about money transfers greater than $500 sent to or from Arizona, California, New Mexico, Texas, or Mexico (hereinafter, "Watchlist States").  These financial records were obtained under the ostensible authority of various TRAC participants, including Arizona and New Mexico law enforcement officials and the federal government.  All requests were intended to result in the production of responsive data to TRAC, so that TRAC could make it accessible to all participants, including the federal government.  The scheme helped facilitate the creation of a mass database that federal government agencies and other TRAC participants would be able to access without limitation, sidestepping the protections of the RFPA.

18.     Federal involvement in TRAC, including access to the private financial information gathered by TRAC, has a long history.  Although TRAC was not formally incorporated as a stand-alone entity until 2014, its genesis appears to go back decades to 1996. Numerous federal agencies have had access to financial data gathered by TRAC, enabling them to comb through millions of financial records with no warrant or judicial oversight, and without compliance with RFPA's requirements.

19.     TRAC gathers, stores, and shares private financial records in its database even when there is no link to any particularized suspicion of criminal activity.  Instead, money transfer companies like the MTB Defendants disclose, and the government and Federal Government Defendants have access to, information about *any* transfer by any consumer of $500 or more in the Watchlist States, at the very least.

20.     Plaintiffs bring this action to remedy these unlawful surveillance activities.

### V.     GENERAL ALLEGATIONS

**A.     The Federal RFPA Protects Consumers From Unwarranted Federal Government Intrusion**

21.     In 1978, Congress passed the RFPA to protect the confidentiality of financial records. 12 U.S.C. §§ 3401, *et seq*.  The RFPA was passed in response to the Supreme Court's ruling in *United States v. Miller*, 425 U.S. 435 (1976), in which the court held that, under the Fourth Amendment, individuals do not have a reasonable expectation of privacy in information that they disclose to a third-party like a bank.  Congress, however, recognized that unchecked government access to financial information is dangerous, and that individuals have a right of privacy in their financial affairs.

22.     The RFPA established specific procedures that federal government authorities must follow to obtain an individual's financial records from consumer financial institutions.  The RFPA also guarantees consumers notice and an opportunity to challenge an attempt by the government to access their financial records.  For example, when obtaining a consumer's financial records by way of an administrative summons or judicial subpoena, the government must provide a copy of the subpoena or summons to the consumer's last known address.  12 U.S.C. §§ 3405(2), 3407(2).  The government must also inform the consumer of the purpose for which the records are being sought and inform the consumer of the procedures for challenging the disclosure of their financial records.

23.     By requiring that consumers be notified and given the opportunity to respond to most federal government requests for financial records, the RFPA seeks to prevent unchecked government surveillance of consumers' financial records.

**B.      How Money Transfer Businesses Work**

24.      Money transfer businesses provide an important consumer financial service, enabling people to send and receive money across borders.  Immigrants and other people with friends and relatives abroad are particularly reliant on money transfer businesses to facilitate the sending of remittances.  A remittance is an international wire, often money sent by an immigrant or migrant worker to family members, friends, and close relations in their country of origin.  The United States is the largest source of international remittances in the world.  Approximately $150 billion in remittances are sent annually from the United States, with approximately $30 billion being sent from the United States to Mexico.  Money transfers can also be made domestically.

25.      To effectuate a money transfer, a sender typically brings cash to a money transfer business's brick and mortar location.  A business representative will receive the cash and arrange for a transfer to the location specified by the sender.  Once the transaction is processed, the beneficiary or recipient of the transfer need only visit the appropriate branch of a money transfer business, where the money is delivered to them.

26.      Money transfer businesses profit by setting exchange rates above market rates and by charging commission fees.  The transaction costs of a money transfer can reach 10%, and tend to be higher when sending money to remote destinations.  The vast majority of revenue at companies like the MTB Defendants comes from person-to-person transfers, with 90% of that business dealing with cash on both ends.

