SIDLEY AUSTIN LLP
Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
Stephen Chang (SBN 312580)
stephen.chang@sidley.com
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Hille R. Sheppard (*pro hac vice*)
hsheppard@sidley.com
One South Dearborn
Chicago, Illinois  60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Attorneys for Defendant*
*Western Union Financial Services, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| NELSON SEQUEIRA, ORSAY ALEGRIA, and ISMAEL CORDERO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; WESTERN UNION FINANCIAL SERVICES, INC., a Colorado corporation; CONTINENTAL EXCHANGE SOLUTIONS, INC., a Kansas corporation, d/b/a RIA FINANCIAL SERVICES and AFEX MONEY EXPRESS; VIAMERICAS CORPORATION, a Delaware Corporation; and DOLEX DOLLAR EXPRESS, INC., a Texas corporation,<br><br>Defendants. | Case No. 4:22-cv-07996-HSG<br><br>**DEFENDANT WESTERN UNION FINANCIAL SERVICES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date:  May 18, 2023<br>Time:  2:00 PM<br>Place:  Courtroom 2, 4th Floor, Oakland<br>Judge:  Honorable Haywood S. Gilliam, Jr.<br><br>Amended Complaint Filed: January 24, 2023 |

### NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

**PLEASE TAKE NOTICE** that on May 18, 2023, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom No. 2 of the above entitled Court, located at 1301 Clay Street, Oakland, CA 94612, before the Honorable Haywood S. Gilliam, Jr., Defendant Western Union Financial Services, Inc. ("Western Union") will and hereby does move the Court for an order dismissing with prejudice the First Amended Class Action Complaint ("Amended Complaint" or "Am. Compl.") (ECF No. 38).

Western Union moves to dismiss both causes of action: Count One, for alleged violations of the Right to Financial Privacy Act, 12 U.S.C. §§ 3401 *et seq.*, and Count Two, for alleged violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* Western Union makes this motion pursuant to Federal Rule of Civil Procedure 12(b)(6) because the Amended Complaint fails to state a claim upon which relief can be granted.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Request of Judicial Notice and Consideration of Documents Incorporated by Reference, the Declaration of Sheila A.G. Armbrust and attached exhibits, the record in this action, and any oral argument permitted by the Court.

Dated: March 3, 2023                              Respectfully submitted,


                                                  */s/ Hille R. Sheppard*
                                                  Hille R. Sheppard
                                                  Sheila A.G. Armbrust
                                                  Stephen Chang
                                                  SIDLEY AUSTIN LLP

                                                  Attorneys for Defendant
                                                  Western Union Financial Services, Inc.

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................................. 1

II.     BACKGROUND .................................................................................................................. 2

     A.      From 2010 Until 2019, Western Union Was Required To Produce Records Under A Court-Ordered Settlement Agreement And Monitorship. ............................................. 2

     B.      From 2019 Through 2022, Western Union Was Required To Produce Records Pursuant To Compulsory Customs Summonses. ................................................................. 4

III.    LEGAL STANDARD............................................................................................................ 6

IV.     ARGUMENT ....................................................................................................................... 6

     A.      Count One Should Be Dismissed Because The RFPA Does Not Apply To Western Union................................................................................................................................ 6

         1.      Western Union Is Not A "Financial Institution" As That Term Is Defined In The RFPA. ....................................................................................................... 6

         2.      Productions To The State Of Arizona Are Not Covered By The RFPA Because Arizona Is Not A "Government Authority" Under The RFPA. ......... 9

     B.      Counts One and Two Should Be Dismissed Because Western Union's Productions Fall Within The Bank Secrecy Act's Safe Harbor..................................................... 10

     C.      Count Two Also Should Be Dismissed Because Plaintiffs Fail To State A Claim Under Law. ................................................................................................................. 12

         1.      Plaintiffs Lack Standing To Bring A Claim Under The California UCL. ....... 13

         2.      Western Union's Productions Are Exempt From Liability Under Cal. FIPA. ..................................................................................................... 14

V.      CONCLUSION.................................................................................................................. 18

i

DEFENDANT WESTERN UNION FINANCIAL SERVICES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS
AMENDED COMPLAINT, CASE NO. 4:22-CV-07996-HSG

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Al-Ahmed v. Twitter, Inc.*,

5
   603 F. Supp. 3d 857 (N.D. Cal. 2022) ................................................................................6

6

*Arizona v. United States*,
   567 U.S. 387 (2012) ...........................................................................................................17

7

8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .........................................................................................................6, 8

9

*Bell Atl. Corp. v. Twombly*,

10
   550 U.S. 544 (2007) .........................................................................................................6, 8

11

*Budowich v. Pelosi*,
   No. 21-3366 (JEB), 2022 WL 2274359 (D.D.C. June 23, 2022) ....................................15, 16, 17

12

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,

13
   20 Cal.4th 163 (1999) ........................................................................................................13

14

*Commodity Futures Trading Comm'n v. Worth Bullion Group*,

15
   717 F.3d 545 (7th Cir. 2013) ......................................................................................7, 8, 9

16

*Coronado v. Bank Atlantic Bancorp, Inc.*,
   222 F.3d 1315 (11th Cir. 2000) ....................................................................................11, 12

17

*Crosby v. Nat'l Foreign Trade Council*,

18
   530 U.S. 363 (2000) ........................................................................................................12, 16

19

*Hartless v. Clorox*,

20
   2007 WL 3245260 (S.D. Cal. Nov. 2, 2007) ....................................................................14

21

*Lopez v. First Union Nat. Bank of Fla.*,
   129 F.3d 1186 (11th Cir. 1997) ....................................................................................11, 12

22

23

*Newton v. Am. Debt Svcs., Inc.*,
   75 F. Supp. 3d 1048 (N.D. Cal. 2014) ..........................................................................13, 14

24

*O'Donnell v. Bank of Am., Nat. Ass'n*,
   504 Fed. Appx. 566 (9th Cir. 2013) ..................................................................................13

25

26

*Oneok v. Learjet, Inc.*,
   575 U.S. 373 (2015) ........................................................................................................12, 16

