Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
Edelson PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Sejal Zota (*pro hac vice*)
sejal@justfutureslaw.org
Dinesh McCoy (*pro hac vice*)
dinesh@justfutureslaw.org
Daniel Werner (SBN 322310)
daniel@justfutureslaw.org
Just Futures Law
95 Washington Street, Suite 104-149
Canton, MA 02021
Tel: 617.812.2822

*Attorneys for Plaintiffs and the proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| NELSON SEQUEIRA, ORSAY ALEGRIA, and ISMAEL CORDERO, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; WESTERN UNION FINANCIAL SERVICES, INC., a Colorado corporation; CONTINENTAL EXCHANGE SOLUTIONS, INC., a Kansas corporation, d/b/a RIA FINANCIAL SERVICES and AFEX MONEY EXPRESS; VIAMERICAS CORPORATION, a Delaware Corporation; and DOLEX DOLLAR EXPRESS, INC., a Texas corporation,<br><br>*Defendants*. | Case No. 4:22-cv-07996-HSG<br><br>**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Hearing Date: May 18, 2023<br>Time: 2:00 PM<br>Place: Courtroom 2, 4th Floor, Oakland<br>Judge: Hon. Haywood S. Gilliam, Jr. |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND ............................................................................................. 3

III.   LEGAL STANDARD ..................................................................................... 8

IV.   ARGUMENT .................................................................................................. 8

    A.   **Defendants Violated the Right to Financial Privacy Act** ............................. 8

        1.   Money Transmitters Are Consumer Finance Institutions ..................... 9

        2.   RFPA's Section 3414 Does Not Categorically Exempt DHS and ICE From Its Requirements .................................................................. 16

        3.   Plaintiffs Are "Customers" of the MTB Defendants ........................... 17

        4.   Plaintiffs' Transaction Records Constitute "Financial Records" .............. 19

        5.   Plaintiffs Adequately Allege Disclosures to a "Government Authority" ........ 19

        6.   Mr. Alegria Has Standing to Sue Viamericas Under the RFPA ............... 23

    B.   **Plaintiffs Sufficiently Allege UCL Claims Predicated on the MTB Defendants' Violation of CalFIPA.** ............................................................ 24

        1.   Plaintiffs Have "Lost Money or Property" ......................................... 25

        2.   The Lack of a Private Right of Action Under CalFIPA Does Not Foreclose Plaintiffs' UCL Claim. ..................................................... 26

        3.   None of the Exceptions to Liability Under CalFIPA Apply Here .............. 28

            a.   *The disclosures were not made pursuant to a properly authorized subpoena.* ...... 29

            b.   *None of the other exceptions indirectly apply.* .................................. 31

            c.   *Plaintiffs' claims regarding CalFIPA are not preempted.* ..................... 35

    C.   **The Bank Secrecy Act Does Not Immunize the MTB Defendants' Conduct** .......... 36

V.    CONCLUSION ............................................................................................ 38

1

## **TABLE OF AUTHORITIES**

2

**CASES**

3

*Bank of Eureka Springs v. Evans*,
    109 S.W.3d 672 (Ark. 2003) ............................................................................. 38

*Barnhart v. Sigmon Coal Co., Inc.*,
    534 U.S. 438 (2002) ......................................................................................... 10

*Barnhart v. Thomas*,
    540 U.S. 20 (2003) ........................................................................................... 19

*Bd. of Trustees v. Welfare & Pension Admin. Servs.*,
    24 F.4th 1278 (9th Cir. 2022) .......................................................................... 15

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) ......................................................................................... 37

*Brusewitz v. Wyeth, LLC*,
    562 U.S. 223 (2011) ......................................................................................... 15

*Byrd v. GMAC Mortgage LLC*,
    2020 WL 4577461 (D. Colo. Aug. 7, 2020) ................................................... 22

*Calhoun v. Google LLC*,
    526 F. Supp. 3d 605 (N.D. Cal. 2021) ............................................................ 26

*Cel–Tech Communications Inc. v. Los Angeles Cellular Telephone Co.*,
    20 Cal. 4th 163 (1999) ..................................................................................... 26

*Chang v. Tenn. Valley Auth.*,
    82 F. Supp. 2d 817 (E.D. Tenn. 2000) ............................................................ 14

*Chao v. Cmty. Tr. Co.*,
    474 F.3d 75 (3rd Cir. 2007) ............................................................................. 18

*Chavez v. City of Los Angeles*,
    224 P.3d 41 (Cal. 2010) ................................................................................... 35

*Chemehuevi Indian Tribe v. Newsom*,
    919 F.3d 1148 (9th Cir. 2019) .................................................................... 10, 20

*Commodity Futures Trading Comm'n v. Monex Credit Co.*,
    931 F.3d 966 (9th Cir. 2019) ................................................................... 8, 28, 36

*Commodity Futures Trading Commission v. Worth Bullion Group, Inc.*,
    717 F.3d 545 (7th Cir. 2013) .............................................................. 11, 11, 13, 15

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

*Coronado v. Bank Atl. Bancorp, Inc,*
    222 F.3d 1315 (11th Cir. 2000) .................................................................................... 36, 37

*Covalt v. Carey Canada, Inc.,*
    860 F.2d 1434 (7th Cir. 1988) ............................................................................................ 16

*Donahue v. Gavin,*
    1999 WL 165700 (E.D. Pa. Mar. 12, 1999) ...................................................................... 22

*Duncan v. Belcher,*
    813 F.2d 1335 (4th Cir. 1987) ............................................................................................ 18

*Evans v. ZB, N.A.,*
    779 Fed. App'x 443 (9th Cir. 2019) .................................................................................... 19

*Falls v. Dep't of Def.,*
    2017 WL 990586 (N.D. Fla. Feb. 9, 2017) ........................................................................ 14

*Flatt v. SEC,*
    2010 WL 1524328 (S.D. Fla. Apr. 14, 2010) ..................................................................... 18

*Flowers v. First Hawaiian Bank,*
    295 F.3d 966 (9th Cir. 2002) .............................................................................................. 36

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ............................................................................................................ 16

*FTC v. Sterling Precious Metals, LLC,*
    2013 WL 1442180 (S.D. Fla. Apr. 9, 2013) ....................................................................... 12

*Galloway v. United States Dep't of Transp. Off. of Inspector Gen,*
    2019 WL 4479970 (N.D. Ohio Sept. 18, 2019) .................................................................. 14

*Greene v. Bank of Am.,*
    216 Cal. App. 4th 454 (2013) ............................................................................................. 37

*Hall v. U.S. Dep't of Agric.,*
    984 F.3d 825 (9th Cir. 2020) .............................................................................................. 18

*Harrison v. SEC,*
    2012 WL 13130044 (N.D. Ga. Aug. 3, 2012) .................................................................... 14

*Haw. Dep't of Hum. Servs. v. U.S. Dep't of Educ.,*
    46 F.4th 1148 (9th Cir. 2022) ............................................................................................. 10

*Hendricks v. StarKist Co.,*
    30 F. Supp. 3d 917 (N.D. Cal. 2014) ............................................................................ 35, 36

*Huffman v. Comm'r of Internal Revenue,*
    978 F.2d 1139 (9th Cir. 1992)......................................................................... 10

*In re Blunden,*
    896 F. Supp. 996 (C.D. Cal. 1996)................................................................. 19

*In re Grand Jury Proceedings,*
    827 F.2d 301 (8th Cir. 1987)............................................................................. 4

*In re Porras,*
    191 BR 357 (Bankr. W.D. Tex. 1995) ........................................................... 18

*Kasky v. Nike, Inc.,*
    45 P.3d 243 (Cal. 2002) ................................................................................. 26

*Kraus v. Trinity Mgmt. Servs., Inc.,*
    999 P.2d 718 (Cal. 2000) ............................................................................... 32

*Kwikset Corp. v. Superior Court,*
    246 P.3d 877 (Cal. 2011) ............................................................................... 25

*Lanier v. Dep't of Def,*
    2011 WL 1659313 (S.D. Miss. Apr. 29, 2011).............................................. 14

*Lerman v. SEC,*
    928 F. Supp. 2d 798 (S.D.N.Y. 2013)............................................................ 14

*Longi v. New York,*
    2006 WL 8441210 (E.D.N.Y. June 26, 2006)............................................... 18

*Longview Fibre Co. v. Rasmussen,*
    980 F.2d 1307 (9th Cir. 1992)........................................................................ 29

*Lopez v. First Union Nat. Bank of Fla.,*
    129 F.3d 1186 (11th Cir. 1997)...................................................................... 37

*Lynn v. United States,*
    2013 WL 6989358 (S.D. Ind. 2013)............................................................... 18

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*
    519 F.3d 1025 (9th Cir. 2008).......................................................................... 8

*Martino v. Barnett,*
    595 S.E.2d 65 (W. Va. 2004) ......................................................................... 32

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
    521 F.3d 1097 (9th Cir. 2008).......................................................................... 8

*United States v. Miller,*
    425 U.S. 437 ............................................................................................... 9, 13, 13

*Neece v. IRS,*
    922 F.2d 573 (10th Cir. 1990) ............................................................................ 19

*Nevin v. Citibank, N.A.,*
    107 F. Supp. 2d 333 (S.D.N.Y. 2000) ................................................................ 38

*Nicksolat v. U.S. Dep't of Transp.,*
    277 F. Supp. 3d 122 (D.D.C. 2017) .................................................................... 14

*Penalosa v. Dep't of Def.,*
    2015 WL 1598088 (D. Colo. Apr. 8, 2015) ........................................................ 14

*People v. Arias,*
    195 P.3d 103 (Cal. 2008) .................................................................................... 32

*People v. Fisher,*
    96 Cal. App. 4th 1147 (2002) ............................................................................. 28

*Picayune Rancheria of Chukchansi Indians v. Brown,*
    229 Cal. App. 4th 1416 (2014) ........................................................................... 31

*Pirani v. Slack Techs., Inc.,*
    445 F. Supp. 3d 367 (N.D. Cal. 2020) ................................................................ 35

*Pit River Tribe v. Bureau of Land Mgmt.,*
    939 F.3d 962 (9th Cir. 2019) .............................................................................. 10

*Presbyterian Camp & Conference Centers, Inc. v. Superior Court,*
    501 P.3d 211 (Cal. 2021) .................................................................................... 31

*Quern v. Mandley,*
    436 U.S. 725 (1978) ............................................................................................ 16

*Rainero v. Archon Corp.,*
    844 F.3d 832 (9th Cir. 2016) .............................................................................. 10

*Rose v. Bank of Am., N.A.,*
    304 P.3d 181 (Cal. 2013) .................................................................................... 24

*Rose v. Bank of America, the California Supreme Court,*
    57 Cal. 4th 390 (2013) ................................................................................... 27, 28

*Rosiere v. SEC,*
    2010 WL 419440 (D. Nev. Jan. 29, 2010) .......................................................... 22

*Safe Air for Everyone v. Meyer,*
  373 F.3d 1035 (9th Cir. 2004)................................................................... 23

*SEC v. Baian,*
  2009 WL 10676276 (C.D. Cal. Nov. 24, 2009) ..................................... 14

*SEC v. Jerry T. O'Brien, Inc.,*
  467 U.S. 735 (1984) ................................................................................. 8

*Simpson Strong-Tie Co., Inc. v. Gore,*
  49 Cal. 4th 12 (2010)............................................................................... 28

*Smith v. Wells Fargo Bank, N.A.,*
  135 Cal. App. 4th 1463 (2005)................................................................ 27

*State ex rel. Goddard v. Western Union Fin. Servs., Inc.,*
  166 P.3d 916 (Ariz. Ct. App. 2007) ..................................... 4, 4, 22, 30

*State v. Western Union Fin. Servs., Inc.,*
  220 Ariz. 567 (2009) ............................................................................... 5

*Stop Youth Addiction v. Lucky's Stores, Inc.,*
  950 P.2d 1086 (Cal. 1998) ............................................................ 24, 26, 27

*Tabet v. SEC,*
  2012 WL 3205581 (S.D. Cal. Aug. 6, 2012) ......................................... 14

*Tapia v. Coca-Cola Co.,*
  2013 WL 2621346 (N.D. Cal. Mar. 23, 2013) ....................................... 8

*Tcherepnin v. Knight,*
  389 U.S. 322 (1967) ................................................................................. 35

*Troyk v. Farmers Grp., Inc.,*
  171 Cal. App. 4th 1305 (2009)................................................................ 27

*United States v. Mead,*
  533 U.S. 218 (2000) ................................................................................. 16

*United States v. Ritchie,*
  342 F.3d 903 (9th Cir. 2003)................................................................... 8

*United States v. Ron Pair Enters., Inc.,*
  489 U.S. 235 (1989) ................................................................................. 10

*United States v. Wilson,*
  571 F. Supp. 1417 (S.D.N.Y. 1983)........................................................ 14

*United States v. Zimmerman,*
    957 F. Supp. 94 (N.D. W. Va. 1997).................................................................... 22

*Walker v. S.W.I.F.T. SCRL,*
    491 F. Supp. 2d 781 (N.D. Ill. 2007) .................................................................. 22

*Widi v. McNeil,*
    2013 WL 5407457 (D. Me. Sept. 25, 2013)......................................................... 37

*Winters v. Board of County Commissioners,*
    4 F.3d 848 (10th Cir. 1993).................................................................................. 13

*Young v. Trans Union,*
    2012 WL 12844773 (N.D. Cal. Aug. 29, 2012).................................................. 18