27.      Many money transfer consumers are unbanked and therefore unable to use cheaper transfer systems like electronic checking or bank wiring instead.  These services are used overwhelmingly by lower-income minority and immigrant communities.  Currently, there are 200 million migrant workers that use money transfer businesses to send financial support to dependent family members in their countries of origin.  During 2020, remittances to Latin America and the Caribbean increased by 6.5% despite the economic downturn caused by the COVID-19 pandemic, indicating the extent to which many family members of immigrants rely on the income from remittances.

28.     At no point did the MTB Defendants inform consumers in the Watchlist States or elsewhere that their private financial records would be routinely divulged to Defendant ICE or other federal agencies.

C.     **The TRAC Program Has Collected Hundreds of Millions of Consumer Financial Records**

29.     TRAC, in its current iteration, has existed since 2014.  However, attempts to monitor the activities of people who use money transfer services *en masse* began well before that time.  A 1996 bulletin issued by the Arizona Attorney General's Office, for example, states that TRAC was housed within that office's Financial Remedies Unit.  The bulletin explains that TRAC, at that time, had responsibilities to "input, computerize, and analyze the [financial data] in response to requests from local, state, and federal law enforcement," and that "TRAC is the nucleus of a state/federal Suspicious Transaction Report Project, which coordinates money laundering investigation and prosecutions among [various Arizona agencies], the U.S. Customs Service, and the Drug Enforcement Administration."  In 2006, the Arizona Attorney General attempted to obtain bulk records from Western Union, serving Western Union with a warrant for data regarding every person-to-person money transfer transaction over $500 in a three-year period sent from multiple states to Sonora, Mexico.  The ensuing legal battle ended with the Arizona Supreme Court holding that the warrant for out-of-state Western Union transaction records was unconstitutional.

30.     Having previously failed to obtain bulk records through litigation, in February 2010, the Arizona Attorney General and Western Union reached an agreement whereby Western Union would turn over bulk transaction data, particularly targeting the southwest border and immigrant populations.  From the start, it was evident that the Arizona Attorney General intended to share the data produced by Western Union with other state and federal law enforcement officials, as reflected in the agreement.

31.     In January 2014, the Arizona Financial Crimes Task Force ("AZFCTF")—which is composed of the Arizona Attorney General's Office, the Phoenix Police Department, the

Arizona Department of Public Safety, and participation by DHS—expanded the existing agreement with Western Union and founded the Transaction Record Analysis Center.

32.     The TRAC surveillance program was designed to facilitate collaboration between state and federal government agencies, particularly DHS and its predecessors.  Early policy documents touted TRAC's goal of leveraging the analytical resources of federal law enforcement agencies.  Similarly, Southwest Border Anti-Money Laundering Alliance (an entity TRAC contracted with) documents from as early as 2016 indicated that collaboration with DHS was a primary goal.  By 2017, TRAC had cemented a close working relationship with ICE sub-component HSI.

33.     TRAC is staffed by analysts and law enforcement professionals and designed to facilitate law enforcement access to bulk data.  It functions as a data analysis center with a web-accessible, searchable, centralized database of money transfer transactions concentrated in southwest border-states and Mexico.  The data stored in TRAC include, at the very least, financial records of consumers from Arizona, California, New Mexico, and Texas, as well as Mexico.

34.     Western Union was not the only money transfer business providing bulk transaction data to TRAC after its creation in 2014.  The Arizona Attorney General's office also requested that at least six other companies, including Defendants Continental, Viamericas, and DolEx, produce bulk transaction data to TRAC.  Those requests continued through 2022 and have expanded to include at least ten other known companies.  None of these requests complied with the RFPA, even though their purpose was to provide access to the financial records to the federal agencies participating in TRAC, including the Federal Government Defendants.  At least 20 money transfer businesses are implicated in the program, according to TRAC board meeting minutes.

35.     An AZFCTF PowerPoint presentation dated January 19, 2017 conveys the immense scale of the program:



36.     In 2019, Western Union's data sharing agreement with the Arizona Attorney General expired.  Despite the agreement lapsing, Western Union continued to hand over millions of financial records to TRAC without any legal process required by the RFPA.