27

*S.E.C. v. Jerry T. O'Brien, Inc.*,

28
   467 U.S. 735 (1984) ...........................................................................................................1

ii

DEFENDANT WESTERN UNION FINANCIAL SERVICES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS
AMENDED COMPLAINT, CASE NO. 4:22-CV-07996-HSG

*Salinas v. United States R.R. Ret. Bd.*,
   141 S. Ct. 691 (2021) ................................................................................................9

*Shaeffer v. Califia Farms, LLC*,
   44 Cal. App. 5th 1125 (2020) ................................................................................13

*Silva v. AvalonBay Communities, Inc.*,
   No. LACV1504157JAKPLAX, 2015 WL 11422302 (C.D. Cal. Oct. 8, 2015) ..................... 13-14

*Sornberger v. First Midwest Bank*,
   278 F. Supp. 2d 935 (C.D. Ill. 2002) ......................................................................17

*Widi v. McNeil*,
   No. 2:12-cv-00188, 2013 WL 5407457 8 (D. Me. Sept. 25, 2013) ............................................12

*Zhang v. Superior Ct.*,
   57 Cal. 4th 364 (2013) ..........................................................................................14

**Statutes**

12 U.S.C. § 1843(k)(4) ..............................................................................................14

12 U.S.C. § 3401 ...............................................................................................7, 9

12 U.S.C. § 3402 ......................................................................................................9

12 U.S.C. § 3414(a) ..................................................................................................9

19 U.S.C. § 1509 ...........................................................................5, 12, 15, 16, 17

31 U.S.C. § 5312 ................................................................................................9, 10

31 U.S.C. § 5318(g)(3) ("Annunzio-Wylie Anti-Money Laundering Act of 1992") ..............10, 11, 12

Bank Secrecy Act ("BSA") ...............................................................................1, 8, 9, 10

Cal. Bus. & Prof. Code § 17200 .............................................................................13

Cal. Fin. Code § 4052 ..............................................................................................14

Cal. Fin. Code § 4056 ...............................................................................15, 16, 17

Cal. Fin. Code § 4057 ..............................................................................................14

California Financial Information Privacy Act ("FIPA") ....................................................... *passim*

California Unfair Competition Law ("UCL") ..............................................1, 13, 14, 15, 17

Fed. R. Civ. P. 12(b)(6) ............................................................................................6

DEFENDANT WESTERN UNION FINANCIAL SERVICES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS
AMENDED COMPLAINT, CASE NO. 4:22-cv-07996-HSG

U.S. Const., art. VI, cl. 2 ("Constitution's Supremacy Clause") ...................................................12, 16

**Other Authorities**

Dustin Volz and Bryan Tau, *Little-Known Surveillance Program Captures Money Transfers Between U.S. and More than 20 Countries*, WALL STREET JOURNAL, Jan. 18, 2023 ...............................................................................................................................5

Department of Justice, *Criminal Resource Manual*, WWW.JUSTICE.GOV (last updated Jan. 22, 2020)...........................................................................................................................7

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.  INTRODUCTION

3       Plaintiffs bring this lawsuit against Western Union, three other money transfer businesses,

4  and two federal government defendants based on novel, infirm legal theories that have not been

5  adopted by any court in the country. Plaintiffs ask this Court to impose liability on Western Union

6  for producing money transfer records to law enforcement without advance notice to its customers—

7  even where Western Union did so to comply with court orders and compulsory administrative

8  subpoenas from law enforcement. Plaintiffs' theories under the federal Right to Financial Privacy

9  Act ("RFPA") and under the California Unfair Competition Law ("UCL") and California Financial

10  Information Privacy Act ("Cal. FIPA") both fail to state a claim for relief.

11       The Supreme Court has held that the "most salient feature" of the RFPA is "the narrow scope

12  of the entitlements it creates." *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984). Yet, in

13  Count One, Plaintiffs ask this Court to extend the reach of the RFPA to hold Western Union liable

14  for producing money transfer records to state and federal law enforcement pursuant to court orders

15  and compulsory administrative subpoenas. This claim fails because money transfer businesses fall

16  outside the narrow reach of the RFPA. To hold otherwise would contort the clear intent of Congress.

17  Further, under its express terms, the RFPA does not extend to any of Western Union's productions to

18  the State of Arizona.

19       Both of Plaintiffs' claims are barred because Western Union's production of money transfer

20  records pursuant to court orders and compulsory administrative subpoenas are protected by a safe

21  harbor in the Bank Secrecy Act ("BSA").

22       Count Two also fails for two additional reasons. First, Plaintiffs lack standing to bring a

23  claim for unlawful conduct under the UCL where Cal. FIPA contains no private right of action.

24  Second, enumerated exceptions to Cal. FIPA permitted Western Union to produce money transfer

25  records without consumer notice in order to abide by court orders and comply with compulsory

26  administrative subpoenas from law enforcement.

27       Western Union's productions of money transfer records to law enforcement, as alleged by

28

1

Plaintiffs, do not give rise to causes of action under either federal or state law. Because it does not state a claim, the Amended Complaint should be dismissed with prejudice.[1]

## II.    BACKGROUND

Western Union is incorporated and headquartered in the State of Colorado. Am. Compl. ¶ 6. As Plaintiffs allege, companies like Western Union provide an important service "enabling people to send and receive money across borders." *Id.* ¶ 22. Money transfers, as alleged in the Amended Complaint, involve transfers of money between two individuals:

> To effectuate a money transfer, a sender typically brings cash to a money transfer business's brick and mortar location. A business representative will receive the cash and arrange for a transfer to the location specified by the sender. Once the transaction is processed, the beneficiary or recipient of the transfer need only visit the appropriate branch of a money transfer business, where the money is delivered to them.

*Id.* ¶ 23. The Amended Complaint states that Plaintiffs Sequeira and Cordero each used Western Union's money transfer services to send money to "family abroad." *Id.* ¶¶ 53, 55.

Plaintiffs' claims against Western Union involve two distinct time periods during which Western Union was required to produce money transfer records: first, the period from 2010 through June 30, 2019, when Western Union produced records to the State of Arizona pursuant to court orders; and second, the time period from July 1, 2019 through 2022, when Western Union produced records pursuant to compulsory customs summonses, a type of administrative subpoena, issued by a federal law enforcement agency, Homeland Security Investigations ("HSI"), which is part of the Department of Homeland Security ("DHS").