*Zhang v. Superior Court,*
    304 P.3d 163 (Cal. 2013) ..................................................................................... 26

**STATUTES**

12 U.S.C.
    § 1843.................................................................................................................... 25
    § 1952.................................................................................................................... 34
    § 3401............................................................................................................. *passim*
    § 3403.................................................................................................................... 20
    § 3404...................................................................................................................... 9
    § 3405...................................................................................................................... 7
    § 3414.......................................................................................................... 14, 16, 17
    § 3417................................................................................................................... 7, 9
    § 3418...................................................................................................................... 9

15 U.S.C.
    § 6802.................................................................................................................... 31
    § 6807.................................................................................................................... 35

19 U.S.C.
    § 1509.............................................................................................................. 17, 30

31 U.S.C.
    § 5312.............................................................................................................. 15, 16
    § 5313.................................................................................................................... 34
    § 5318.................................................................................................................... 36

California
    Cal. Bus. & Prof. Code § 17200........................................................................... 24
    Cal. Bus. & Prof. Code § 17203........................................................................... 24
    Cal. Bus. & Prof. Code § 17204........................................................................... 25
    Cal. Bus. & Prof. Code § 17205........................................................................... 27
    Cal. Civ. Code § 1798.150................................................................................... 26

Cal. Civ. Code § 1858 ............................................................................ 31
Cal. Fin. Code § 4050 ............................................................................ 24
Cal. Fin. Code § 4051 ....................................................................... 7, 31
Cal. Fin. Code § 4052 ............................................................................ 25
Cal. Fin. Code § 4052.5 ......................................................................... 25
Cal. Fin. Code § 4053 ....................................................................... 28
Cal. Fin. Code § 4056 ................................................................... 28, 29
Cal. Ins. Code § 381 .............................................................................. 27
Cal. Penal Code § 308 ........................................................................... 27

**REGULATIONS**

12 C.F.R.
§ 208.62 ................................................................................................ 37
§ 1016.15 .............................................................................................. 35
§ 1016.17 .............................................................................................. 35

19 C.F.R.
§ 163.6 .................................................................................................. 17
§ 163.7 .................................................................................................. 17

31 C.F.R.
§ 1022.210 ............................................................................................ 33

**OTHER AUTHORITIES**

139 Cong. Rec. E57-02 (1993) (Letter of Rep. Annunzio),
WL 1254 (1993) .................................................................................. 37

H.R. Rep. No. 95-1383 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9273. ............................ 7, 13

H.R. Rep. No. 106-74, pt. 3 (1999) ............................................................ 32

Intelligence Authorization Act for Fiscal Year 2004, Pub. L. No. 108-177, § 374
117 Stat. 2599 (Dec. 13, 2003) ............................................................. 14

Michelle Hackman and Dustin Volz, *Secret Surveillance Program Collects Americans' Money-Transfer Data, Senator Says*, WALL ST. J. (Mar. 8, 2022),
https://www.wsj.com/articles/secret-surveillance-program-collects-americans-money-transfer-data-senator-says-11646737201. ................................................ 6

1

## I.   **INTRODUCTION**

2          This case challenges a dragnet surveillance program that relies on massive invasions of

3   financial privacy which in turn enable targeting of immigrants and communities of color.

4   Underpinning this dragnet is a federal and state law enforcement collaboration called TRAC, short

5   for Transaction Records Analysis Center, which receives federal funding.  TRAC appears to have its

6   genesis in a mid-aughts quest by the Arizona Attorney General for unfettered access to Western

7   Union's transaction records, including for records that had no connection to Arizona (such as

8   transactions that solely involved other states or countries), ostensibly to investigate money

9   laundering.  After Western Union successfully litigated a challenge to the AG's subpoenas,

10  obtaining both an appellate and state supreme court ruling that such subpoenas were overbroad and

11  unlawful, the Arizona AG sued Western Union itself.  The parties quickly reached a settlement,

12  under which Western Union agreed to provide the Arizona AG with the very records it had been

13  seeking moving forward in response to similarly defective subpoenas from the AG.  Western Union

14  also agreed to provide financial support to help form TRAC.  In short order, several other money

15  transmitters began providing their records to TRAC as well.  There is no indication that the bulk

16  production of millions of innocent people's data is necessary to prosecute crime.

17          TRAC serves, among other things, as a clearinghouse for over 145 million transaction

18  records from money transmitters.  FAC ¶ 43.  These records contain a wealth of data about money

19  transfers conducted by individuals in the southwest border states and Mexico and sent to countries

20  around the world, as well as other U.S. states.  An array of law enforcement agencies have access to

21  this data, including dozens of federal government agencies like Immigration and Customs

22  Enforcement ("ICE").  *Id.* ¶ 41.  Money transmitters who turn over records to TRAC know and

23  expect that the federal government will obtain and have access to those records.  *Id.* ¶ 48.

24          Plaintiffs Nelson Sequeira, Orsay Alegria, and Ismael Cordero assert that the bulk disclosure

25  and collection of these records tramples on their statutory financial privacy rights, raising claims

26  under federal law against two federal government defendants, and under both federal and state law

27  against four money transfer businesses, Defendants Western Union Financial Services, Inc.,

28  Continental Exchange Solutions, Inc. (which does business as "Ria Financial Services"), Viamericas

---

Corporation, and DolEx Dollar Express, Inc. (referred to collectively as "the MTB Defendants") who willingly provide records to TRAC.

First, Plaintiffs invoke the federal Right to Financial Privacy Act ("RFPA"), which requires customer consent (which was neither sought nor provided here) or notice and an opportunity to object before a financial institution provides consumer financial records to the federal government or any agent of the federal government, and before the federal government accesses them. Defendants principally contend that the RFPA does not apply here because the law's coverage is limited to entities in the business of providing loans, and the MTB Defendants are therefore outside the law's scope. But this argument, which is based on a stray quote from an out-of-circuit judicial decision taken out of context, is divorced from the plain language and purpose of the law. Defendants also contend that the RFPA does not govern disclosures to a state law enforcement agency. But Plaintiffs' challenge is based on disclosures to federal agencies, not state agencies. While many (though not all) of the disclosures made to TRAC ostensibly made in response to an Arizona administrative subpoena, those subpoenas directed the disclosure *to TRAC*, which means that they were made directly to the federal government. The government cannot side-step RFPA so easily.

Second, Plaintiffs raise a claim against the MTB Defendants under California's Unfair Competition Law ("UCL"), premised on the MTB Defendants' violation of the California Financial Information Privacy Act ("CalFIPA"). The MTB Defendants' principal response is that their disclosures qualify for one or more of CalFIPA's exemptions because they followed subpoenas from the Arizona AG or the Department of Homeland Security. But these exemptions are affirmative defenses that cannot be resolved on the pleadings and, in any case, they do not apply here because the subpoenas were not properly authorized, are facially overbroad, and are not focused on any particular suspicion of criminal activity. The entire purpose of financial privacy laws would be defeated if any state, local, or federal agency could simply ask the custodian of customer financial records for free-wheeling access to all of its customers' records without any particular nexus to a specific investigation predicated on reasonable suspicion of unlawful activity. Indeed, even the Arizona Court of Appeal and Arizona Supreme Court have held that the Arizona AG's subpoenas to Western Union were overbroad and thus unlawful, yet the MTB Defendants continued to volunteer

their customer data *en masse* in response to those unlawful demands without restraint. The financial privacy laws cannot be so easily gamed.

The motions to dismiss should be denied.

## II.   BACKGROUND

This case revolves around money transfer businesses ("MTBs"). These businesses provide an important service, enabling individuals to send cash to friends and family, both domestically and internationally. FAC ¶ 22. Because one need not have a traditional bank account (which in some places can only be opened with a permanent address and U.S. citizenship, and which typically comes with a minimum balance requirement and a series of account fees) or pay an annual fee in order to use a money transmitter's services, these businesses remain popular with economically vulnerable communities, particularly immigrant communities, despite the fact that MTBs charge an exorbitant fee to facilitate wire transfers. *Id.* ¶¶ 24-25. In fact, approximately $30 billion is sent annually from the United States to Mexico through money transfer businesses. *Id.* ¶ 22. And remittances to Latin America and the Caribbean *grew* by 6.5% in 2020 despite global economic struggles. *Id.* ¶ 25.

To effectuate a money transfer, an individual typically brings cash to a money transfer business's brick-and-mortar location, provides their name and address (and potentially other sensitive information, such as social security numbers), as well as the name and address of the recipient. FAC ¶¶ 23, 36. The business then makes the cash available to the recipient at the location nearest their home. *Id.* ¶ 23. For years, however, these personal details, as well as information about the transfer itself, were disclosed by MTBs to the TRAC program, where all sorts of law enforcement agencies, including dozens of federal agencies like ICE, had access to them. *Id.* ¶¶ 26, 30, 32.

In some form, border governments have attempted to systematically monitor the activities of those who use money transfer services since at least 1996. FAC ¶ 27. Early efforts were housed within an office of the Arizona AG, and were, it appears from publicly available documents, focused on computerizing data from federal (*e.g.*, the U.S. Customs Service and the Drug Enforcement Administration) and Arizona money laundering investigations. *Id.*

In the mid 2000s, however, the office of the Arizona AG set out to dramatically expand

money-transfer-based border surveillance.  A subpoena issued by that office in early 2006 to Western Union sought 49 pieces of data related to *every* money transfer to or from Sonora, Mexico over $300 (the Mexican state which abuts nearly all of Arizona's international border) over a 3-year period. *State ex rel. Goddard v. Western Union Fin. Servs., Inc.*, 166 P.3d 916, 918 (Ariz. Ct. App. 2007).  The subpoena certified that it was issued to investigate racketeering under Arizona law, as required by A.R.S. § 13-2315.  *See id.*  Western Union challenged the subpoena as overbroad.  The Court of Appeals of Arizona agreed with Western Union's challenge in part, holding that § 13-2315 requires that "any request for information be 'reasonable,'" that the AG have reasonable grounds for conducting an investigation into racketeering, and that the information sought have a reasonable connection to that investigation and to conduct indictable in Arizona.  *See id.* at 922-26.  The court credited an affidavit submitted by the Arizona AG discussing huge amounts of transfers from the United States to five border towns in Sonora as potentially providing a sufficient basis for a more limited subpoena.  *Id.* at 923, 925.  But, the court observed the Arizona subpoena was not so limited: it sought huge amounts of data unconnected to transfers to or from these five towns.  *Id.* at 923.  The court therefore held the subpoena overbroad, likening it to a similar subpoena struck down under federal law as overbroad because it would require the disclosure of "data for hundreds of innocent users." *Id.* at 924 (discussing *In re Grand Jury Proceedings*, 827 F.2d 301 (8th Cir. 1987)).

Finally, rejecting the Arizona Attorney General's argument that the more expansive data set was necessary in order to establish a baseline for "innocent" use of Western Union's services, the court observed that such a contention would eliminate any limits on the subpoena power authorized by § 13-2315.  *Goddard*, 166 P.3d at 926.  Permitting that type of request to go forward, the court observed, would be "tantamount" to a law "requiring Western Union to open all of its financial records to law-enforcement officials from any of its locations worldwide for the privilege of doing business in Arizona," something the court was unwilling to endorse.  *Id.*  In language especially relevant for this case, the court noted that "the Financial Crimes Task Force [a forerunner to TRAC], which is a cooperative exercise of many jurisdictions including the federal government, has apparently decided to gather its financial data through Arizona law.  *It is thus limited in those efforts by the requirements of that law*." *Id.* (emphasis added).

1    Not only did Western Union successfully challenge an Arizona AG subpoena before the

2    Arizona Court of Appeal—it also won a separate challenge at the Arizona Supreme Court. *See State*

3    *v. Western Union Fin. Servs., Inc.*, 220 Ariz. 567 (2009).  The highest judicial authority in the state

4    summarized that "[t]he issue for decision is whether an Arizona court can issue a warrant seizing

5    Western Union money transfers sent from other states to Mexico." *Id.* at 568.  The court held that

6    "an Arizona court lacks jurisdiction under the Due Process Clause of the United States to issue such

7    a warrant." *Id.*  Leading up to that case, the Arizona AG had applied for a seizure warrant from a

8    state court, which was ultimately granted and "authorized the State to seize person-to-person wire

9    transfers from twenty-eight states other than Arizona to twenty-six locations in Sonora [in Mexico]."

10   *Id.* at 568.  The Arizona Supreme Court treated the issue as a question of in rem jurisdiction,

11   analogizing Western Union's role in wire transfers as "akin to that of a courier," such that "Arizona

12   courts could not exercise in rem jurisdiction over the package in either Colorado or Mexico, even if

13   the funds in the package represented the proceeds of racketeering committed in Arizona and the

14   courier was subject to general Arizona jurisdiction." *Id.* at 572.  Instead, the court emphasized that:

15   "we cannot conclude that the property seized here, although in electronic form, is itself located in

16   Arizona simply because Western Union can be sued here.  The technical complexities of the

17   electronic age should not blind courts to the substance of transactions in conducting jurisdictional

18   analyses." *Id.*

19       Rather than respect these judicial rulings by limiting its investigations to those within its

20   jurisdiction by issuing narrower subpoenas, the Arizona AG opted to sue Western Union, ostensibly

21   for having an inadequate anti-money-laundering program.  The parties settled that litigation, as well

22   as Western Union's multi-year challenges to the AG's subpoenas, in 2010 with an agreement

23   requiring, among other things, that Western Union turn over bulk transaction data to the Arizona

24   AG's in response to lawful requests.  FAC ¶ 28.  Ironically, though, all of the Arizona AG's requests

25   under the settlement agreement and beyond were just as defective as those held unlawful by

26   Arizona's appellate and supreme courts, for the reasons that Western Union itself had previously

27   argued.  Four years later, the Financial Crimes Task Force expanded the existing agreement with

28   Western Union, creating TRAC.  *Id.* ¶ 29.  In short order, the Arizona AG approached other MTBs

and sought their participation in TRAC.  *Id.* ¶¶ 32-33.