37.     Defendant DHS stepped in to try to fill the void left by the expiration of the Arizona Attorney General's agreement with Western Union.  According to minutes of a September 2019 TRAC board meeting, before the agreement expired, HSI committed to funding TRAC for one year, with the hope of finding permanent funding going forward.  Additionally, the HSI Special Agent in charge of Phoenix began issuing a series of requests to Western Union every six months directing the company to continue transmitting records of money transfers to TRAC, so that all participants, including the federal agency participants, could continue to have access to the bulk financial records.  Indeed, requests sent by HSI to Western Union and Maxi Transfers swept in over six million additional records over the next three years.  HSI did not comply with the RFPA's requirements before issuing the requests to Western Union or accessing the underlying data, such as providing notice to the affected consumers, issuing a valid administrative subpoena, or obtaining a court order.  Nor did Western Union comply with the

RFPA's requirements before divulging information to the federal agencies involved in TRAC in response to HSI's requests.

38.    The information in TRAC's database is extensive and intrusive.  At the very least, it contains information on all transactions in amounts over $500 to or from Arizona, California, New Mexico, Texas, and Mexico since as early as 2010.  The data collected about each transaction may include: sender's name, sender's address, sender's phone number, sender's date of birth, sender's occupation, sender's social security number, payee's name, payee's address, payee's phone number, payee's date of birth, payee's occupation, payee's social security number, sender's and payee's identification numbers and types (passport or other ID numbers), date and times of transactions, operators' names, sending agent's address, paying agent's address, and the sending and paying countries, currencies, and dollar amounts.

39.    The mass information collection is intended to be a dragnet, and is not focused on particular individuals suspected of criminal activity.  An AZFCTF PowerPoint presentation about TRAC's capabilities, for example, emphasizes how federal and state law enforcement participants can use highly general queries, such as "search[ing] a geographic area" for "persons who are sending/receiving the highest volume/dollar amounts," as depicted below:



40.    Further, anxiety about immigration is a focus of the TRAC database.  One slide in a 2017 AZFCTF PowerPoint presentation, for example, focuses on "Middle Eastern Human

Smuggling (SI Aliens) along the Arizona Border."  The subsequent slides emphasize that certain transactions captured by TRAC were deemed suspicious because they involved money sent by people with "Middle Eastern names" or "Middle Eastern/Arabic names."  That raises another danger of mass surveillance tools: they may be weaponized against vulnerable groups based on improper criteria, such as race, religion, or national origin.  The RFPA's protections provide a potential safeguard against such activities, but the MTB Defendants and Federal Government Defendants ignored them.

### D.  DHS and Other Federal Agencies Have Had Years of Illegal Access to Consumer Financial Records

41.    Although the Arizona Attorney General created TRAC, dozens of federal agencies participate in TRAC and have full access to transaction data tracking millions of consumers' financial activities.

42.    TRAC was designed with the goal of collaboration with federal government agencies, especially DHS.  HSI has been an active user of the database since at least 2017, according to internal TRAC documents, even before HSI began sending its own data requests.

43.    According to TRAC board meeting minutes, an alphabet soup of federal agencies has actively participated in TRAC and has access to the financial data contained therein, in flagrant violation of the RFPA.  The federal agencies with access to TRAC data include ICE, U.S. Customs & Border Protection, U.S. Citizenship and Immigration Services, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Bureau of Indian Affairs Office of Justice Services Law Enforcement Division, the Drug Enforcement Administration, the Internal Revenue Service, the U.S. Department of State, the U.S. Fish and Wildlife Service, the U.S. Postal Inspection Service, the U.S. Marshals Service, the U.S. Secret Service, and the U.S. Department of Agriculture—and this list is not exhaustive.  As discussed above, HSI and its parent agency Defendant ICE not only accessed TRAC, but actively participated in obtaining records for the TRAC database.

44.    HSI's bulk data collection was continuous and extensive until 2022 when Senator Ron Wyden raised concerns about the program, ultimately resulting in a suspension of HSI's role

in requesting the data in question from Western Union and Maxi.  However, upon information and belief, HSI continues to be a member of TRAC with access to consumer financial records, and the MTB Defendants and other money transfer businesses have continued to provide the Federal Government Defendants with access to consumer financial records through TRAC without following the RFPA's requirements.