### A.    From 2010 Until 2019, Western Union Was Required To Produce Records Under A Court-Ordered Settlement Agreement And Monitorship.

First, Plaintiffs allege that, between 2010 and 2019, Western Union produced money transfer

---

[1] Western Union also is evaluating bringing a motion to compel arbitration because the terms and conditions governing its money transfer services contain an arbitration clause. Western Union currently lacks key identifying information about Plaintiffs Sequeira and Cordero, the two Plaintiffs who allege they sent money via Western Union. Western Union has issued limited discovery requests to Plaintiffs Sequeira and Cordero to obtain this information and is awaiting their responses.

records to the State of Arizona pursuant to an "agreement" between Western Union and the Arizona Attorney General. Am. Compl. ¶¶ 28-33. Plaintiffs allege that these money transfer records ultimately were shared with the Arizona Financial Crimes Task Force ("AZFCTF") through its Transaction Record Analysis Center ("TRAC"). *See id.* ¶¶ 28-29, 48. Plaintiffs allege TRAC was founded in 2014 and composed of the Arizona Attorney General's Office, the Phoenix Police Department, and the Arizona Department of Public Safety. *See id.* ¶¶ 28-29, 48. Plaintiffs further allege that, by 2017, TRAC had a "close relationship" with HSI. *Id.* ¶ 30.

Western Union's production of money transfer records to Arizona followed years of litigation that resulted in a court-ordered settlement agreement and monitorship that required Western Union to produce the records. Specifically, in 2006, the Arizona Attorney General attempted to obtain money transfer records from Western Union by "serving [the company] with a warrant for data regarding every person-to-person transaction over $500 … sent from multiple states to Sonora, Mexico." *Id.* ¶ 27. Western Union vehemently opposed this attempt, litigating the issue all the way to the Arizona Supreme Court. *Id.* In February 2010, the Arizona Attorney General and Western Union entered the "agreement" cited by Plaintiffs, which was a lengthy settlement agreement (the "Arizona Settlement Agreement"). *See id.* ¶ 28; Armbrust Decl., Ex. A[2] (Arizona Settlement Agreement); Armbrust Decl., Ex. B (2010 Arizona Court Order).

The Arizona Settlement Agreement was approved in full in a February 24, 2010 order ("2010 Arizona Court Order") by the Superior Court of the State of Arizona in and for the County of Maricopa (the "Arizona Court"). Armbrust Decl., Ex. B at 6. The Arizona Court ordered the appointment of an independent Monitor. *Id.* at 4.

The Arizona Court also ordered Western Union to turn over certain money transfer records to the State of Arizona and certain other states in the Southwest Border Area,[3] and to do so in an

---

[2] The exhibits attached to the Declaration of Sheila A.G. Armbrust are judicially noticeable and incorporated by reference. *See* Defendant Western Union Financial Services, Inc.'s Request for Judicial Notice and Consideration of Documents Incorporated by Reference in Support of Motion to Dismiss Amended Complaint, filed concurrently herewith.

[3] The 2010 Settlement Agreement defines the Southwest Border Area to be all of Arizona and the area within 200 miles north and south of the United States/Mexico border, which includes portions of California, New Mexico, Texas, and Mexico. Armbrust Decl., Ex. A at 2.

3

1    ongoing manner through the term of the Monitor's engagement. Specifically, the 2010 Arizona

2    Court Order required:

3            <u>TURN OVER TO MONITOR AND STATES</u>. IT IS FURTHER
             ORDERED that Western Union, upon service of this Order upon them,
4            shall deliver to the Monitor … and to the State, the materials described
             in … the Agreement and the data described in … the Monitor
5            Engagement Letter implementing the Agreement, which includes full
             transaction data relating to all person-to-person transactions sent to or
6            from authorized delegate/Agent locations within the Southwest Border
             Area from January 1, 2005, to the present and throughout the term of
7            the Monitor's Engagement involving transactions in amounts of $500
             or more.
8

9    *Id.* at 7; *see also* Am. Compl. ¶ 28 (discussing settlement agreement and Arizona Attorney General's

10   "intent to share the data produced by Western Union with other state and federal law enforcement

11   officials"). The Arizona Settlement Agreement, which incorporated a Monitor engagement letter,

12   required Western Union to produce the money transfer records discussed above. Armbrust Decl.,

13   Ex. A at 6 (Arizona Settlement Agreement ¶ 17.1) and 35 (Monitorship Engagement Letter ¶ 32.5);

14   Am. Compl. ¶ 28.

15          In January 2014, the Arizona Attorney General's Office, in coordination with other Arizona

16   state agencies, "expanded the existing [settlement] agreement with Western Union" and at that time

17   founded TRAC. Am. Compl. ¶ 29. On January 31, 2014, the Arizona Court approved an amendment

18   to the Arizona Settlement Agreement and ordered Western Union to continue producing to Arizona

19   the specified money transfer records for another five years, until January 30, 2019. Armbrust Decl.,

20   Ex. C at 4 (Jan. 2014 Arizona Court Order); Armbrust Decl., Ex. D at 19 (Jan. 2014 Settlement

21   Amendment, ¶ 17.1.6). On October 17, 2014, the Arizona Court ordered Western Union to continue

22   producing to Arizona the specified money transfer records until June 30, 2019. Armbrust Decl.,

23   Ex. E (Oct. 2014 Arizona Court Order). Nearly five years later, the Arizona Court held that Western

24   Union's obligations to produce money transfer records to Arizona would expire as of June 30, 2019.

25   *See* Am. Compl. ¶ 34; Armbrust Decl., Ex. F (2019 Arizona Court Order).