As a formal matter, to facilitate the transfer of data to TRAC the Arizona AG would issue an administrative subpoena to a participating MTBs, requesting huge amounts of data regarding every money transfer of at least $500 in or out of anywhere in Mexico and one of the four states bordering Mexico (California, Arizona, New Mexico, and Texas), including domestic transfers between these four states.  The subpoenas would certify, as in *Goddard*, that it was issued as part of an investigation into racketeering per A.R.S. § 13-2315, and would direct the business to send this data to a network address associated with TRAC.  In 2019, the Arizona AG's agreement with Western Union lapsed, and a federal entity, Homeland Security Investigations ("HSI"), the investigative arm of ICE, began to pick up the slack, first by providing funding to TRAC and then by issuing its own requests to continue the flow of data.  FAC ¶ 35.  (Recent reporting also suggests that the subject subpoenas seek data relating to transfers to or from a host of other countries in addition to Mexico. *See* Michelle Hackman and Dustin Volz, *Secret Surveillance Program Collects Americans' Money-Transfer Data, Senator Says*, WALL ST. J. (Mar. 8, 2022), https://www.wsj.com/articles/secret-surveillance-program-collects-americans-money-transfer-data-senator-says-11646737201.)

The information contained in the TRAC database is extensive and intrusive.  It includes information such as the names, addresses, dates of birth, occupations, and identification numbers (such as social security numbers or passport numbers) of both the sender and recipient of every money transfer of more than $500 between Mexico and one of the four border states since 2010. FAC ¶ 36.  It also contains information on when the transfers were sent.  *Id.*  The program has at all times been a joint venture of local, state, and federal law enforcement, and early policy documents tout TRAC's ability to leverage the law enforcement capabilities of the Department of Homeland Security (which includes ICE).  *Id* ¶¶ 30, 40 (alleging that TRAC "was designed with the goal of collaboration with federal government agencies").  The data TRAC receives is stored in a large, searchable database, which is available to any law enforcement personnel with the password.  *Id.* ¶ 31.  Dozens of federal entities have access to this database.  *Id.* ¶ 41.  Entities that provide information to TRAC know and understand that the information will be provided to federal investigative entities.  *Id.* ¶ 48.

Moreover, TRAC's collection of records is not intended to be aimed at any particular crime or even any particular investigation. Instead, it functions as a dragnet, facilitating all sorts of intrusive surveillance. FAC ¶ 37. For instance, the TRAC database allows searches that target particular areas or involve names that are associated with particular ethnic groups, enabling the database to be weaponized against vulnerable communities. *Id.* ¶ 38. TRAC database searches could be used, for instance, to reveal details relevant to a noncitizen's immigration status, to reveal an individual's movements, or to monitor that person's international network. *Id.* ¶¶ 49-51.

Both federal and state law provide protections against this kind of overreaching, intrusive data collection. The Right to Financial Privacy Act ("RFPA") was enacted in 1978 and was "intended to protect the customers of financial institutions from unwarranted intrusion into their records while at the same time permitting legitimate law enforcement activity." H.R. Rep. No. 95-1383, at 28 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9273, 9305. Even when records are sought pursuant to a court order or subpoena, the statute requires notice to the consumer and an opportunity for them to object before production can be made. *See* 12 U.S.C. §§ 3405, 3406, 3407. Liability accrues both to the government and to the financial entity that makes disclosures without consent or the requisite notice. 12 U.S.C. § 3417(a).

Likewise, in passing the California Financial Information Privacy Act ("CalFIPA"), the California legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions." Cal. Fin. Code § 4051(a). The legislature determined that analogous federal protections were "inadequate to meet the privacy concerns of California residents" and sought to provide Californians with an additional measure of control over their financial information "by requiring that financial institutions that want to share information with third parties and unrelated companies [to] seek and acquire the affirmative consent of California consumers prior to sharing the information." *Id.* § 4051.5(a)(3), (b)(2); *see id.* § 4052.5 (except for enumerated exceptions, "a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates").

Plaintiffs Nelson Sequeira, Orsay Alegria, and Ismael Cordero contend that the bulk disclosure of records to TRAC violates these laws.  Plaintiffs used money transfer businesses (specifically the named MTB Defendants) to send money to their family abroad.  They received no notice that records of these transactions would be shared with the federal government, particularly in the absence of a valid warrant, and would have chosen a different means of sending money abroad were they aware.  Defendants move to dismiss these claims, asking the Court to accept at face value that the bulk disclosure of data in response to an invalid but unchallenged subpoena, issued by a state but directing disclosure to a federal entity, is immunized from liability under federal and state law. The Court should reject these arguments, and deny the motions to dismiss.

## III.   LEGAL STANDARD

"'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'"  *Tapia v. Coca-Cola Co.*, 2023 WL 2621346, at *1 (N.D. Cal. Mar. 23, 2013) (Gilliam, J.) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).  "In reviewing the plausibility of a complaint, courts 'accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party.'"  *Id.* at *2 (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)).  The Court may also consider any materials incorporated by reference into the complaint, or matters subject to judicial notice, when testing the plausibility of Plaintiffs' allegations.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Moreover, "Rule 8 does not require plaintiffs to plead around affirmative defenses."  *Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019).  Dismissal on the basis of an affirmative defense is appropriate only "when *the complaint* establishes the defense."  *Id.* at 973 (emphasis in original).

## IV.   ARGUMENT

### A.   Defendants Violated the Right to Financial Privacy Act

Plaintiffs begin with their claim under the Right to Financial Privacy Act, the sole claim alleged against all defendants.  The RFPA was enacted in 1978 "in response to [the Supreme Court's] decision in *United States v. Miller*."  *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745

1  (1984).  *Miller* held that individuals have no Fourth Amendment privacy interest in their financial

2  records because such records are voluntarily disclosed to a third party, the financial institution.  The

3  Court held that the district court properly declined to suppress evidence obtained in response to a

4  defective subpoena seeking "all records of accounts" held in the defendant's name because

5  documents like "checks," "financial statements[,] and deposit slips" "contain only information

6  voluntarily conveyed to the banks and exposed to their employees in the ordinary course of

7  business," thus lacking a private character by virtue of disclosure to the bank.  425 U.S. 435, 437,

8  442 (1976).  The RFPA sought to address this problem, by giving customers a measure of control

9  over their financial information.  *See Jerry T. O'Brien*, 467 U.S. at 745.

10       The RFPA broadly prohibits government access to "the information contained in the

11  financial records of any customer of a financial institution" absent consent (12 U.S.C. § 3404), or, as

12  relevant here, unless the records are sought under a subpoena that relates "to a legitimate law

13  enforcement inquiry" and the customer has notice of and an opportunity to contest the subpoena (*id.*

14  §§ 3405, 3407).  The law authorizes both injunctive relief (*id.* § 3418) and monetary damages which

15  can be sought both against the federal government and the disclosing financial institution (*id.*

16  § 3417).  There is no dispute that Plaintiffs' financial records were disclosed to the federal

17  government without notice of any subpoena or consent.  But Defendants contend that the RFPA does

18  not apply here because the MTB Defendants are not "financial institutions" and, in any event, that

19  because the disclosures were made in response to an Arizona subpoena, these federal protections do

20  not apply.  Neither argument has merit.

21          **1.    Money Transmitters Are Consumer Finance Institutions**

22       A threshold question with respect to Plaintiffs' RFPA claim (raised by every defendant) is

23  whether the MTB Defendants are "financial institutions" within the meaning of the statute.  A

24  "financial institution" is defined as "any office of a bank, savings bank, card issuer as defined in

25  section 1602(n) of Title 15, industrial loan company, trust company, savings association, building

26  and loan, or homestead association (including cooperative banks), credit union, or consumer finance

27  institution . . . ."  12 U.S.C. § 3401(1).  No court has yet resolved whether money transfer businesses

28  fit this definition; thus, no court has ever held that the MTB Defendants are not covered institutions.

1     Resolving this question of statutory construction "begin[s] with the statute's language, which

2     is conclusive unless literally applying the statute's text demonstrably contradicts Congress's intent."

3     *Chemehuevi Indian Tribe v. Newsom*, 919 F.3d 1148, 1151 (9th Cir. 2019); *see also United States v.*

4     *Ron Pair Enters., Inc.*, 489 U.S. 235, 243 (1989) ("The plain meaning of legislation should be

5     conclusive, except in the rare cases in which the literal application of a statute will produce a result

6     demonstrably at odds with the intention of its drafters.") (quotations and alterations omitted).  The

7     court must first determine "whether the language at issue has a plain and unambiguous meaning with

8     regard to the particular dispute in the case."  *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450

9     (2002).  "When deciding whether the language is plain, courts must read the words in their context

10    and with a view to their place in the overall statutory scheme."  *Rainero v. Archon Corp.*, 844 F.3d

11    832, 837 (9th Cir. 2016) (quotations and alterations omitted).  If the term is ambiguous, then the

12    court must "look to the congressional intent revealed in the history and purposes of the statutory

13    scheme," *Pit River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 970 (9th Cir. 2019), and may

14    consider "other traditional aids of statutory interpretation,'" *Haw. Dep't of Hum. Servs. v. U.S. Dep't*

15    *of Educ.*, 46 F.4th 1148, 1154 (9th Cir. 2022).  In the absence of a statutory definition for an

16    ambiguous term, the court may "consult common dictionary definitions to divine the ordinary,

17    contemporary, common meaning at the time the statute was enacted."  *Id.* at 1155 (quotations

18    omitted).

19    The term "consumer finance institution" is not defined in the statute.  Its meaning is

20    ambiguous.  While Plaintiffs agree with Defendants that entities that lend money or otherwise extend

21    credit to consumers qualify as consumer finance institutions, Plaintiffs disagree that that is the only

22    reasonable interpretation of the term.  Another reasonable interpretation is that the term covers all

23    institutions that provide services related to consumer finances.  That clearly covers institutions

24    whose primary purpose is to assist consumers with financial transactions.  (Defendants' attempt to

25    rely solely on technical dictionaries to give meaning to the term is inconsistent with the canon of

26    statutory construction holding that the common understanding of a term guides the interpretation of a

27    statute, not a specialized or technical meaning.  *See Huffman v. Comm'r of Internal Revenue*, 978

28    F.2d 1139, 1145 (9th Cir. 1992) (indicating that "[w]ords of both technical and common usage are

1   construed in the latter sense unless the statute plainly indicates otherwise").  The MTB Defendants

2   are "consumer finance institutions" because the provision of consumer financial services is the core

3   of their business.  Two MTB Defendants even say so in their names:  Western Union *Financial*

4   *Services* and RIA *Financial Services* (Continental).  And all MTB Defendants say so in their

5   marketing materials.  Western Union describes itself as "working to provide consumers . . . with

6   access to an expanding portfolio of payment and other financial services."  FAC ¶ 6.  Viamericas

7   also describes its money transfer service as a "financial service[]" for consumers on its website.  *Id.*

8   ¶ 8.  The MTB Defendants provide a variety of other consumer financial services, including lending

9   services (Western Union and DolEx, *id.* ¶¶ 6, 9), debit card services (Continental, *id.* ¶ 7), and bill

10  payment, check cashing, and money orders (Continental, Viamericas, and DolEx, *id.* ¶¶ 7-9).  They

11  are consumer-oriented companies that provide a variety of financial services to their customers.

12          Defendants nevertheless assert that only institutions that offer *lending* services qualify as

13  "financial institutions."  To support that argument, they rely not on the language of the statute or the

14  legislative history and purpose, but rather an overbroad misreading of the Seventh Circuit's decision

15  in *Commodity Futures Trading Commission v. Worth Bullion Group, Inc.*, 717 F.3d 545 (7th Cir.

16  2013).  Contrary to Defendants' assertion, however, *Worth Bullion* does not stand for the proposition

17  that only lending institutions are covered by RFPA.  Rather, it stands for the proposition that the

18  catch-all term "consumer finance institution" only applies to institutions which, like the other

19  enumerated entities, provide covered financial services as a core feature of their business, rather than

20  an incidental one.

21          A further explanation is in order.  *Worth Bullion* involved subpoenas issued by the

22  Commodity Futures Trading Commission (CFTC) to precious metal wholesalers, dealers, retailers,

23  and depositors "seek[ing] documents relating to purchases or sales of precious metals."  *Worth*

24  *Bullion*, 717 F.3d at 547.  The respondent businesses provided the documents in question, but

25  redacted the names and contact information of individual customers, retailers, and intermediaries on

26  the assertion that the information was protected by the RFPA.  *Id.*  The vendors believed that to be

27  the case because their sales of precious metals were "financed, meaning that the customer pays only

28  a portion of the price and borrows the remainder."  *Id.* at 547-48.  The vendors argued—much like

defendants here—that the term "consumer finance institution" covers "nonbank entities who deal directly with customers to provide and facilitate financing for business or personal use." *Id.* at 550.