45.     TRAC, with information provided by the MTB Defendants and other money transfer businesses, allows federal government agencies to conduct warrantless searches on the millions of financial records stored in its database.  Customers making money transfers in the Watchlist States have no way of knowing their information will be taken and provided to the federal government without notice or due process.  The over 145 million financial records stored in TRAC's databases and made available to the federal government break the promise of financial privacy laid out in the RFPA.

**E.     TRAC Poses Particular Harm to Immigrant and Vulnerable Communities**

46.     TRAC's collection of sensitive personal information from MTB consumers and law enforcement agencies' unfettered access to those records cause particular harm to immigrant communities and others who disproportionately rely on money transfer services.  Using the sensitive address information that is contained within money transfer records, ICE and other law enforcement agencies can track and locate people and conduct arrests or raids that lead to detention and deportations.

47.     TRAC collects information that poses additional risk to noncitizens by revealing details relevant to their immigration status.  For example, whether a person has a valid social security number can be used as a proxy for assessing a person's status as a citizen or visa holder.

48.     Regardless of a money sender's immigration status, because TRAC collects data about both the sender and recipient of remittances, TRAC provides ICE with information about a person's network of family members and other associates living in other countries.  This raises the additional fear of surveillance and targeting of the overseas recipients, especially if they decide to come to the United States in the future.

49.     TRAC's collection of consumer financial information from the MTB Defendants

and other money transfer companies, and its sharing of these records with ICE and other federal agencies, causes harm because the underlying information is both private and sensitive. Immigrants have expressed specific fears related to TRAC surveillance and ICE targeting, noting that ICE's tracking of their information from remittances is "scary to think about" given the threat of potential detention.  TRAC's data collection also poses a threat to First Amendment association rights and creates a chilling effect among immigrant communities who rely on these necessary services to support their families in Mexico and beyond.  These remittance payments help provide for basic family needs, as people have planned their lives around working and sending money back to family as a means of consistent support.  Such payments and the use of essential services should not be used by ICE as a basis to target immigrants and others.  To minimize the risk of such abuses, the Federal Government Defendants and MTB Defendants must be required to comply with the RFPA's protections.

## FACTS SPECIFIC TO PLAINTIFFS

50.     Plaintiff Nelson Sequiera regularly used Western Union to send money from California (including from this District) to his family abroad, including in excess of $500.  Mr. Sequiera was never informed that records from these transactions would be shared with the federal government without a valid warrant, subpoena, or court order, and would remain in a mass database accessible by hundreds of government agencies indefinitely.  If Mr. Sequiera had known about this invasion of his privacy, he would not have paid Western Union to process the transaction, and would instead have searched for alternative options for sending his money.  Mr. Sequiera is disturbed that his personal financial information, along with information about his family abroad, was shared with the federal government without his knowledge.

51.     Plaintiff Orsay Alegria regularly uses money transfer companies, including Continental, Viamericas, and DolEx, to send money from California (including from this District) to his family in Mexico, including in excess of $500.  His family has used this money for basic needs, such as food and medical costs.  Mr. Alegria was never informed that records from these transactions would be shared with the federal government without a valid warrant, subpoena, or court order, and would remain in a mass database accessible by hundreds of

government agencies indefinitely.  Mr. Alegria feels distress and that his privacy has been violated because of the companies' sharing of his personal information with law enforcement.

52.     Plaintiff Ismael Cordero regularly used Western Union to send money from California to his family abroad, including in excess of $500.  Mr. Cordero was never informed that records from these transactions would be shared with the federal government without a valid warrant, subpoena, or court order, and would remain in a mass database accessible by hundreds of government agencies indefinitely.  If Mr. Cordero had known about this invasion of his privacy, he would not have paid Western Union to process the transaction, and would instead have searched for alternative options for sending his money.  Mr. Cordero is disturbed that his personal financial information, along with information about his family abroad, was shared with the federal government without his knowledge.