26          **B.      From 2019 Through 2022, Western Union Was Required To Produce Records
                      Pursuant To Compulsory Customs Summonses.**
27

28          Second, Plaintiffs allege that, in 2019, federal agents from DHS "stepped in to try to fill the

                                                     4

void left by the expiration of the Arizona Attorney General's agreement with Western Union." Am. Compl. ¶ 35. According to Plaintiffs, "the HSI Special Agent in charge of Phoenix began issuing a series of requests to Western Union every six months directing the company to continue transmitting records of money transfers to TRAC." *Id.* ¶ 35. Plaintiffs acknowledge that the "requests" that HSI "issued" were "customs summons." *Id.* ¶¶ 35, 46; Armbrust Decl., Ex. H (describing HSI issuance of "customs summons" every six months); *see also* 19 U.S.C. § 1509(a)(2) (providing authority for customs summons).

Plaintiffs filed this lawsuit after "press reports" from "earlier this year" "exposed" what they call an "unlawful surveillance program." Am. Compl. ¶¶ 1, 13. These reports followed Senator Ron Wyden's March 8, 2022 letter to the Inspector General of DHS (the "2022 Wyden Letter"), which raised concerns about "HSI's bulk data collection program" through which HSI used "customs summons" to obtain money transfer records, including from Western Union. *See id.* ¶¶ 34, 42; Armbrust Decl., Ex. H (2022 Wyden Letter).

As Plaintiffs allege, on January 18, 2023, Senator Wyden sent another letter to the United States Department of Justice Inspector General ("2023 Wyden Letter"). Am. Compl. ¶ 45 Senator Wyden wrote: "In a February 18, 2022, briefing, senior HSI personnel informed my office that HSI had issued customs summonses, starting in July 2019, to Western Union[.]" Armbrust Decl., Ex. G at 2; *see also* Am. Compl. ¶ 46 (quoting a January 18, 2023 Wall Street Journal article describing customs summonses).[4] Plaintiffs allege that "the HSI custom summonses requested that the data at issue be delivered to TRAC." Am. Compl. ¶ 46.

Plaintiffs allege that "HSI's bulk data collection was continuous and extensive until 2022 when Senator Ron Wyden raised concerns about the program, ultimately resulting in a suspension of HSI's role in requesting the data in question from Western Union." *Id.* ¶ 42; *see also* Armbrust

---

[4] The article states: "Mr. Wyden determined last year that the federal government participated in TRAC, and specifically that Homeland Security Investigations … used customs summonses, a type of subpoena, to collect about six million records from Western Union … since 2019." Dustin Volz and Bryan Tau, *Little-Known Surveillance Program Captures Money Transfers Between U.S. and More Than 20 Countries*, THE WALL STREET JOURNAL, Jan. 18, 2023, https://www.wsj.com/articles/little-known-surveillance-program-captures-money-transfers-between-u-s-and-more-than-20-countries-11674019904.

Decl., Ex. H at 2 (2022 Wyden Letter) ("After my staff contacted HSI about the program in January 2022, HSI immediately terminated the program.").

Plaintiffs do not allege that Western Union produced any records to TRAC that were not compelled by the Arizona Court Orders[5] or the HSI customs summonses.

## III.  LEGAL STANDARD

Dismissal is appropriate under Rule 12(b)(6) when a claimant's allegations fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In making this determination, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotes and citation omitted). Facts subject to judicial notice may be considered on a motion to dismiss, and the doctrine of incorporation by reference permits a district court to consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to … the pleadings." *Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 866 (N.D. Cal. 2022).

## IV.  ARGUMENT

### A.  Count One Should Be Dismissed Because The RFPA Does Not Apply To Western Union.

#### 1.  Western Union Is Not A "Financial Institution" As That Term Is Defined In The RFPA.

No court has ever held that money transfer businesses are subject to the consumer notice requirements of the RFPA. And for good reason: money transfer businesses are not included in the list of "financial institutions" covered by the RFPA.[6] The RFPA defines the term "financial institution" as follows:

---

[5] "Arizona Court Orders" refers collectively to the 2010, 2014, and 2019 Arizona Court Orders defined above.

[6] Indeed, a now-archived 2020 version of the Department of Justice's *Criminal Resource Manual* expressly states, "Institutions not covered by the [RFPA] include … Western Union." Department of

6

> [E]xcept as provided in section 3414 of this title, ["financial institution"] means any office of a bank, savings bank, card issuer as defined in section 1602(n)[1] of title 15, industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution, located in any State or territory of the United States, the District of Columbia, Puerto Rico, Guam, American Samoa, or the Virgin Islands[.]

12 U.S.C. § 3401(1).

The money transfer activities alleged by Plaintiffs (*see* Am. Compl. ¶¶ 22-23) plainly do not qualify Western Union as a "bank," "savings bank," "savings association," "credit union," or any enumerated bank-like entity described in Section 3401(1). Plaintiffs do not contend otherwise; indeed, they even assert that "[m]any money transfer consumers are unbanked." Am. Compl. ¶ 25. Rather, Plaintiffs appear to claim that Western Union comes within the RFPA's definition because it is a "consumer finance institution." Am. Compl. ¶¶ 14, 67. Plaintiffs are wrong.

The Seventh Circuit, the only circuit court to address the RFPA's definition of "consumer finance institution," has held that this term cannot be construed to include businesses that do not provide financing as a core part of their business. *Commodity Futures Trading Comm'n v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 551-52 (7th Cir. 2013). In *Worth*, the government served administrative subpoenas on three companies that conduct business in the precious metals market. *Id.* at 546-47. Because the government had not complied with the RFPA's notice requirements, and because the companies asserted they were "consumer finance institutions" as that term is used in the RFPA, the companies redacted customer information from their productions and thus failed to comply in full with the subpoenas. *Id.* at 548-49. Both the district court and the Seventh Circuit rejected this position, concluding that the RFPA did not apply to the companies because they were not "consumer finance institutions" under the RFPA. *Id.* at 551. In giving meaning to the term "consumer finance institution," *Worth* evaluated the list of entities included in the RFPA's definition

---

Justice, *Criminal Resource Manual*, WWW.JUSTICE.GOV, https://www.justice.gov/archives/jm/criminal-resource-manual-402-financial-institutions-covered (last updated Jan. 22, 2020). Additionally, in the letters that appear to have prompted this lawsuit, Senator Wyden made clear his understanding that the RFPA does not apply to money transfer businesses, repeating in each of his letters: "money transfer businesses are not subject to the same protections as bank-based transactions under the [RFPA]." Armbrust Decl., Exs. G and H.