The Seventh Circuit disagreed. *Worth Bullion*, 717 F.3d at 550. It applied the canon of *noscitur a sociis*, and analyzed the catch-all term "consumer finance institution" in light of what other enumerated entities have in common. *Id.* at 550-51. In the context of determining whether the fact that a precious metal vendor's provision of financing for purchases made it similar to other covered entities, the court reasoned that what "banks, card issuers, loan and trust companies, and credit unions" all had in common was that they "convey considerably more than a tangential or secondary relationship to the field of financing." *Id.* at 551. Unlike the precious metal vendors, whose key purpose was to sell precious metals and only provided financing options to facilitate those sales, "a primary reason" the other institutions "exist[] is to provide financing and cash loans to the general public, making these services a core function and purpose of such businesses." *Id.* The court rejected the vendors' broader interpretation of the term covering even incidental financial services because it would "include every retailer that extends financing to a percentage of its customers as part of its business," when the statute was only intended to cover companies whose core purpose is the provision of financial services. *Id.* Accordingly, "the provision of financing is not a defining characteristic of appellants' business" but rather "a means to an end, the real or primary goal of the transaction being a sale of precious metals." *Id.* The vendors were "sellers, not financial institutions." *Id.*

That the Seventh Circuit discussed financing specifically is not surprising, as the only type of financial service offered by the defendant in *Worth Bullion* was lending. But far from holding that only lending institutions qualify as "financial institutions" under the statute, *Worth Bullion* merely held that the catch-all term "consumer finance institution" should be construed to cover only entities whose "core function" makes them in some way similar to the other enumerated entities, based on the canon of *noscitur a sociis*.[1]

Applying the logic of *Worth Bullion* to this case actually supports Plaintiffs, not Defendants. It is beyond dispute that the MTB Defendants provide important financial services to their

---

[1]  The district court decision in *FTC v. Sterling Precious Metals, LLC*, 2013 WL 1442180 (S.D. Fla. Apr. 9, 2013) is inapposite for the same reasons as *Commodity Futures*.

1    customers—primarily through, though not exclusively, receiving, holding, and transferring money

2    across state and national borders—and that such service is the very core of their business.  That

3    makes them like many of the enumerated entities which also facilitate the movement of money

4    through deposits, withdrawals, transfers between accounts, transfers between accountholders, and

5    transfers between institutions.  That is exactly what the MTB Defendants do.  Tellingly, Defendants

6    do not cite a single case holding or even suggesting that their businesses are *not* consumer finance

7    institutions.  Instead, they cite cases about other kinds of businesses, like pawnshops, *see Winters v.*

8    *Board of County Commissioners*, 4 F.3d 848 (10th Cir. 1993), or precious metal vendors, *see Worth*

9    *Bullion*, 717 F.3d 545.  Of course, money transfer businesses whose core activity involves providing

10   financial services to consumers are nothing like pawnshops or precious metal dealers.

11         Plaintiffs' construction of "consumer finance institution" also is more consistent with the

12   statute's purpose and the common understanding of the term "consumer finance institution" than

13   Defendants' construction.

14         The RFPA was "intended to protect the customers of financial institutions from unwarranted

15   intrusion into their records while at the same time permitting legitimate law enforcement activity."

16   H.R. Rep. No. 95-1383, at 28 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9273, 9305. The statute

17   was "a Congressional response to the Supreme Court decision in The United States v. Miller which

18   held that a customer of a financial institution has no standing under the constitution to contest

19   government access to financial records." *Id.* at 9306.

20         Congress' express desire to respond to the Supreme Court's holding in *United States v.*

21   *Miller* definitively rebuts any notion that the RFPA was exclusively or even primarily concerned

22   with lenders or the act of lending, as Defendants posit.  Indeed, *Miller* was not about privacy rights

23   in lending.  Rather, the case involved a defective subpoena to a bank for "all records of accounts,

24   i.e., savings, checking, loan, or otherwise," and the records obtained and reviewed by the

25   government included "all checks, deposit slips, two financial statements, and three monthly

26   statements."  *Miller*, 425 U.S. at 437-38.  The government then used those records to identify "three

27   financial transactions" that formed the basis of a criminal prosecution, which information the

28   defendant unsuccessfully argued should have been suppressed. *Id.*

---

Very clearly, *Miller* was about the privacy of financial *transactions*, not just lending records. Congress' "fix" for *Miller* was the RFPA.  Given that backdrop, Congress was plainly concerned not just with privacy of lending and borrowing activity, but also financial records more broadly, including information about financial transactions.  Indeed, the vast majority of cases addressing the RFPA's application to government subpoenas for financial records involve just that—an investigative interest in *transactions*, such as transfers between individuals and between accounts, deposits, and withdrawals—not lending and borrowing activities.[2]

Finally, Defendants also argue that the Court should imply Congressional intent to *exclude* money transfer institutions based on post-9/11 amendments to the RFPA that apply a different definition of the term "financial institution" for only certain provisions of the statute.  *See* 12 U.S.C. § 3401(1) (definition quoted above applies "except as provided in section 3414 of this title"); *id.* § 3414(e) ("For purposes of this section, and sections 3415 and 3417 of this title insofar as they relate to the operation of this section, the term 'financial institution' has the same meaning as in subsections (a)(2) and (c)(1) of section 5312 of Title 31," with certain exceptions).  The statute was

---

[2] *See, e.g.*, *Nicksolat v. U.S. Dep't of Transp.*, 277 F. Supp. 3d 122, 126 (D.D.C. 2017) (seeking records re: "deposit slips, withdrawals, monthly statements, . . . and wire transfers"); *Lerman v. SEC*, 928 F. Supp. 2d 798, 801 (S.D.N.Y. 2013) (regarding subpoenas for evidence of inter-account transfers); *Chang v. Tenn. Valley Auth.*, 82 F. Supp. 2d 817, 819 (E.D. Tenn. 2000) (seeking "bank statements, deposit slips with deposit items, canceled checks, cash withdrawal slips, wire transfers, cashier checks, and certified checks"); *United States v. Wilson*, 571 F. Supp. 1417, 1419 (S.D.N.Y. 1983) (seeking records "relating to the transfer . . . of funds to these bank accounts by way of electronic or wire transfer"); *Galloway v. United States Dep't of Transp. Off. of Inspector Gen.*, 2019 WL 4479970, at *9 (N.D. Ohio Sept. 18, 2019) (seeking "details of deposits, withdrawals, debits, and checks written on the account(s)," "[a]ll checks . . . and money orders purchased," and "[a]ll incoming and outgoing wire transfers"); *Falls v. Dep't of Def.*, 2017 WL 990586, at *1 (N.D. Fla. Feb. 9, 2017) (seeking "statements, correspondence, deposit and withdrawal records, wire transfers, ATM transactions, debit and credit card transactions, checks, and records reflecting account ownership"), *report and recommendation adopted*, 2017 WL 989262 (N.D. Fla. Mar. 14, 2017); *Penalosa v. Dep't of Def.*, 2015 WL 1598088, at *3 (D. Colo. Apr. 8, 2015) (seeking "monthly bank statements . . . deposit records, withdrawal records, wire transfer records, Automatic Teller Machine transaction records, debit and credit card transaction records, checks drawn on or deposited into the account"); *Harrison v. SEC*, 2012 WL 13130044, at *2 (N.D. Ga. Aug. 3, 2012) (seeking "deposit and withdrawal slips, wire transfers, wire transfer instructions or other letters of instruction, backs and fronts of checks, money orders"); *Tabet v. SEC*, 2012 WL 3205581, at *1 (S.D. Cal. Aug. 6, 2012) (seeking "account statements, checks, wire transfers"), *aff'd*, 2012 WL 3986656, at *1 (S.D. Cal. Sept. 11, 2012); *Lanier v. Dep't of Def*, 2011 WL 1659313, at *1 n.1 (S.D. Miss. Apr. 29, 2011) (seeking "deposit records, withdrawal records, wire transfer records, records of ATM transactions, and of debit and credit card transactions, copies of checks written on the account and/or deposited into the account"); *SEC v. Baian*, 2009 WL 10676276, at *1 (C.D. Cal. Nov. 24, 2009) (seeking "deposit and withdrawal documentation, trading and/or transaction confirmations . . . incoming and outgoing wire transfer records").

not amended with those provisions until December 2003, over three decades after the RFPA was passed.  *See* Intelligence Authorization Act for Fiscal Year 2004, Pub. L. No. 108-177, § 374(a), 117 Stat. 2599, 2628 (Dec. 13, 2003).  Therefore, it is not any indication of Congress' purpose in 1978, when the term "consumer finance institution" was adopted, nor any indication of the common understanding of that phrase at the time it was adopted.  *See Brusewitz v. Wyeth, LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."); *Bd. of Trustees v. Welfare & Pension Admin. Servs.*, 24 F.4th 1278, 1286-87 (9th Cir. 2022) ("We must not attempt to deduce the intent behind one act of Congress from the implication of a second act passed years later.") (quotations omitted).

In any case, Section 3414 and the incorporated provisions of Title 31 do not provide support for Defendants' argument.  Subsections (a)(2) and (c)(1) of 31 U.S.C. § 5312 enumerate over two dozen types of entities considered for purposes of that statute to be "financial institution[s]."  They overlap to a large degree with those enumerated in the RFPA, including banks, *see* 31 U.S.C. § 5312(a)(2)(A)-(E), credit unions, *id.* § 5312(a)(2)(E), and loan companies, *id.* § 5312(a)(2)(P).  While there are some areas of clear divergence—for example, with respect to insurance companies, dealers of precious metals, pawnbrokers, travel agencies, sellers of automobiles, airplanes, and boats, as well as casinos, which are not covered by the RFPA but are enumerated in Section 5312—Section 5312 does *not* include a catch-all term like the RFPA's "consumer finance institution."  Thus, Defendants cannot rule out the possibility that one or more of the entities specifically enumerated in Section 5312 may also be covered by Section 3401's catch-all term "consumer finance institution."  Nothing in Section 5312 is inconsistent with the possibility that RFPA's general term "consumer finance institution" encompasses several of the more specific terms enumerated in 31 U.S.C. § 5312, including the one that matters most here, "a licensed sender of money or any other person who engages as a business in the transmission of currency, funds, or value . . . or any network of people who engage as a business in facilitating the transfer of money."  31 U.S.C. § 5312(a)(2)(R).[3]

---

[3]  In *Worth Bullion*, the Seventh Circuit did not consider the extent to which the term "consumer finance institution" in Section 3401 overlaps with the entities enumerated in 31 U.S.C. § 5312.  It merely rejected the precious metal vendors' "argument that we should adopt the definition of 'financial institution' contained in the Bank Secrecy Act," given that the sections into which that definition were incorporated were not at issue.  717 F.3d at 552.  Plaintiffs here do not argue that the definition in the Bank Secrecy Act applies; they argue that "consumer finance institution" includes

15

1    Therefore, the language of 31 U.S.C. § 5312, and its incorporation into 12 U.S.C. § 3414(e),

2    standing alone, sheds no light on the meaning of the term "consumer finance institution" in 12

3    U.S.C. § 3401(1), even if it were proper to take a 2003 amendment into consideration when trying to

4    discern the meaning of language passed over two decades prior.[4]

##       2.       RFPA's Section 3414 Does Not Categorically Exempt DHS and ICE From Its Requirements

6            One defendant—Continental—advances the startling argument that the RFPA categorically

7    excludes disclosure of financial transactions to DHS or ICE from its consumer notice requirements.

8    *See* Continental Mot. at 10-12.  Not even DHS or ICE argue in favor of this radical interpretation of

9    the law.  The gist of Continental's argument is that because DHS and ICE's general mandate

10   includes counter-terrorism and counter-intelligence work, *all* disclosures to those entities are

11   exempted from RFPA's customer notice requirements under 12 U.S.C. § 3414.  But that's not what

12   the statute says at all.  Rather, Section 3414 provides that the statutory notice requirements do not

13   apply to requests for records from "a Government authority authorized to conduct foreign counter-

14   or foreign positive-intelligence activities *for purposes of conducting such activities*" or "a

15   Government authority authorized to conduct investigations of, or intelligence or counterintelligence

16   analyses related to, international terrorism *for the purpose of conducting such investigations or*

17

18   money transfer businesses.
19   [4] The Federal Defendants' and Western Union's attempt to draw meaning from recent comments by
     Senator Wyden is unavailing.  "As an expression of Congress' understanding as to the scope of [a
20   law], such *post hoc* observations by a single member of Congress carry little if any weight." *Quern
     v. Mandley*, 436 U.S. 725, 736 n.10 (1978); *see Covalt v. Carey Canada, Inc.*, 860 F.2d 1434, 1438-
21   39 (7th Cir. 1988) (rejecting reliance on post-enactment statements of legislators as reliable guide to
     statutory meaning, writing that "subsequent writings may be nothing but wishful thinking, and
22   unless they are uttered as part of the process of enacting a later law (and therefore show assumptions
     on which Congress as a whole acted at least once) they are of no account").  This rule carries even
23   more weight here since Senator Wyden was not even part of the enacting Congress, and may have
     his own political motivations for asserting that money transfer businesses are not covered by the
24   RFPA (namely, to make the case that new legislation is needed), whether or not his assertion accords
     with the best reading of the law (and it does not).  Further, Western Union's reliance on an old
25   version of the U.S. Department of Justice's Criminal Resource Manual is unavailing, the manual's
     conclusory and unreasoned assertion is not entitled to any deference, particularly since the
26   Department is not charged with policy-making authority under the RFPA.  *See, e.g.*, *Food & Drug
     Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (noting that *Chevron*
27   deference applies only "to an agency's construction of a statute that it administers [and] is premised
     on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the
     agency to fill in the statutory gaps"); *United States v. Mead*, 533 U.S. 218, 230 (2000) (noting that
28   *Chevron* deference at best applies to interpretations adopted through "notice-and-comment
     rulemaking or formal adjudication" or another "relatively formal administrative procedure tending to
     foster the fairness and deliberation that should underlie a pronouncement of such force").