53.     Plaintiff Raul Lopez regularly uses Continental to send money from California to his family in Guatemala, including in excess of $500.  His family has used this money for basic needs, such as food and medical costs.  Mr. Lopez was never informed that records from these transactions would be shared with the federal government without a valid warrant, subpoena, or court order, and would remain in a mass database accessible by hundreds of government agencies indefinitely.  If he had known about this invasion of his privacy, Mr. Lopez would not have paid Continental to process the transactions, and would instead have searched for alternative options for sending the money in question.  Mr. Lopez feels distress and that his privacy has been violated because of the company's sharing of his personal information with law enforcement.

## VI.   CLASS ALLEGATIONS

54.     **Class and Subclass Definitions**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and a Class and Subclasses of similarly situated individuals, defined as follows:

> **Federal Defendants Class (All Plaintiffs):** All persons who sent or received a money transfer via any money transfer business and whose transaction data a federal government agency had access to or obtained copies of through TRAC since 2010.

**Western Union Subclass (Plaintiffs Sequiera and Cordero):** All persons who sent or received a money transfer via Western Union or any of its subsidiaries, and whose transaction data a federal government agency had access to or obtained copies of through TRAC since 2010.

**Continental Subclass (Plaintiffs Lopez and Alegria):** All persons who sent or received a money transfer via Continental or any of its subsidiaries, and whose transaction data a federal government agency had access to or obtained copies of through TRAC since 2010.

**Viamericas Subclass (Plaintiff Alegria):** All persons who sent or received a money transfer via Viamericas or any of its subsidiaries, and whose transaction data a federal government agency had access to or obtained copies of through TRAC since 2010.

**DolEx Subclass (Plaintiff Alegria):** All persons who sent or received a money transfer via DolEx or any of its subsidiaries, and whose transaction data a federal government agency had access to or obtained copies of through TRAC since 2010.

**California Subclass (All Plaintiffs):** All California residents who are a member of the Western Union, Continental, Viameriacs, or DolEx Subclasses.

People who sent money from outside the United States to within the United States are not included in the proposed Class or Subclasses. The following people are also excluded from the Class and Subclasses: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

55.     **Numerosity**: On information and belief, the proposed Class and Subclasses include hundreds of thousands, if not millions, of people. Members of the Class and Subclasses can be identified through Defendants' records.

56.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs' and each Class and Subclass members' claims, and those questions predominate over any questions that may affect individual class members. Common questions include but are not limited to the following:

a.  Whether the MTB Defendants unlawfully provided access to or copies of the information contained in Plaintiffs' and the proposed Class Members' financial records to a government authority;

b.  Whether the Federal Government Defendants unlawfully had access to, or obtained copies of, the information contained in Plaintiffs' and the proposed Class Members' financial records;

c.  Whether Plaintiffs and the proposed Class and Subclass Members are entitled to injunctive relief, statutory damages, actual damages, punitive damages, and reasonable costs and attorney's fees from Defendants under the Right to Financial Privacy Act; and,

d.  Whether Plaintiffs and the proposed California Subclass Members are entitled to restitution and injunctive relief under California's Unfair Competition Law.

57.  **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class and Subclasses in that Plaintiffs and the members of the Class and Subclasses were harmed, and face ongoing harm, arising out of Defendants' wrongful conduct.

58.  **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses, and have retained counsel competent and experienced in complex litigation and class actions.  Plaintiffs' claims are representative of the claims of the other members of the Class and Subclasses, as Plaintiffs and each member of the Class and Subclasses suffered privacy violations because of Defendants' unlawful conduct. Plaintiffs also have no interests antagonistic to those of the Class or Subclasses, and Defendants have no defenses unique to Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and Subclasses, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to the Class or Subclasses.

59.  **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible

standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole.  The policies that Plaintiffs challenge apply to and affect members of the Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.  The factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Class are the same.

60.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct.  Absent a class action, it would be difficult for the individual members of the Class to obtain effective relief from Defendants.  Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court.  Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

61.     Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## COUNT I

### RIGHT TO FINANCIAL PRIVACY ACT
**12 U.S.C. §§ 3401, *et seq.***
**(Plaintiffs, on behalf of themselves, the Federal Defendant Class, the Western Union, Continental, Viamericas, and DolEx Subclasses, against All Defendants)**

62.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

63.     Plaintiffs and the Class and members of the Western Union, Continental, Viamericas, and DolEx Subclasses are persons under 12 U.S.C. § 3401(4).