1   of "financial institution," holding that "all of the referenced entities surrounding the phrase

2   'consumer finance institution' … considerably convey more than a tangential or secondary

3   relationship to the field of financing. Rather, a primary reason each of these entities exists is to

4   provide financing and cash loans to the general public, making these services a core function and

5   purpose of such businesses." *Id.* at 551-52. The Seventh Circuit held that the RFPA did not apply to

6   the precious metals companies because, even though two of the companies (a wholesaler and

7   retailer) regularly extended financing to their customers to purchase precious metals, "the provision

8   of financing is not a defining characteristic of appellants' business; rather, it is merely a means to an

9   end, the real or primary goal of the transaction being a sale of precious metals." *Id.* at 551.

10      Here, just as in *Worth*, "the provision of financing is not a defining characteristic" of

11   Western Union's business. To the contrary, Plaintiffs' allegations focus entirely on the provision of

12   money transfer services, which do not involve loans or any sort of financing at all. Plaintiffs do not

13   plausibly allege that Western Union carries out any lending or financing activities.[7] Notably,

14   Plaintiffs do not allege that Western Union had any license to engage in lending, and indeed

15   Western Union's license to do business in California makes clear that it is licensed solely as a money

16   transmitter. *See* https://dfpi.ca.gov/2018/03/15/western-union-financial-services-inc/. Thus, Western

17   Union is not a consumer finance institution as that term is used in the RFPA.

18      *Worth* also forecloses any argument that the broader definition of "financial institution" in

19   the Bank Secrecy Act ("BSA") should apply to Plaintiffs' claims. Section 3401(1) of the RFPA

20   contains an express exception that makes clear that the RFPA's general definition of "financial

21   institution" does not apply to the provision of the RFPA that addresses counterintelligence,

22

23   _____

    [7] The Amended Complaint contains one conclusory assertion that Western Union provides "lending
24   services," Am. Comp. ¶ 6, but "naked assertion[s] devoid of further factual enhancement" are
    insufficient at the pleading stage. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Apart
25   from this one stray and unexplained assertion that Western Union engages in lending, the Amended
    Complaint is solely focused on Western Union's money transfer services, both in general discussion
26   about person-to-person transactions and in relation to Plaintiffs' allegations. In fact, it repeatedly
    refers to Western Union and the other non-government defendants as the "Money Transfer Business
27   Defendants" or "MTB Defendants." *See, e.g.*, Am. Compl. ¶¶ 6, 27, 32, 35, 53, and 55. Further,
    Plaintiffs Sequeira and Cordero each allege that they "used Western Union to send money … to …
28   family abroad." *Id.* ¶¶ 53, 55. They fail to allege that any Plaintiff used Western Union for lending
    services, or that lending services have any relationship to this litigation.

terrorism, and Secret Service investigations. 12 U.S.C. § 3414(a). In Section 3414, Congress expressly incorporated a different, broader definition of the term "financial institution" from the BSA. 31 U.S.C. § 5312. The BSA defines "financial institution" to embrace an unusually wide range of actors—including money transfer businesses. *See id.* § 5312(a)(2)(R). Thus, Congress chose to make money transfer businesses subject to only one, narrow provision of the RFPA (applicable only to intelligence and national security investigations), and not the rest of the statute. *Worth* reasoned that the RFPA incorporates the BSA's definition of "financial institution" only for counterintelligence, terrorism, and Secret Service investigations, and thus there is no basis for applying this broader definition to investigations outside of that narrow scope. 717 F. 3d at 552-53. The Court should give effect to that policy choice in narrowly interpreting the term "financial institution" as applied to Plaintiffs' claims. *See, e.g.*, *Salinas v. United States R.R. Ret. Bd.*, 141 S. Ct. 691, 698 (2021) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Plaintiffs have not plausibly alleged that Western Union is a "financial institution" or a "consumer finance institution" within the meaning of Section 3401 of the RFPA. Because the RFPA therefore does not apply to Western Union, Count One should be dismissed.

### 2. Productions To The State Of Arizona Are Not Covered By The RFPA Because Arizona Is Not A "Government Authority" Under The RFPA.

Count One also fails to the extent it relies on productions to the State of Arizona, which Plaintiffs allege Western Union made from 2010 through the first half of 2019. Am. Compl. ¶¶ 28-34. This is because productions to a State—not to a federal authority—are not covered by the RFPA. The RFPA applies only to "Government authority" access to or receipt of records from financial institutions. 12 U.S.C. § 3402. "Government authority" is defined to include only the federal government: "any agency or department of the United States, or any officer, employee, or agent thereof[.]" 12 U.S.C. § 3401(3). Plainly, the State of Arizona is not a "Government authority" within the meaning of the RFPA.

Plaintiffs do not allege that Western Union produced any records directly to Government

9

1    authorities as that phrase is defined in the RFPA—*i.e., federal government authorities*—until 2019.[8]

2    Although Plaintiffs allege that the State of Arizona provided federal authorities with access to the

3    TRAC database, Plaintiffs do not allege that Western Union produced any money transfer records in

4    response to requests from HSI, U.S. Immigration and Customs Enforcement ("ICE"), or any other

5    federal agency or federal authority before 2019. Because Plaintiffs fail to allege that Western Union

6    produced money transfer records to any federal agency until 2019, Plaintiffs have failed to state a

7    claim for which relief can be granted under the RFPA from 2010 through June 30, 2019, when the

8    Arizona Court Orders expired. *See* Am. Compl. ¶ 34.

9         Because the RFPA does not apply to productions to non-federal actors, Count One also

10   should be dismissed as to Western Union to the extent it is based on productions to the State of

11   Arizona prior to June 30, 2019.

12        **B.    Counts One and Two Should Be Dismissed Because Western Union's**
          **Productions Fall Within The Bank Secrecy Act's Safe Harbor.**

13

14        Counts One and Two both fail for an independent reason: Western Union's productions of

15   money transfer records—to the State of Arizona pursuant to Court orders and to HSI pursuant to

16   compulsory customs summonses—are protected by the safe harbor in the Annunzio-Wylie Anti-

17   Money Laundering Act of 1992, which amended the BSA (hereafter "the Annunzio-Wylie Act").

18   31 U.S.C. § 5318(g)(3)(A). In that safe harbor, the Annunzio-Wylie Act provides "financial

19   institutions"[9] (but not any government or agency of government) immunity from civil liability for

20   disclosures made pursuant to a legal authority:

21             Any financial institution that … makes a disclosure pursuant to this
               subsection *or any other authority* … shall not be liable to any person
22             under any law or regulation of the United States … for any failure to
               provide notice of such disclosure to the person who is the subject of
23             such disclosure.