1   *analyses*." 12 U.S.C. §§ 3414(a)(1)(A) & (a)(1)(C) (emphases added).

2          Nothing in Plaintiffs' complaint supports the notion that Plaintiffs' and the proposed Class

3   Members' data was produced to TRAC in connection with a counterterrorism or counterintelligence

4   investigation.  To the contrary, Plaintiffs' claims turn on the notion that the underlying subpoenas

5   were not made in furtherance of an investigation of any kind.  They are dragnet subpoenas which

6   seek huge amounts of information of no conceivable relevance to counterterrorism or

7   counterintelligence.

8          Even if we take these subpoenas at face value, to the extent that Plaintiffs allege disclosures

9   were made in response to requests from DHS and ICE, they allege the disclosures were made in

10  connection with customs summonses.  *See* FAC ¶ 46.  Customs summonses are issued "for the

11  purpose of ascertaining the correctness of any entry, for determining the liability of any person for

12  duty, fees and taxes due or duties, fees and taxes which may be due . . ., for determining liability for

13  fines and penalties, or for insuring compliance with the laws of the United States . . . ."  19 U.S.C. §

14  1509(a); *see also* 19 C.F.R. § 163.7(a) (summonses are issued in connection with investigations

15  "initiated for the reasons set forth in § 163.6(c)"); 19 C.F.R. § 163.6(c)(1) (applicable reasons relate

16  to duties, taxes, and fees and other customs laws).  These are not the type of investigations covered

17  by Section 3414.  Further, to the extent disclosures were made to DHS and ICE via TRAC in

18  response to data demands from the Arizona AG, those were ostensibly made to investigate potential

19  racketeering and money laundering, not terrorism or foreign intelligence.  Continental's argument is

20  meritless.

21              **3.     Plaintiffs Are "Customers" of the MTB Defendants**

22          DolEx is the sole defendant to assert that Plaintiffs are not "customers" under the RFPA

23  because they do not maintain "accounts."  DolEx Mot. at 5-6.  The RFPA defines a customer as "any

24  person or authorized representative of that person who utilized or is utilizing any service of a

25  financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in

26  relation to an account maintained in the person's name."  12 U.S.C. § 3401(5).

27          Plaintiffs allege that they used the MTB Defendants' money transfer services.  FAC ¶¶ 53-

28  55.  DolEx claims these allegations are insufficient because Plaintiffs do not explicitly state they did

1   so "in relation to an account maintained in [their] name[s]."  DolEx Mot. at 6. But how else would

2   Plaintiffs utilize the MTB Defendants' services except in relation to their own names and accounts?

3   Plaintiffs' allegations confirm that their transactions are tied to their names, and that their names are

4   part of the information the MTB Defendants shared with the federal government.  FAC ¶ 36.[5]

5   DolEx's own filings indicate that it maintains "accounts" for its customers.[6]  None of the out-of-

6   circuit decisions cited by DolEx show that this is insufficient to state a claim—to the contrary, all

7   they establish is the "account" requirement is really intended to make sure the plaintiff is actually a

8   customer of the institution and not a corporate entity or other unrelated third-party.[7]  (If the Court

9   determines a more specific allegation is required, Plaintiffs can easily provide it in an amended

10  complaint, but the allegations already support a plausible inference that DolEx's customers have

11  accounts with it.)

12       In any case, it isn't even clear that the portion of the statute relied upon by DolEx applies

13  here.  DolEx's argument assumes that the phrase "in relation to an account maintained in the

14  person's name" modifies "person who utilized or is utilizing any service of a financial institution,"

15  but "'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase

16  it immediately follows.'"  *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 837 (9th Cir. 2020) (quoting

---

[5] Discovery will show that the MTB Defendants track all transactions with persistent, unique customer identifiers akin to account numbers.

[6]  In its motion, DolEx attempts to minimize the role it plays in offering its customer lending services, arguing that it is a money transfer business and only facilitates lending through a third-party entity called Oportun.  *See* DolEx Mot. at 10.  As support, it cites a page from its website about the Oportun loan program.  *Id.*  That exhibit, however, states that "[b]y applying through DolEx, you agree that DolEx can use the contact information you provide for a loan application *to also open a DolEx customer account for you*."  DolEx Ex. A at 1 (emphasis added).  Taking DolEx at its word, the language can only be understood to mean that DolEx creates a money transfer account for people who apply for a loan through its platform, which further supports Plaintiffs' argument that money transfer customers have "accounts" with the company.

[7]  *See, e.g.*, *Chao v. Cmty. Tr. Co.*, 474 F.3d 75, 81-82 (3rd Cir. 2007) (trusts are not "persons" or "customers" covered by RFPA); *Duncan v. Belcher*, 813 F.2d 1335, 1338 (4th Cir. 1987) (plaintiff individuals *were* American Express customers because account was in their names, notwithstanding use of account for corporate expenses); *Lynn v. United States*, 2013 WL 6989358, at *1-2 (S.D. Ind. 2013) (corporations and trusts were not "customer[s]" covered by the RFPA, and individual's name merely came up in related paperwork but was not accountholder); *Young v. Trans Union*, 2012 WL 12844773, at *7 (N.D. Cal. Aug. 29, 2012) (plaintiff had no account with Visa because Visa was merely a network operator, not a card issuer); *Flatt v. SEC*, 2010 WL 1524328, at *3 (S.D. Fla. Apr. 14, 2010) (limited liability company not a "person" so not a "customer"); *Longi v. New York*, 2006 WL 8441210, at *27 (E.D.N.Y. June 26, 2006) (corporate entity was not a "customer" because it is not a "person"); *In re Porras*, 191 BR 357, 359 (Bankr. W.D. Tex. 1995) (trust not a "person" so not a "customer").

*Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)).  And, in fact, many cases *do* read the limiting phrase as modifying only the preceding phrase "for whom a financial institution is acting or has acted as a fiduciary" and not the earlier phrase "person who utilized or is utilizing any service of a financial institution."  *See Neece v. IRS*, 922 F.2d 573, 574 n.2 (10th Cir. 1990) ("Defendants further argue that plaintiffs did not have a 'customer's relationship' with the Bank as defined in section 3401(5). Section 3401(5) defines a customer as any person who 'utilized or is utilizing any service of a financial institution . . . .'"); *In re Blunden*, 896 F. Supp. 996, 1000 n.1 (C.D. Cal. 1996) ("The Taons half-heartedly suggest that because they do not have accounts with Bank, they are not Bank's customers.  This argument is without merit. Section 3401(5) defines 'customer' as 'any person . . . who utilized . . . any service of a financial institution . . . .'  This definition is broad enough to include loan applicants.").  That makes sense, because some of the enumerated entities—like banks—may have fiduciary duties to persons other than their customers.  *See*, *e.g.*, *Evans v. ZB, N.A.*, 779 Fed. App'x 443, 444-47 (9th Cir. 2019) (explaining that a bank may have a fiduciary duty towards a non-customer when it knows a customer is perpetrating fraud against others).  In such circumstances, RFPA only applies to a bank exercising its fiduciary duty towards an accountholder, not other persons.  Thus, dismissal is improper because the account requirement does not apply here.

### 4.    Plaintiffs' Transaction Records Constitute "Financial Records"

DolEx is also the only defendant to argue that Plaintiffs do not adequately allege the disclosure of "financial records" under RFPA.  DolEx Mot. at 10.  The RFPA defines a "financial record" as "an original of, a copy of, or information known to have been derived from, any record held by a financial institution pertaining to a customer's relationship with the financial institution." 12 U.S.C. § 3401(2).  The sole basis for DolEx's argument is that the transaction records in question cannot be "financial records" because Plaintiffs are not "customers" and DolEx is not a "financial institution."  DolEx Mot. at 10.  DolEx is wrong for the reasons stated in Sections I.A.1 & I.A.3, *supra*.  Therefore, its argument that the records in question are not "financial records" fails.

### 5.    Plaintiffs Adequately Allege Disclosures to a "Government Authority"

The RFPA explicitly provides that "[n]o financial institution, or officer, employees, or agent of a financial institution, may provide to any Government authority access to or copies of, or the

1    information contained in, the financial records of any customer except in accordance with the

2    provisions of this chapter."  12 U.S.C. § 3403(a).  The statute defines a "Government authority," as

3    "any agency or department of the United States, or any officer, employee, or agent thereof."  *Id.*

4    § 3401(3).

5         As the terms of the statute make very clear, the RFPA regulates disclosures to the federal

6    government regardless of how the request for such disclosure is initiated, and by whom.

7    Nevertheless, Continental, DolEx, and Western Union attempt to graft onto the statute language that

8    simply does not appear there: the notion that disclosures to the federal government are not covered if

9    the disclosures are instead requested by a state or local law enforcement agency.  That argument has

10   no support in the statute.  *See Chemeheuvi Indian Tribe v. Newsom*, 919 F.3d 1148, 1153 (9th Cir.

11   2019) ("[W]e are not vested with the power to rewrite the statutes, but rather must construe what

12   Congress has written . . . .  It is for us to ascertain—neither to add nor to subtract, neither to delete

13   nor to distort." (quotation and citation omitted)).

14        Thus, whether the requests for data originated with the federal government or another entity

15   is irrelevant, so long as the requests directed disclosure to the federal government.  Here, even the

16   data requests issued by the Arizona AG meet that criteria because they directed production of

17   responsive data directly to TRAC, which the MTB Defendants knew included the federal

18   government.  Plaintiffs allege "[t]he MTB Defendants were well aware that, by disclosing financial

19   records to TRAC, they were also disclosing them to the federal government agencies participating in

20   TRAC—even when data requests did not come directly from a federal government agency."  FAC

21   ¶ 44.  Plaintiffs cite correspondence from Viamericas and DolEx indicating that, although they were

22   responding to requests ostensibly from the Arizona AG, they knew the records were going to TRAC

23   for federal use.  *Id.* ¶ 46 ("You and I exchanged emails last summer regarding TRAC. . . . I have

24   attached sample SAR data and hope that you will once again consider allowing Viamericas to start

25   exchanging information with TRAC."); *id.* ¶ 47 (DolEx e-mail stating the company would continue

26   sending data to the "TRAC team").  The federal government's involvement in TRAC was no secret.

27   This is not a situation where records disclosed to a state investigator later ended up in the hands of

28   federal agents as an incident of an investigation's later progression or expansion.

With respect to data produced to TRAC in response to requests from the Arizona AG, those are also covered because TRAC and the Arizona AG were acting as agents of the federal government, and the RFPA defines a covered "government authority" to include an "agent" of "any agency or department of the United States."  12 U.S.C. § 3401(3).  Plaintiffs' allegations of an agency relationship in connection with the data requests is well-supported in light of the central involvement of federal officials in TRAC since its inception, and the MTB Defendants' awareness that disclosure to TRAC was the same as disclosure to the federal government.  For example, Plaintiffs allege that "since as early as at least 2015, TRAC, with the participation of federal government agencies, has been gathering and accessing consumer financial records from the MTB Defendants and other money transfer companies . . . ."  FAC ¶ 15.  Plaintiffs note that although the records were obtained under the ostensible authority of various TRAC participants, including the Arizona AG, "[a]ll requests were intended to result in the production of responsive data to TRAC, so that TRAC could make it accessible to all participants, including the federal government."  *Id.* Plaintiffs allege that TRAC was specifically intended to "facilitate the creation of a mass database that federal government agencies and other TRAC participants would be able to access without limitation, sidestepping the protections of the RFPA."  *Id.*  Moreover, Plaintiffs allege that TRAC receives federal funding, *id.* ¶ 16, and that federal involvement in TRAC's predecessor dates to at least 1996, *id.* ¶ 27 (quoting Arizona Attorney General bulletin stating that "TRAC is the nucleus of a state/federal Suspicious Transaction Report Project, which coordinates money laundering investigation and prosecutions among [various Arizona agencies], the U.S. Customs Service, and the Drug Enforcement Administration").  The TRAC surveillance program was "designed to facilitate collaboration between state and federal government agencies, particularly DHS and its predecessors."  *Id.* ¶ 30.  Even when data requests were presented on letterhead from the Arizona Attorney General, "their purpose was to provide access to the financial records to the federal agencies participating in TRAC, including the Federal Government Defendants."  *Id.* ¶ 32.  The federal government was so involved in this program, that when the data sharing agreement between Arizona and Western Union lapsed in 2019, "Defendant DHS stepped in to try to fill the void left" by issuing its own data requests, and "committed to funding TRAC for one year."  *Id.* ¶ 35.  Dozens

1   of federal agencies participate in TRAC.  *Id.* ¶ 41.  Such allegations support a plausible inference

2   that the Arizona AG's demands that money transfer companies produce data in bulk to TRAC were