64.     Plaintiffs and the Class and Western Union, Continental, Viamericas, and DolEx Subclass Members are customers under 12 U.S.C. § 3401(5) because they utilize the services of the MTB Defendants and other money transfer companies.

65.     The MTB Defendants are financial institutions under 12 U.S.C. § 3401(1) because they are consumer finance institutions located in the United States.

66.     The Federal Government Defendants are a government authority under 12 U.S.C. § 3401(3).

67.     Plaintiffs and the Class and Subclass Members transacted with the MTB Defendants when using their money transfer services.

68.     When Plaintiffs and the Class and Western Union, Continental, Viamericas, and DolEx Subclass Members send money transfers through the MTB Defendants, they provide detailed personally identifiable information about themselves and the recipient of the money transfer.

69.     The transaction information that the MTB Defendants store are financial records under 12 U.S.C. § 3401(2) because it is information pertaining to a customer's relationship with the financial institution.

70.     The MTB Defendants acted willfully and intentionally each time they provided financial records to federal government agencies through TRAC because that information was shared with government authorities, including the Federal Government Defendants.  12 U.S.C. § 3417(a)(3).

71.     The Federal Government Defendants violated the RFPA by gaining access to or obtaining copies of the financial information in the TRAC database.  12 U.S.C. § 3402.

72.     The Federal Government Defendants acted willfully and intentionally in having access to and obtaining copies of the information in Plaintiffs' and the Class and Western Union, Continental, Viamericas, and DolEx Subclass members' financial records through TRAC.  12 U.S.C. § 3417(a)(3).

73.     At no point did the Federal Government Defendants, or any government authority participating in TRAC, provide Plaintiffs or the Class or Western Union, Continental,

Viamericas, and DolEx Subclass Members with notice and information about how to object to the disclosure of their financial records as required under the RFPA. 12 U.S.C. §§ 3405(2), 3407(2).

74.     Plaintiffs and the Class and Western Union, Continental, Viamericas, and DolEx Subclass Members are entitled to statutory damages, punitive damages, and reasonable attorney's fees and costs for Defendants' violations of the RFPA. 12 U.S.C. § 3417(a).

75.     Plaintiffs and the Class and Western Union, Continental, Viamericas, and DolEx Subclass Members are also entitled to injunctive relief, including but not limited to barring the Federal Government Defendants from accessing financial records in violation of the RFPA, requiring the federal government to destroy all copies of such information obtained in violation of the RFPA, and prohibiting the MTB Defendants from providing access to or copies of information in the financial records to the federal government without complying with the RFPA. 12 U.S.C. § 3418.

## COUNT II

### California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq*.
### (Plaintiffs, on behalf of themselves and the California Subclass, against the MTB Defendants)

76.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

77.     The MTB Defendants engage in unlawful business practices by violating the California Financial Information Privacy Act, Cal. Fin. Code §§ 4050, *et seq*. ("Cal. FIPA").

78.     The Cal. FIPA prohibits financial institutions from sharing nonpublic personal information with any nonaffiliated third party, without the explicit prior consent of the consumer. Cal. Fin. Code § 4052.5.

79.     The purpose of Cal. FIPA is to ensure that consumers have a meaningful choice about whether their private financial information is shared with third parties. Cal. Fin. Code § 4051. When consumers are not given notice and the ability to decline to have their information shared as required by Cal. FIPA, consumers' privacy rights are violated.

80.     The MTB Defendants are financial institutions because they engage in money transfers. Cal. Fin. Code § 4052.

81.     Plaintiffs and the California Subclass are consumers because they are individuals who reside in California and obtain financial services from the MTB Defendants.

82.     Plaintiffs and the California Subclass were harmed when the MTB Defendants shared their private financial data with TRAC, the Federal Government Defendants, and other law enforcement agencies participating in TRAC because their privacy rights were violated.