24

25   _____

     [8] Plaintiffs even acknowledge that, before 2017, TRAC documents "touted TRAC's *goal* of
26   leveraging the analytical resources of federal law enforcement agencies," and that only "[b]y 2017"
     had "TRAC [] cemented a close working relationship with ICE subcomponent HSI." Am. Compl.
27   ¶ 30.

     [9] In contrast to the RFPA, the BSA, which the Annunzio-Wiley Act amends, explicitly includes
28   money transmitters within the definition of a "financial institution." 31 U.S.C. § 5312(2)(R).

10

DEFENDANT WESTERN UNION FINANCIAL SERVICES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS
AMENDED COMPLAINT, CASE NO. 4:22-CV-07996-HSG

*Id.* (emphasis added). Courts have interpreted the reference to "other authority" (which they refer to as the Annunzio-Wylie Act's "third safe harbor") as extending the safe harbor to productions made pursuant to *legal* authority, such as a statute, court order, or subpoena. The Eleventh Circuit explained:

> Because the second safe harbor ["makes a disclosure pursuant to this subsection"] protects disclosures pursuant to the legal authority of the Treasury Secretary's regulations, "other authority" means authority other than the Treasury Secretary's regulations. The "other authority" must be legal authority, … *e.g.*, statutes, regulations, court orders, etc. Hence, for a financial institution's disclosure to fall within the confines of the third safe harbor ["pursuant to … any other authority"], the financial institution must be able to point to a statute, regulation, court order, or other source of law that specifically or impliedly authorized the disclosure. If it cannot do so, the disclosure is not entitled to the protection of the safe harbor.

*Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186, 1193-94 (11th Cir. 1997). *Lopez* held that a bank's disclosure of customer financial records pursuant to a seizure warrant in alleged violation of the RFPA was protected by the Annunzio-Wylie Act's safe harbor for disclosures made pursuant to "other authority." *Id.* (citing 31 U.S.C. § 5318(g)(3)). The Eleventh Circuit explained that a seizure warrant represents "a judicial determination that the government had a legal right to obtain [the plaintiff's] financial records," and that the bank "was neither required nor permitted to sit in review of the court's legal determination. It is immune from any liability for any disclosures made pursuant to the seizure warrant." *Id.*

Similarly, in *Coronado v. Bank Atlantic Bancorp, Inc.*, 222 F.3d 1315 (11th Cir. 2000), the Eleventh Circuit held that the Annunzio-Wylie Act safe harbor shielded the defendant bank from liability under the RFPA for production of bank records to law enforcement in response to grand jury subpoenas. Drawing on *Lopez*, *Coronado* distinguished between "a mere verbal request from a government agent" and a grand jury subpoena, concluding that the latter has the force of law because "there is a legal mechanism" for enforcement. *Id.* at 1320. *Coronado* further reasoned that "[f]orcing a bank to challenge a facially valid grand jury subpoena in order to avoid liability to … its customers would fly in the face of … the Annunzio-Wylie Act's clear intent to encourage cooperation with money laundering investigations." *Id.* at 1321. *Coronado* concluded that it was proper to label

11

"grand jury subpoenas, like search warrants or court orders, 'legal authority' under *Lopez*," and "that a grand jury subpoena qualifies as 'other authority' under the Annunzio-Wylie Act's third safe harbor." *Id.*; *see also Widi v. McNeil*, No. 2:12-cv-00188, 2013 WL 5407457, at *8 (D. Me. Sept. 25, 2013) ("Whatever else 'other authority' means [in 31 U.S.C. § 5318(g)(3)], it applies to the legal mandate of a grand jury to produce records.").

Western Union's productions of money transfer records in response to the Arizona Court Orders were made pursuant to "legal" authority under *Lopez* and *Coronado*. And, similar to the subpoenas at issue in *Coronado*, Western Union produced money transfer records to HSI pursuant to compulsory customs summonses, which impose penalties up to $100,000 for noncompliance and allow HSI to seek enforcement. 19 U.S.C. § 1509 (g)(2), (6). Western Union was neither required nor permitted to sit in review of the Arizona Court's legal determination, nor was Western Union required to challenge a subpoena from HSI. Therefore, pursuant to the Annunzio-Wylie Act's safe harbor, Western Union is immune from liability for its productions to the State of Arizona pursuant to Court order and in response to compulsory customs summonses from HSI.

This immunity applies not only to the federal RFPA claim, but also to Count Two's UCL claim based on Cal. FIPA because, otherwise, state law would override Congress's decision to provide a safe harbor. Preemption derives from the U.S. Constitution's Supremacy Clause, which directs that the "Laws of the United States … shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. Federal law prevails and preempts state law, even in the absence of an express preemption provision, where "compliance with both federal and state law is impossible," or where, as here, "the state law stands as an obstacle to the accomplishment and execution of the full purposes of Congress." *Oneok v. Learjet, Inc.*, 575 U.S. 373, 373, 377 (2015). State law is preempted "to the extent of *any* conflict with a federal statute," particularly so where its enforcement "undermines" the "natural effect" of a federal law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Counts One and Two should both be dismissed as barred by the Annunzio-Wiley Act safe harbor.

**C.      Count Two Also Should Be Dismissed Because Plaintiffs Fail To State A Claim Under Law.**

Count Two also fails for two additional reasons: First, Plaintiffs lack standing to bring a

12

DEFENDANT WESTERN UNION FINANCIAL SERVICES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT, CASE NO. 4:22-CV-07996-HSG

1    claim under the UCL where Cal. FIPA contains no private right of action. Second, Western Union's

2    productions of money transfer records in response to court orders and administrative subpoenas,

3    even without explicit prior customer consent, fall within statutory exceptions that were designed to

4    ensure that California's financial privacy statute would not interfere with law enforcement activity.