3   made at the behest of all TRAC members, including the federal government, and that TRAC was

4   also acting as an agent of the federal government.[8]  *See Walker v. S.W.I.F.T. SCRL*, 491 F. Supp. 2d

5   781, 793 (N.D. Ill. 2007) (denying motion to dismiss RFPA claim even though defendant was not a

6   covered "financial institution" because plaintiff adequately alleged that defendant acted as an

7   "agent" of a covered financial institution or government entity).  In contrast, none of the cases cited

8   by Defendants involved a state or local entity or official who was acting as an agent of the federal

9   government.[9]

10          Finally, even if the disclosures made to the federal government through TRAC in response to

11   demands from the Arizona AG are not actionable under RFPA, Defendants' motions should be

12   denied because Plaintiffs allege that some disclosures to TRAC were also made directly in response

13   to demands that came from federal agencies or departments.  *See* FAC ¶ 35 (alleging that HSI agent

14   began issuing summons to Western Union to produce data to TRAC in 2019), *id.* ¶ 45 (alleging that

15   Viamericas and Continental, d/b/a RIA, "also delivered customer data in bulk to TRAC, in response

16   to legal demands from HSI and other government entities"); *id.* ¶ 46 (citing January 2023 Wall

17   Street Journal article in which "'Viamericas said data disclosures were ongoing' in response to

18   customs summonses issued by Defendant ICE"), *id.* ¶ 47 ("Like Viamericas and DolEx, Western

19   Union and Euronet's subsidiary Continental (including Ria and AFEX) have also been providing

20   mass transaction data to TRAC for years," and "[t]hey produced that data in response to requests

21

22   ────────────────────

     [8]  If the Court concludes the present allegations are insufficient to demonstrate an agency
23   relationship, Plaintiffs respectfully request leave to amend.  Plaintiffs could add additional
     allegations, including, among other things, that representatives of federal agencies sat on TRAC's
     board and that federal agencies worked closely with TRAC and the Arizona AG to co-determine
24   their strategy.  Indeed, even the Arizona courts recognized that "the federal government, has
     apparently decided to gather its financial data through Arizona law."  *Goddard*, 166 P.3d at 926.
25   [9]  *See United States v. Zimmerman*, 957 F. Supp. 94, 96 (N.D. W. Va. 1997) (very limited factual
     record, but nothing indicating that the county sheriff who obtained the records did so at the behest of
26   the federal government or with the express purpose of providing it to them); *Donahue v. Gavin*, 1999
     WL 165700, at *7 (E.D. Pa. Mar. 12, 1999) ("Since plaintiff does not allege that federal authorities
27   had any role in the events giving rise to his RFPA claims, he has failed to state a cause of action
     pursuant to that Act."); *Byrd v. GMAC Mortgage LLC*, 2020 WL 4577461, at *3 (D. Colo. Aug. 7,
28   2020) (no allegation that lender reported information to the federal government, only to to private
     credit reporting agency); *Rosiere v. SEC*, 2010 WL 419440, at *1 (D. Nev. Jan. 29, 2010) (plaintiff
     sought to quash subpoena issued by Florida Office of Regulation, not SEC, and no indication that
     Florida acted at SEC's behest or for the express purpose of providing records to SEC).

1   from federal agencies, as well as state law enforcement agencies acting on behalf of TRAC and its

2   membership").  Thus, at the very least, the productions made in response to requests that originated

3   directly from a federal entity are covered by the RFPA.

4           **6.**     **Mr. Alegria Has Standing to Sue Viamericas Under the RFPA**

5        Apart from the merits, Viamericas alone contends that Plaintiff Alegria lacks standing to sue

6   Viamericas under the RFPA on traceability and redressability grounds.  Viamericas argues that Mr.

7   Alegria's injuries (for RFPA purposes) are not traceable to Viamericas' conduct—because

8   Viamericas turned over information in response to an Arizona subpoena, and that if the federal

9   government accessed the disclosed information, it was the doing of a third party and not

10   Viamericas—and that Mr. Alegria's requested injunction would not redress any injuries he has

11   suffered. Neither argument should prevail.

12        First, Viamericas' assumption that disclosures in response to the Arizona subpoenas are *not*

13   governed by RFPA assumes the truth of important legal and factual questions related to the merits in

14   this matter.  As discussed above, Plaintiffs contend that such disclosures *are* governed by the RFPA,

15   because the disclosures were made with the understanding that the federal government would obtain

16   and have access to Viamericas' transaction data and because Arizona and TRAC acted as an agent of

17   the federal government.  Because Viamericas' standing argument is intertwined with the merits of

18   this action, it should be rejected and the case resolved on the merits.  *See Safe Air for Everyone v.*

19   *Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004).

20        In any event, Viamericas' own presentation undermines its argument.  As the Castaneda

21   declaration states, the disclosures Viamericas made in response to the Arizona subpoena were made

22   *to TRAC*, an entity composed of dozens of federal government agencies and which received funding

23   from the federal government.  Dkt. 63-1, ¶ 6.  This is, of course, consistent with the allegations in the

24   Amended Complaint.  *See* FAC ¶ 45 (letter from Senator Wyden stating that "[o]utside counsel for

25   Viamericas informed my office that in addition to the requests from HSI San Juan, the company also

26   received legal demands from the Arizona AG, the DEA, and the FBI"); *id.* ¶ 46 (quoting February

27   2017 e-mail from Viamericas' Legal Counsel & Compliance Officer in connection with Arizona AG

28   administrative subpoena, stating, "I . . . hope that you will once again consider allowing Viamericas

to start exchanging information with TRAC"); *id.* ¶ 46 (quoting January 2023 Wall Street Journal article providing that "Viamericas said data disclosures were ongoing" in response to DHS customs summonses). So this is not a case in which Viamericas made an innocent disclosure to the Arizona AG, after which the federal government independently accessed the material disclosed. Instead, Viamericas made the disclosure *directly to TRAC*, including its federal government members, as well as in response to demands from the federal government. Plaintiffs' injury is therefore traceable to Viamericas' conduct.

Viamericas' arguments about Plaintiffs' requested injunctive relief are similarly unavailing. The only injunction Plaintiffs seek against the MTB Defendants is an injunction preventing them from providing information to TRAC without first complying with the RFPA, so long as TRAC is a conduit to the federal government. FAC Prayer for Relief (d). Plaintiffs have not requested an injunction forbidding compliance with valid Arizona subpoenas. Plaintiffs have only requested future compliance with the RFPA. That injunction would redress the privacy invasion caused by Viamericas' disregard of that statute. There is no issue of redressability here.

In sum, there is no basis to dismiss Plaintiffs' claims under the RFPA.

## B.   Plaintiffs Sufficiently Allege UCL Claims Predicated on the MTB Defendants' Violation of CalFIPA.

Plaintiffs' next claim arises under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* The UCL prohibits "unfair competition," *id.* § 17203, which is broadly defined to include any "unlawful" business practice, *id.* § 17200. "'By proscribing 'any unlawful' business practice, Business and Professions Code section 17200 'borrows' violations of other laws and treats them as 'unlawful practices' that the UCL makes independently actionable." *Rose v. Bank of Am., N.A.*, 304 P.3d 181, 185 (Cal. 2013) (quotations omitted). A suit alleging "unlawful" conduct does not enforce the underlying statute, but simply allows private plaintiffs to prosecute unfair competition claims. *Id.*; *see also Stop Youth Addiction v. Lucky's Stores, Inc.*, 950 P.2d 1086, 1094 (Cal. 1998), *superseded by statute on other grounds*.

Plaintiffs allege that the MTB Defendants engaged in unlawful conduct because their decision to share their sensitive personal information with TRAC violates the California Financial Information Privacy Act ("CalFIPA"), Cal. Fin. Code § 4050 *et seq.* That law provides that "a

1   financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal

2   information to or with any nonaffiliated third parties without the explicit prior consent of the

3   consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.

4       There is no argument that the MTB Defendants are not "financial institutions" subject to this

5   law,[10] nor is there any dispute about whether "nonpublic personal information" was disclosed

6   without consent.  Instead, the MTB Defendants argue that this claim must be dismissed for,

7   essentially, one of three reasons.  First, Continental argues that Mr. Alegria lacks standing to pursue

8   this claim either because he has not lost any money or property (a prerequisite to bringing this claim

9   in a representative capacity, *see* Cal. Bus. & Prof. Code § 17204).  Second, Continental and Western

10  Union argue that, because CalFIPA itself lacks a private right of action, Plaintiffs cannot borrow a

11  CalFIPA violation to pursue a UCL claim.  Third, all MTB Defendants contend that their conduct

12  fits within certain exceptions to liability under CalFIPA (though not all defendants invoke all

13  exceptions).  None of these arguments can carry the day.

14      **1.**    **Plaintiffs Have "Lost Money or Property"**

15      Continental's contention that Mr. Alegria has not lost money or property can be easily

16  dispatched.  Plaintiffs all say they would not have used the services of the MTB Defendants, which

17  cost money, had they understood that their personal information and transaction data would

18  thereafter be shared with the federal government, not to mention the governments of several states,

19  and even be made available to local law enforcement.  FAC ¶ 85 ("Had Plaintiffs and the California

20  Subclass members known that their private financial records would be shared with state and federal

21  law enforcement agencies around the country through TRAC, they would not have chosen to use and

22  pay for the MTB Defendants' services.").  As such, the MTB Defendants' noncompliance with

23  CalFIPA caused the Plaintiffs to lose money in the form of service fees they paid.  *See Kwikset*

24  *Corp. v. Superior Court*, 246 P.3d 877, 889-91 (Cal. 2011) (allegation that a consumer would not

25

---

26  [10] CalFIPA covers money transfer businesses.  *See* Cal. Fin. Code § 4052(c) ("'Financial institution' means any institution the business of which is engaging in financial activities as described in Section

27  1843(k) of Title 12 of the United States Code and doing business in this state."); 12 U.S.C. § 1843(k)(4)(A) (providing that "the following activities shall be considered to be financial in

28  nature," including "[l]ending, exchanging, *transferring*, investing for others, or safeguarding money or securities") (emphasis added).  Western Union concedes as much.  *See* Western Union Mot. at 14 n.10.

have purchased product absent an unlawful representation about the product sufficient to demonstrate that the plaintiff has "lost money or property" within the meaning of the UCL). Continental's argument that this case also concerns privacy invasions is beside the point. Whether or not Continental is right that loss of control over personal information is not the kind of economic injury that permits a representative suit under the UCL (and it is not right—*see Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (rejecting argument similar to that pressed by Continental)), Mr. Alegria's allegations explain why he would have elected to find some other way to remit money to his friends and family, rather than use Continental's services.

### 2. The Lack of a Private Right of Action Under CalFIPA Does Not Foreclose Plaintiffs' UCL Claim.

Next, Continental and Western Union contend that Plaintiffs cannot maintain a claim under the UCL for violations of CalFIPA because CalFIPA does not itself have a private right of action. Western Union adds that because CalFIPA contains a provision for civil penalties that can only be obtained in a public enforcement action, no UCL action can be maintained that is premised on violations of CalFIPA. Neither argument is persuasive.

The bottom line is that a predicate statute need not itself be independently actionable for a plaintiff to bring a claim under the UCL's unlawful prong. *See Kasky v. Nike, Inc.*, 45 P.3d 243, 249 (Cal. 2002) ("A private plaintiff may bring a UCL action even when the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action." (quotations omitted)). Instead, "the UCL cannot be used to state a cause of action the gist of which is absolutely *barred* under some other principle of law." *Zhang v. Superior Court*, 304 P.3d 163, 172 (Cal. 2013) (quoting *Stop Youth Addiction*) (emphasis added). That bar can come from the statutory language itself, *see, e.g.*, Cal. Civ. Code § 1798.150(c) ("Nothing in this title shall be interpreted to serve as the basis for a private right of action under any other law."), or from some other source of law, *see Stop Youth Addiction*, 950 P.2d at 1094 (litigation privilege would bar UCL action). "The rule does not, however, prohibit an action under the [UCL] merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually 'bar' the action or clearly permit the conduct." *Cel–Tech Communications Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th

163, 182-83 (1999).

In fact, California courts have made this clear, several times over.  In *Stop Youth Addiction*, the plaintiff sued the defendant under the UCL for selling cigarettes to minors in violation of Cal. Penal Code § 308.  950 P.2d at 1090.  Cal. Penal Code § 308 contains no private right of action, but does establish that violation of § 308 is a misdemeanor and that in "a civil action brought by a city attorney, a county counsel, or a district attorney" the government could seek fines.  Cal. Penal Code § 308(a)(1)(A)(i).  The California Supreme Court rejected the defendant's argument that the lack of a private right of action and the provisions for public enforcers to pursue civil penalties precluded the plaintiff's UCL claim.  The court noted that "simply no basis exists for concluding that . . . the Legislature intended to bar unfair competition causes of action" for conduct that violated § 308.  *Id.* at 1094.  Moreover, the court held that "it does not follow" that § 308's provision for public enforcement somehow barred a UCL claim that borrows violations of § 308 to demonstrate unfair competition.  *Id.*  The court further noted that any legislative bar to such a UCL claim must be "expressly" stated.  *Id.* at 1099 (discussing Cal. Bus. & Prof. Code § 17205).  Finding no express bar, nor any other basis to bar the UCL claim, the court affirmed the judgment overruling the demurrer.