83.     Had Plaintiffs and the California Subclass members known that their private financial records would be shared with state and federal law enforcement agencies around the country through TRAC, they would not have chosen to use and pay for the MTB Defendants' services.  The fact that private financial records would be shared with TRAC and dozens of state and federal law enforcement agencies would have been material to a reasonable consumer's choice whether to use a particular money transfer service.  Plaintiffs and the California Subclass members were harmed because they paid for a service they would not have paid for had they known the MTB Defendants would violate their privacy rights.

84.     Plaintiffs and the California Subclass Members have all been harmed by MTB Defendants' unlawful practices.  Plaintiffs and the California Subclass seek restitution of the transaction and service fees they paid to the MTB Defendants in connection with any transfers that were shared with TRAC, a permanent injunction to stop the MTB Defendants from continuing these policies and practices, and to require the MTB Defendants to request that TRAC delete all transaction data pertaining to Plaintiffs and the California Subclass members that was collected in violation of the UCL and Cal. FIPA.

## **PRAYER FOR RELIEF**

Plaintiffs Sequiera, Alegria, Cordero, and Lopez, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a)     Certifying this case as a class action on behalf of the Class and Subclasses defined above, appointing Plaintiffs Sequiera, Alegria, Cordero, and Lopez as representatives of the Class and the respective Subclasses, and appointing their counsel as Class Counsel;

b)     Declaring that Defendants' conduct, as set out above, is unlawful under the RFPA, 12 U.S.C. §§ 3401, *et seq*.

c)      Declaring that the MTB Defendants' conduct, as set out above, is unlawful under the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

d)      Enjoining the MTB Defendants from continuing to provide access to or copies of Plaintiffs' or the Class and Subclass members' consumer financial information to a federal government agency through TRAC or otherwise without complying with RFPA;

e)      Enjoining the Federal Government Defendants from continuing to have access to or obtain copies of Plaintiffs' and the Class Members' consumer financial information through TRAC or otherwise without complying with RFPA, and requiring them to destroy any copies of such information currently in their possession;

f)      Awarding the Class and the Western Union, Continental, Viamericas, and DolEx Subclasses statutory damages for each violation of the RFPA;

g)      Awarding the Class and the Western Union, Continental, Viamericas, and DolEx Subclasses punitive damages for violations of the RFPA;

h)      Awarding the California Subclass monetary restitution for violations of the UCL and Cal. FIPA, not to exceed the amount paid by California Subclass Members to the MTB Defendants in transaction or service fees;

i)      Awarding reasonable attorney's fees and expenses;

j)      Awarding pre- and post-judgment interest, to the extent allowable;

k)      Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class and Subclasses; and

l)      Awarding such other and further relief as equity and justice require, including but not limited to all forms of relief provided for under the UCL.

## **JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

1

2          Respectfully Submitted,

3          **NELSON SEQUIERA, ORSAY ALEGRIA,
           ISMAEL CORDERO, and RAUL LOPEZ**,
4          individually and on behalf of all others similarly
           situated,

5

Dated: December 12, 2022          By: /s/ Yaman Salahi

6

7          Rafey Balabanian (SBN 315962)
           rbalabanian@edelson.com
8          Yaman Salahi (SBN 288752)
           ysalahi@edelson.com
9          P. Solange Hilfinger-Pardo (SBN 320055)
           shilfingerpardo@edelson.com
10         EDELSON PC
           150 California St., 18th Floor
11         San Francisco, California 94111
           Tel: 415.212.9300
12         Fax: 415.373.9435

13         Sejal Zota (*pro hac vice* forthcoming)
           sejal@justfutureslaw.org
14         Dinesh McCoy (*pro hac vice* forthcoming)
           dinesh@justfutureslaw.org
15         Daniel Werner (SBN 322310)
           daniel@justfutureslaw.org
16         JUST FUTURES LAW
           95 Washington Street, Suite 104-149
17         Canton, MA 02021
           Tel: 617.812.2822

18
           *Counsel for Individual and Representative Plaintiffs*
19         *Nelson Sequiera, Orsay Alegria, Ismael Cordero,*
           *and Raul Lopez*

20

21

22

23

24

25

26

27

28