5    Because Plaintiffs cannot allege that Western Union violated Cal. FIPA, Plaintiffs' UCL claim set

6    forth in Count Two should be dismissed.

7              1.      **Plaintiffs Lack Standing To Bring A Claim Under The California UCL.**

8              Cal. FIPA contains no private right of action, and thus Plaintiffs lack standing to bring a

9    claim for unlawful conduct under the UCL. To state a UCL claim, a plaintiff must show an

10   "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Plaintiffs

11   plead that Western Union engaged in unlawful business practices in violation of the UCL, Am.

12   Compl. ¶ 79, bringing their claim under the "unlawful" prong of the UCL. "By proscribing any

13   unlawful business practice, Section 17200 borrows violations of other laws and treats them as

14   unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech*

15   *Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999) (internal quotes and

16   citation omitted). Therefore, to pursue a UCL claim under the "unlawful" prong of Section 17200,

17   Plaintiffs must allege a predicate violation of law, *i.e.*, that a challenged practice "violates any

18   federal or California statute or regulation." *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125,

19   1136 (2020). Furthermore, courts find that plaintiffs lack standing to bring suit under the "unlawful"

20   prong of the UCL where the underlying statute does not contain a private right of action. *See*

21   *O'Donnell v. Bank of Am., Nat. Ass'n*, 504 Fed. Appx. 566 (9th Cir. 2013) (affirming dismissal of

22   UCL claim based on alleged violation of the Federal Trade Commission Act because statute did not

23   create a private right of action); *Newton v. Am. Debt Svcs., Inc.*, 75 F. Supp. 3d 1048 (N.D. Cal.

24   2014) (holding that UCL claim cannot be predicated on Federal Insecticide, Fungicide, and

25   Rodenticide Act ("FIFRA") due to Congress's rejection of private actions to enforce FIFRA);

26   *Hartless v. Clorox*, 2007 WL 3245260, at *4 (S.D. Cal. Nov. 2, 2007) (same); *Silva v. AvalonBay*

27   *Communities, Inc.*, No. LACV1504157JAKPLAX, 2015 WL 11422302, at *10 (C.D. Cal. Oct. 8,

28

13

2015) (granting motion to dismiss claim alleging "unlawful" prong of UCL where underlying California statute did not contain a private right of action).

Here, and unlike other California consumer protection statutes, no provision of Cal. FIPA contains a private right of action; to the contrary, pursuant to its terms, "the civil penalties provided for in [Cal. FIPA] shall be *exclusively* assessed and recovered in a civil action brought in the name of the people of the State of California … by … the Attorney General [or] [t]he functional regulator with jurisdiction over regulation of the financial institution." Cal. Fin. Code § 4057 (emphasis added). The California Supreme Court has concluded in the context of the California Unfair Insurance Practices Act ("UIPA") that, where "the Legislature … contemplated only administrative enforcement by the Insurance Commissioner," "a litigant may not rely on the proscriptions of [the statute] as the basis for a UCL claim." *Zhang v. Superior Ct.*, 57 Cal. 4th 364, 384 (2013). Thus, where a private right of action under a given statute is "absolutely barred, a litigant may not rely on the proscriptions of [that law] as the basis for a UCL claim." *Newton*, 75 F. Supp. 3d at 1058. Because Cal. FIPA does not provide a private right of action, Plaintiffs fail to identify a predicate violation of law that they have standing to address. Plaintiffs therefore cannot state a claim under the "unlawful" prong of the UCL, and Count Two should be dismissed.

### 2. Western Union's Productions Are Exempt From Liability Under Cal. FIPA.

Plaintiffs contend that Western Union committed a predicate unlawful act by sharing consumers' nonpublic, personal information in violation of Cal. FIPA. Am. Compl. ¶ 79. However, Western Union's productions of money transfer records to the State of Arizona and in response to subpoenas from federal law enforcement were protected under exceptions to Cal. FIPA.

Generally, Cal. FIPA prohibits financial institutions[10] from sharing nonpublic personal information with any nonaffiliated third party without the explicit prior consent of the consumer. Cal. Fin. Code § 4052.5. However, even as alleged by Plaintiffs, Western Union's conduct falls

---

[10] Cal. FIPA defines "financial institution" broadly to include "any institution the business of which is engaging in financial activities described in Section 1843(k) of Title 12 of the United States Code and doing business in this state." Cal. Fin. Code § 4052. Section 1834(k)'s definition of "financial activities" includes transferring money. 12 U.S.C. § 1843(k)(4).

squarely within two exceptions to Cal. FIPA.

First, Western Union is not liable under Cal. FIPA for producing "nonpublic personal information" "to the extent specifically required or specifically permitted under other provisions of law and in accordance with the [RFPA], to law enforcement agencies … or for an investigation on a matter related to public safety." Cal. Fin. Code § 4056(5). As alleged by Plaintiffs, Western Union produced money transfer records only as required by law, specifically, court orders and administrative subpoenas, to state and federal law enforcement agencies. *See supra*, Part II. And, as described above, Western Union's money transfer services are not subject to any requirements under the RFPA. *See supra*, Part IV.A. Accordingly, Plaintiffs fail to allege that Western Union has violated Cal. FIPA.

Second, Western Union is not liable under Cal. FIPA for producing "nonpublic personal information" "to comply with federal, state … and other applicable legal requirements" or "to comply with a properly authorized civil, criminal, administrative, or regulatory investigation or subpoena or summons by federal, state, or local authorities; or to respond to judicial process." Cal. Fin. Code § 4056(b)(7). Western Union's productions pursuant to the Arizona Court Orders and customs summonses fall squarely within this exception, too.

At the state level, Western Union is exempt from Cal. FIPA for its production of money transfer records in accordance with the terms of the Arizona Court Orders from 2010–2019 because such productions were in compliance with state law and judicial process. *See* Am. Compl. ¶ 28; Armbrust Decl., Exs. A-E. From 2010 through the first half of 2019, Western Union produced money transfer records to Arizona only after extensive litigation and pursuant to the Arizona Court Orders. *See supra*, Part II.A. Western Union was obligated to comply with the Arizona Court Orders. Accordingly, Cal. FIPA did not require Western Union to provide notice to consumers when it produced money transfer records to Arizona in response to the Arizona Court Orders.