In *Rose v. Bank of America*, the California Supreme Court was confronted with a UCL claim that borrowed violations of the federal Truth in Savings Act, a law for which Congress had *repealed* the private right of action.  57 Cal. 4th 390 (2013).  The court held that the claim could go forward, emphasizing "the independent nature of a UCL action." *Id.* at 396.  A UCL claim, the court reiterated, is an independent claim that enforces California's prohibition on unlawful practices, not a claim to enforce the law on which the claim of an unlawful business practice is based.  *Id.*; *see also Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1336 (2009) (resolving UCL claim based on violation of Cal. Ins. Code § 381(f), which is not enforceable in a private action for money damages); *Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463, 1481 (2005) (holding that regulations of the Office of the Comptroller of the Currency may be the basis for a UCL claim).

Thus, the lack of a private right of action in CalFIPA cannot stand in the way of a UCL action.  Moreover, none of the MTB Defendants identify any separate bar to this action.  And

Western Union's point that CalFIPA provides a mechanism for public enforcement does not move the needle either.  It is plain enough that a private plaintiff cannot use the UCL to obtain the same penalties available to the Attorney General under CalFIPA.  But the UCL provides for its own set of remedies, which are distinct from (and expressly cumulative to) the public remedies specified in CalFIPA.  *See Rose* at 398-99.  As *Stop Youth Addiction* holds, the mere existence of a public enforcement mechanism is insufficient to preclude a UCL plaintiff from borrowing a predicate statutory violation to demonstrate unfair competition.  Thus, there is no barrier to a UCL claim here.

### 3.    None of the Exceptions to Liability Under CalFIPA Apply Here

The MTB Defendants next contend that because their conduct falls within certain exceptions to CalFIPA that any UCL claim based on noncompliance with CalFIPA must fail.  Subject to certain exceptions, CalFIPA prohibits financial institutions from disclosing or sharing a consumer's "nonpublic personal information" absent notice and written consent.  *See* Cal. Fin. Code § 4053.  The exceptions are codified at Cal. Fin. Code § 4056.

As an initial matter, because § 4056 sets forth various exceptions to the general rule of liability codified in § 4053, the exceptions constitute affirmative defenses, and the MTB Defendants bear the burden of proving their entitlement to them.  *See Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 23 (2010) ("In California, it has been declared that where the statute has exemptions, exceptions or matters which will avoid the statute the burden is on the claimant to show that he falls within that category.") (quotations omitted); *People v. Fisher*, 96 Cal. App. 4th 1147, 1151 (2002) ("It is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant.") (quotations omitted).  Thus, dismissal on the basis of any of these exceptions is merited only if the operative complaint conclusively establishes the Defendants' entitlement to one of Section 4056's exceptions.  *See Monex Credit*, 931 F.3d at 972-73.  That is not the case here.

The MTB Defendants seek refuge in various exclusions:

- Paragraph (b)(3)(B) (Continental only): "The nonpublic personal information is: released to protect against . . . unauthorized transactions, claims, or other liability." (§ 4056(b)(3)(B))

- Paragraph (b)(5) (Continental, Western Union, and Viamericas only): "The nonpublic personal information is released to the extent specifically required or specifically permitted under other provisions of law and in accordance with the Right to Financial Privacy Act of 1978 [], to law enforcement agencies, including a federal functional regulator, the Secretary of the Treasury with respect to subchapter II of Chapter 53 of Title 31, and Chapter 2 of Title I of Public Law 91-508 (12 U.S.C. [§§] 1951-1959), the California Department of Insurance or other state insurance regulators, or the Federal Trade Commission, and self-regulatory organizations, or for an investigation on a matter related to public safety." (§ 4056(b)(5))

- Paragraph (b)(7) (Continental, Western Union, Viamericas, and DolEx): "The nonpublic personal information is released to comply with federal, state, or local laws, rules, and other applicable legal requirements; to comply with a properly authorized civil, criminal, administrative, or regulatory investigation or subpoena or summons by federal, state, or local authorities; or to respond to judicial process or government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law." (§ 4056(b)(7)).

- Paragraph (b)(12) (Continental only): "The nonpublic personal information is: released as required by" the USA PATRIOT Act. (§ 4056(b)(12))

But the Complaint does not conclusively establish the MTB Defendants' entitlement to these exceptions.  The MTB Defendants premise their various arguments upon the fact that they surrendered information to the TRAC database after receiving either a state administrative subpoena or a federal customs summons.  But Defendants do not explain, and cannot explain at this stage, how these requests, which are not connected to any specific investigation, allegation of wrongdoing, or limited in any way to potentially suspicious transactions, are valid.  But accepting these arguments would cause the exceptions to swallow the rule.  Defendants' attempts to engineer this end-run around Plaintiffs' privacy rights must be rejected.

  a.  **The disclosures were not made pursuant to a properly authorized subpoena.**

Only one exception cited by the MTB Defendants directly addresses the situation presented here, *i.e.*, disclosure in response to a subpoena, *see* Cal. Fin. Code § 4056(b)(7), and it is also the only exception advanced by all MTB Defendants.  Paragraph (7), however, only exempts such disclosures from liability if made to comply with a "properly authorized" subpoena.  Disclosures made in response to subpoenas which are not properly authorized are explicitly not exempted from liability under CalFIPA.  *See Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1312-13 (9th Cir. 1992) ("Most strongly put, the expressio unius, or inclusio unius, principle is that when a statute

1  limits a thing to be done in a particular mode, it includes a negative of any other mode." (quotations

2  omitted)).

3       The issues here are two-fold.  First, the subpoenas from the Arizona AG are not lawful uses

4  of that office's subpoena power.  Arizona law permits the Arizona AG to seek information that has

5  some connection to conduct indictable in Arizona.  *See generally Goddard*, 166 P.3d at 918-26.  The

6  investigative requests issued here are wildly overbroad (they seek an array of information about *all*

7  money transfers over $500 between *anywhere in Mexico* and anywhere in one of four states,

8  including California), and, at least as they relate to Plaintiffs and all proposed class members who

9  did not undertake transactions to or from Arizona, have no apparent connection to Arizona.  In fact,

10  the subpoenas at issue here are even more overbroad than the subpoena at issue in *Goddard*, which

11  sought information only about transfers from one Mexican state (which itself borders Arizona).  *Id.*

12  ¶ 2.  An Arizona Court of Appeal has already held that subpoenas like the ones issued by the

13  Arizona AG here are not properly authorized, so standing alone they cannot immunize the MTB

14  Defendants from liability under CalFIPA.

15       Second, regardless of whether the Arizona AG subpoenas were valid under Arizona law, the

16  ensuing disclosures were unlawful under federal law insofar as the RFPA regulates disclosures to

17  federal entities (regardless of the identity of the requesting party), the Arizona AG subpoenas

18  directed production to the federal government through TRAC (as the MTB Defendants allegedly

19  knew), and the Arizona AG's data requests were apparently made with the federal government's

20  knowledge, support, and acceptance, demonstrating an agency relationship with the federal

21  government, as explained above.  *See* Section I.A, *supra.*  Because that is so, and because, as

22  alleged, the RFPA's procedures were not observed here, the subpoenas in question and the ensuing

23  disclosures were unauthorized.

24       Third, to the extent data was produced in response to customs summonses from DHS/HSI,

25  federal law does not authorize HSI to issue dragnet-style subpoenas.  HSI's authority to seek

26  transactions data from the MTB Defendants derives from 19 U.S.C. § 1509, a provision of federal

27  law that authorizes customs summonses.  But section 1509 only authorizes summonses in aid of an

28  investigation into illegal imports or unpaid customs duties.  *Id.* § 1509(a).  Any records sought using

1    a section 1509 summons must be relevant to such an investigation.  *Id.* § 1509(a)(1)(A).  The

2    summonses here don't meet that test.  HSI cannot possibly certify that the dragnet-style requests

3    (which include requests for domestic transfers between the four border states) seek only records that

4    are relevant to an investigation into a violation of the customs laws.  Because these summonses are

5    not authorized by federal law, in addition to their noncompliance with the RFPA, paragraph (7)

6    exception is inapplicable to the HSI data requests.

7                    **b.        None of the other exceptions indirectly apply.**

8            As stated above, Paragraph (b)(7) is the only exception cited by the MTB Defendants that

9    explicitly covers subpoenas.  The remaining exceptions—Paragraphs (b)(3), (b)(5), and (b)(12)—do

10   not explicitly refer to subpoenas.  Thus, at worst, they only indirectly reach situations involving the

11   sharing of financial records in response to a subpoena.  Because one exception from CalFIPA

12   directly addresses subpoenas, ordinary canons of statutory construction instruct that the same subject

13   matter is not likely covered by other exceptions.  *See Picayune Rancheria of Chukchansi Indians v.*

14   *Brown*, 229 Cal. App. 4th 1416, 1428 (2014) (noting longstanding canon of construction that, if

15   possible, meaning is to be given to every word); *see also* Cal. Civ. Code § 1858 ("In the construction

16   of a statute or instrument, . . . where there are several provisions or particulars, such a construction

17   is, if possible, to be adopted as will give effect to all.").  And while this canon is only a "starting

18   point," California courts will adopt constructions that involve some linguistic redundancy only if

19   necessary to give effect to "statutory purpose" or "legislative intent."  *Presbyterian Camp &*

20   *Conference Centers, Inc. v. Superior Court*, 501 P.3d 211, 221 (Cal. 2021).

21           But an interpretation which permits disclosures in response to unauthorized, dragnet-style

22   subpoenas undermines, rather than advances legislative intent.  CalFIPA itself declares that the

23   legislature's intent was to "provide their consumers notice and meaningful choice about how

24   consumers' nonpublic personal information is shared" and "to afford persons greater privacy

25   protections" than those guaranteed by the federal Gramm-Leach-Bliley Act.  Cal. Fin. Code § 4051.

26   Moreover, all but one of the exemptions here are drawn from the Gramm-Leach-Bliley Act itself,

27   *see* 15 U.S.C. § 6802.  (The exception is the paragraph (12) exemption referring to the USA

28   PATRIOT Act, a law that postdates the GLBA.)  And a House Report discussing this section of the

1   GLBA asserts the House's intent is that the exemptions "will be applied in a manner consistent with

2   the subtitle's goal of providing consumers with a reliable means to protect their personal financial

3   information."  H.R. Rep. No. 106-74, pt. 3, at 109 (1999); *see also Martino v. Barnett*, 595 S.E.2d

4   65, 71-72 (W. Va. 2004) (observing, in interpreting exception to disclosure prohibition in GLBA,

5   that the "access to the information a claimant may seek is not without restriction" and must be

6   bounded by the GLBA's privacy protective function).  A careful examination of these other

7   exceptions shows that none protect the MTB Defendants from the disclosures here.

8        Consider paragraph (b)(3)(B) (invoked only by Continental), which exempts from CalFIPA's

9   prohibitions disclosures of nonpublic personal information "to protect against or prevent actual or

10  potential fraud, identity theft, unauthorized transactions, claims, or other liability."  Plaintiffs allege

11  that, in fact, the subpoenas are "not focused on particular individuals suspected of criminal activity."

12  FAC ¶ 37.  And no showing has been, or could be made, that it was necessary to release all the

13  information in question to prevent any specific wrongdoing.

14       Continental nevertheless asserts that because failure to respond to a subpoena can result in

15  criminal liability, this exemption applies.  But this is not the type of "other liability" to which the

16  statute refers.  The phrase "other liability" is connected to a series of examples all of which relate to

17  the use, misuse, or abuse of a financial institution's services.  Thus, "other liability" must be a part of

18  the same class of conduct.  *See People v. Arias*, 195 P.3d 103, 180 (Cal. 2008) ("When a particular

19  class of things modifies general words, those general words are construed as applying only to things

20  of the same nature or class as those enumerated."); *Kraus v. Trinity Mgmt. Servs., Inc.*, 999 P.2d 718,

21  734 (Cal. 2000) ("[I]f the Legislature intends a general word to be used in its unrestricted sense, it

22  does not also offer as examples peculiar things or classes of things since those descriptions then

23  would be surplusage."), *superseded by statute on other grounds*.  This reading makes all the more

24  sense when viewed in the context of paragraph (b)(3) as a whole, which also exempts from liability

25  disclosures made, among others, to protect the confidentiality or security of an institution's records,

26  to resolve customer disputes, or to legal representatives of a customer.  All of these exemptions

27  concern a financial institution's services, and its relationship with its customers.  But a subpoena is

28  something else entirely.  This is a type of liability that does not arise directly from how a financial

institution provides services, or how they are used.  In light of established canons of construction and the fact that subpoenas are specifically mentioned elsewhere in § 4056, the paragraph (b)(3)(B) catchall should not be construed to cover liability that arises from potentially ignoring an administrative subpoena.