At the federal level, Western Union is exempt from Cal. FIPA for its production of money transfer records to comply with compulsory customs summonses issued pursuant to federal law, 19 U.S.C. § 1509. *See* Am. Compl. ¶¶ 35, 46; *Budowich v. Pelosi*, No. 21-3366 (JEB), 2022 WL 2274359, at *15 (D.D.C. June 23, 2022) (dismissing a UCL claim predicated on a violation of Cal.

15

1   FIPA, finding that defendant bank shared information "to comply with federal … and other

2   applicable legal requirements" in accordance with Section 4056(b)(7)). Section 4056(b)(7)'s

3   "expansive language covers the range of subpoenas issued by both state and federal governments."

4   *Budowich*, 2022 WL 2274359, at *16. The HSI customs summonses expressly fall within the

5   statute's subpoena exception. *See* Cal. Fin. Code § 4056(b)(7) (exception for compliance with a

6   "subpoena or summons by federal, state, or local authorities"); *Budowich*, 2022 WL 2274359

7   (subpoena exception to Cal. FIPA applied where defendant bank responded to congressional

8   subpoena). Accordingly, Cal. FIPA did not require Western Union to provide notice to consumers

9   when it produced money transfer records to HSI in response to customs summonses.

10          Through each of these exceptions, California law "[w]isely" avoids interfering with the

11   orders of state courts or the investigative powers of the federal government "by excepting from [Cal.

12   FIPA's] coverage disclosures made pursuant to legitimate government investigations or subpoenas,

13   such as the one[s] at issue here." *Budowich*, 2022 WL 2274359, at *16.

14          Without these exceptions, Cal. FIPA would be preempted by federal law if it sought to

15   prohibit private parties from complying with subpoenas issued by federal agencies, particularly

16   when those agencies operate in uniquely federal domains such as border control and immigration. As

17   explained above, *supra*, Part IV.B., preemption derives from the U.S. Constitution's Supremacy

18   Clause, which directs that the "Laws of the United States … shall be the supreme Law of the Land."

19   U.S. Const., art. VI, cl. 2; *see also Oneok*, 575 U.S. at 373, 377; *Crosby*, 530 U.S. at 372.

20          Cal. FIPA would directly interfere with federal law if it did not contain the Section 4056

21   exceptions, which show that the California Legislature went to great lengths to ensure that Cal. FIPA

22   would not interfere with federal or state law enforcement prerogatives. Take, for example, the

23   situation where a federal law enforcement agency such as HSI served Western Union with an

24   administrative subpoena requiring compliance under federal law (*e.g.*, 19 U.S.C. § 1509). If Cal.

25   FIPA purported to prohibit Western Union from complying with that subpoena, it would be

26   impossible for Western Union to comply with both federal and state law—federal law would compel

27   Western Union to produce information responsive to the subpoena, while state law would forbid that

28   same production. For exactly the same reason, absent these exceptions, Cal. FIPA would stand as an

16

1  obstacle to the achievement of Congress's full purposes in enacting laws like 19 U.S.C. § 1509,

2  which give federal officials authority to investigate compliance with the law, among other things.

3  Cal. FIPA would instead block federal officials from effectively carrying out their investigations.

4  Courts have declined to allow state statutes to interfere with federal investigations in this

5  way. In some cases, they have construed Cal. FIPA and other similar statutes in a manner that avoids

6  a conflict between state and federal law. *See Budowich*, 2022 WL 2274359, at *16 ("[A]dopting [the

7  plaintiff's] interpretation of [Cal. FIPA] would lead to the unlikely scenario in which state law

8  prohibits third parties from complying with a wide range of subpoenas issued by the federal

9  government. Wisely, however, the plain text of [the statute] forecloses such an anomalous result by

10 exception from Cal. FIPA's coverage disclosures made pursuant to legitimate government

11 investigations or subpoenas[.]"). In other cases, courts have held state statutes preempted to the

12 extent that they would cause such interference. *See Sornberger v. First Midwest Bank*, 278 F. Supp.

13 2d 935, 944 (C.D. Ill. 2002) (finding Illinois Banking Act provision preempted by the RFPA).

14 The better reading of Cal. FIPA is the one that, consistent with its text, treats the state statute

15 as deferring to federal law, including the unique federal interests at play in matters of immigration

16 and border control. *See* Cal. Fin. Code § 4056 (permitting release of financial information to law

17 enforcement officers pursuant to federal law, including the RFPA); *Arizona v. United States*, 567

18 U.S. 387, 394-95 (2012) (federal government has "well settled," "broad, undoubted power over the

19 subject of immigration"); Am Compl. ¶ 38 (alleging "anxiety about immigration" as a focus of

20 TRAC). The Court should adopt that reading, thereby avoiding any need to consider whether Cal.

21 FIPA is preempted by federal law.

22 Plaintiffs allege that Western Union violated Cal. FIPA by producing money transfer records

23 in response to state court orders and federal subpoenas, but they overlook that Cal. FIPA permits

24 exactly that conduct by excepting compliance with such legal processes from its terms. Plaintiffs'

25 UCL claim therefore fails to the extent it is predicated on a violation of Cal. FIPA, and Plaintiffs do

26 not allege any other predicate violation of law that could create liability for Western Union under the

27 UCL. Therefore, Count Two should be dismissed.

28

## V.      CONCLUSION

For the foregoing reasons, as well as any additional reasons argued by the other Defendants, Western Union respectfully requests that this Court grant its Motion to Dismiss Plaintiffs' Amended Complaint.

Dated: March 3, 2023                          Respectfully submitted,


                                              */s/ Hille R. Sheppard*
                                              Hille R. Sheppard
                                              Sheila A.G. Armbrust
                                              Stephen Chang
                                              SIDLEY AUSTIN LLP

                                              Attorneys for Defendant
                                              Western Union Financial Services, Inc.