In a similar vein, Continental asserts that the exemption in paragraph (b)(12)—regarding compliance with the USA PATRIOT Act—also exempts disclosures made in response to administrative subpoenas because regulations implementing that law require money services businesses to have an anti-money laundering program which includes policies and procedures for "responding to law enforcement requests."  31 C.F.R. § 1022.210(d)(1)(i)(D).  It is far from clear that the (b)(12) exemption is implicated.  First, both the regulation and the enabling statute are about developing AML *programs*.  They are not concerned with specific disclosures.  Second, none of the relevant subpoenas sought to further investigations into specific concerns about money laundering; they were, as explained elsewhere, about compiling as much data as possible about individuals in particularly vulnerable communities.  And while racketeering is at least the offered pretext for the Arizona subpoenas, the HSI customs summonses have nothing to do with money laundering.  Surely the USA PATRIOT Act's requirements for developing AML programs do not exempt disclosures in response to all law enforcement requests, of whatever flavor, from CalFIPA's prohibitions, particularly when another exemption deals specifically with subpoenas.  The exception cannot swallow the rule.  Finally, the flaw in Continental's argument is that the recipient of a subpoena or other law enforcement "request" can respond in ways other than simply handing over terabytes of nonpublic personal information on a recurring basis for years at a time, as the MTB Defendants did here.  Many businesses understand that it is not necessary to capitulate to all warrantless requests for data.  The MTB Defendants always retained the option of moving to quash the subpoena in whole or in part.  (And Western Union exercised that right.[11])  It was their choice not to.  That choice does not engineer an end-run around clear, guaranteed privacy rights, particularly when Western Union

---

[11]  Plaintiffs can also amend to allege that, according to June 2021 TRAC Board Minutes obtained through public records requests, Western Union indicated to TRAC that it was considering no longer complying with HSI summonses, even before public reporting blew the lid of the program, demonstrating full well that these sophisticated and lawyered-up businesses know how to evaluate the lawfulness and reasonableness of government inquiries.

1      actually spent years successfully challenging similar subpoenas.

2

3

4           The final exemption invoked by three of the MTB Defendants (Continental, Western Union,

5      and Viamericas) is paragraph (b)(5), and it is a mouthful:

6           The nonpublic personal information is released to the extent specifically required or
            specifically permitted under other provisions of law and in accordance with the Right
7           to Financial Privacy Act of 1978 (12 U.S.C. § 3401 *et seq.*), to law enforcement
            agencies, including a federal functional regulator, the Secretary of the Treasury with
8           respect to subchapter II of Chapter 53 of Title 31, and Chapter 2 of Title I of Public
            Law 91-508 (12 U.S.C. [§§] 1951-1959), the California Department of Insurance or
9           other state insurance regulators, or the Federal Trade Commission, and self-regulatory
            organizations, or for an investigation on a matter related to public safety.
10

11          The bottom line is that this provision is best read as exempting disclosures to a small set of

12     entities (law enforcement agencies, including the list that stretches from "federal functional

13     regulator" to "the Federal Trade Commission," self-regulatory organizations, or "for an investigation

14     on a matter related to public safety") so long as (1) those disclosures are specifically required or

15     permitted by law and (2) made in accordance with the RFPA.  This reading treats the first part of this

16     provision as the general exception (*i.e.*, to the extent permitted or required by law), and the

17     remaining portion (discussing to whom the specified disclosures apply) as limiting the general

18     exception.  Defendants' reading, which treats this section as a list of at least 4 different types of

19     disclosures, fails to comport with the privacy protective nature of CalFIPA, or of the GLBA.  The

20     function of this exception is to ensure that CalFIPA's/GLBA's notice and consent requirement do

21     not interfere with regulatory reporting requirements.  Thus, the exception clearly spells out certain

22     types of regulators, and specifically cites two provisions of federal law that impose particular

23     reporting requirements, see 12 U.S.C. § 1952; 31 U.S.C. §§ 5313-5316.  The exception ensures that

24     customers cannot interfere with this reporting.  Construing the "required by law" language of this

25     exception to also concern law enforcement subpoenas would render paragraph (b)(7) a nullity.

26     Plaintiffs' reading is faithful to the function of this exception and its context within CalFIPA (and

27     the GLBA), without jeopardizing the privacy protective nature of these laws.  Defendants' reading,

28     on the other hand, would permit disclosures for any or no reason at all.  It would immunize

1   disclosures made to embarrass a customer, or disclosures made with a malicious purpose, so long as

2   they were to law enforcement, or another enumerated entity.  Such a construction would undermine

3   the whole point of this law, and should be rejected.  *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d

4   367, 379-80 (N.D. Cal. 2020) (applying "the familiar canon of statutory construction that remedial

5   legislation should be construed broadly to effectuate its purposes") (quoting *Tcherepnin v. Knight*,

6   389 U.S. 322, 336 (1967)); *Chavez v. City of Los Angeles*, 224 P.3d 41, 51 (Cal. 2010) ("When

7   engaged in statutory construction, our aim is to ascertain the intent of the enacting legislative body

8   so that we may adopt the construction that best effectuates the purpose of the law.") (quotations

9   omitted).  Because the disclosures here have nothing to do with reporting requirements, they are not

10  immunized by this exception.  Thus, paragraph (b)(5) does not save the MTB Defendants.

### c.   Plaintiffs' claims regarding CalFIPA are not preempted.

12          Finally, Continental contends that Plaintiffs' UCL claims are preempted by the Gramm-

13  Leach-Bliley Act because the duties imposed by CalFIPA, Continental argues, conflict with duties

14  imposed by Regulation P, a set of rules promulgated by the Consumer Financial Protection Bureau

15  under the auspices of the GLBA aimed at preserving the privacy of those who patronize financial

16  institutions.  The regulation implements the privacy rules enacted in the GLBA, and restates the

17  exceptions to those rules, the same exceptions that are codified in CalFIPA.  *See* 12 C.F.R.

18  § 1016.15.  Continental appears to suggest that to the extent their conduct does not fit within an

19  exception to CalFIPA liability, it nevertheless fits within the very same exception under the GLBA.

20  The argument is a non-starter.  First, this is yet another affirmative defense that Plaintiffs need not

21  plead around.  *See Hendricks v. StarKist Co.*, 30 F. Supp. 3d 917, 925 n.5 (N.D. Cal. 2014).  In any

22  event, even assuming that a preemption analysis is warranted here, the preemption rule in Regulation

23  P does not bar Plaintiffs' claim.  Regulation P states that while "inconsistent" state laws are

24  preempted, a state law is not "inconsistent" with Regulation P if it affords consumers "greater"

25  protections than those offered by Regulation P, echoing the general preemption rule under the

26  GLBA.  *See* 12 C.F.R. § 1016.17(b); *see also* 15 U.S.C. § 6807(b) (same preemption standard).

27  Moreover, as explained above, Continental's contention that CalFIPA and Regulation P impose

28  inconsistent duties is based on precisely the same exceptions discussed above, and the same

---

1    misreading thereof.  *See* Continental Mot. at 22.  To the extent Continental means to argue that there

2    is some conflict between the GLBA/Regulation P and CalFIPA rendering compliance with both an

3    impossibility, this is a "demanding defense" that Continental does not substantiate.  *Hendricks*, 30 F.

4    Supp. 3d at 926.  Continental's plea for preemption is therefore meritless.

5            In sum, there is no basis to dismiss Plaintiffs' UCL claim.

6            **C.     The Bank Secrecy Act Does Not Immunize the MTB Defendants' Conduct**

7            Last, Continental and Western Union seek refuge in a safe harbor provided by the Bank

8    Secrecy Act.  A provision of that law, added as part of the Annunzio-Wylie Anti-Money Laundering

9    Act, 31 U.S.C. § 5318(g)(3), provides that "[a]ny financial institution that makes a voluntary

10   disclosure of any possible violation of law or regulation" to the federal government is not liable

11   under federal or state law.

12           As an initial matter, § 5318(g)(3) at best provides an affirmative defense.  *See Coronado v.*

13   *Bank Atl. Bancorp, Inc*., 222 F.3d 1315, 1319 (11th Cir. 2000) ("The plain language of this section

14   supplies an affirmative defense to claims against a financial institution for disclosing an individual's

15   financial records or account-related activity." (quotations omitted)).  Thus, Continental and Western

16   Union may obtain dismissal on this basis only if the defense is clearly established by the allegations

17   in the Complaint. *See Monex Credit*, 931 F.3d at 973.

18           But the complaint does not establish their entitlement to this defense.  The complaint does

19   not allege a disclosure "of a possible violation of law or regulation."  And as Continental admits, the

20   purpose of the Annunzio Act is to protect "the reporting of *suspicious* transactions."  Continental

21   Mot. at 13 (quotations omitted, emphasis added). The problem is that Continental did not report

22   *suspicious* transactions; it reported *all* transactions.  The complaint alleges indiscriminate production

23   of hundreds of millions of financial records, without regard to whether many or any of them are

24   evidence of a "possible violation of law or regulation."  Neither does the fact that the Arizona AG's

25   subpoenas referenced that state's anti-money laundering statute cure the Defendants' actions as it is

26   neither plausible nor probable that all of the millions of financial records swept up in these dragnet

27   requests were related to ongoing investigations or possible violations of law.  *See also Flowers v.*

28   *First Hawaiian Bank*, 295 F.3d 966, 975 (9th Cir. 2002) (holding that invalidly issued subpoena did

1    not entitle bank to RFPA exemption).

2        The cases relied upon by the Defendants are therefore far afield from the facts of this case, as

3    they all concern targeted disclosures made as a part of an investigation into specific suspected

4    criminal or suspicious activity.  In *Lopez*, for instance, the defendant bank disclosed information

5    about just two electronic transfers received by a single individual at the instruction of federal law

6    enforcement authorities.  *Lopez v. First Union Nat. Bank of Fla.*, 129 F.3d 1186, 1188 (11th Cir.

7    1997).  Those disclosures resulted in a civil asset forfeiture.  *Id.* at 1189.  Similarly, *Coronado* dealt

8    with a scenario in which the financial institution had reason to be suspicious of a particular

9    individual's financial movements to the point it suspected that the individual was facilitating money

10   laundering and bank fraud.  *Coronado*, 222 F.3d at 1317.  With those specific concerns of possible

11   violations of law, the bank reported its suspicions to federal law enforcement officials.  *Id.* Finally,

12   *Widi* involved a grand jury subpoena for financial records which ultimately resulted in an indictment

13   on two criminal charges against Mr. Widi.  *Widi v. McNeil*, 2013 WL 5407457, at *4 (D. Me. Sept.

14   25, 2013).  The existence of the grand jury investigation demonstrates that specific allegations of

15   criminal conduct were likely at issue.  *See Branzburg v. Hayes*, 408 U.S. 665, 686-88 (1972).  In

16   fact, all of the cases discussing the § 5318(g)(3) safe harbor reviewed by Plaintiffs' counsel

17   concerned specific and targeted investigations by law enforcement or the consumer financial

18   institution. *Accord* 12 C.F.R. § 208.62(k) (stating that "the safe harbor provisions of § 5318(g)(3) . . .

19   covers [sic] all reports of suspected or known *criminal violations and suspicious activities* to law

20   enforcement" (emphasis added)).  Indeed, it appears to have been the intent of the provision's drafter

21   to give banks greater freedom to "report suspicious transactions."  139 Cong. Rec. E57-02 (1993)

22   (Letter of Rep. Annunzio), 1993 WL 1254.  In fact, the broad reading of this safe harbor urged by

23   Continental and Western Union would render the RFPA at the very least a dead letter, despite the

24   absence of any indication that this was the intent of the enacting Congress.  Any financial institution

25   could simply give the government open access to all customer records under the guise of allowing it

26   to fish for evidence of unlawful activity; that is not the law.

27        The § 5318(g)(3) safe harbor is not limitless.  *See Greene v. Bank of Am.*, 216 Cal. App. 4th

28   454, 463 (2013) ("The immunity provisions in the Act must be viewed in the context of the Act

---

1  and . . . they cannot be read to immunize any report to law enforcement").  The provision is aimed at

2  the disclosure of particular suspicious transactions, something that is not a feature of the disclosures

3  at issue here.  And, "importantly, the Act requires there to be a 'possible' violation of law—

4  'possible' being the operative word—before a financial institution can claim protection of the

5  statute."  *Bank of Eureka Springs v. Evans*, 109 S.W.3d 672, 680 (Ark. 2003).  While a financial

6  institution's suspicions need not be well founded or ultimately meritorious, *see Nevin v. Citibank,*

7  *N.A.*, 107 F. Supp. 2d 333, 341 (S.D.N.Y. 2000), the indiscriminate disclosure of millions of records,

8  without any reference to suspicious activity, does not acquire the embracive immunity of the

9  § 5318(g)(3) safe harbor.

10  **V.     CONCLUSION**

11       The motions to dismiss should be denied.  Should the Court grant any portion of the motions,

12  Plaintiffs respectfully request an opportunity to amend.

13

14

15  Dated: April 14, 2023                              By:  */s/ Yaman Salahi*

16                                                           Rafey S. Balabanian (SBN 315962)
                                                            rbalabanian@edelson.com

17                                                           Yaman Salahi (SBN 288752)
                                                            ysalahi@edelson.com

18                                                           EDELSON PC
                                                            150 California Street, 18th Floor

19                                                           San Francisco, California 94111
                                                            Tel: 415.212.9300

20                                                           Fax: 415.373.9435

21                                                           Sejal Zota (*pro hac vice*)
                                                            sejal@justfutureslaw.org

22                                                           Dinesh McCoy (*pro hac vice*)
                                                            dinesh@justfutureslaw.org

23                                                           Daniel Werner (SBN 322310)
                                                            daniel@justfutureslaw.org

24                                                           JUST FUTURES LAW
                                                            95 Washington Street, Suite 104-149

25                                                           Canton, MA 02021
                                                            Tel: 617.812.2822

26

27                                                           *Attorneys for Individual and Representative*
                                                            *Plaintiffs Nelson Sequeira, Orsay Alegria,*

28                                                           *and Ismael Cordero*