Alan Butler (SBN 281291)
butler@epic.org
Enid Zhou (SBN 321361)
zhou@epic.org
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Avenue NW
Washington, DC 20036
Tel: 202.483.1140

*Attorneys for Amicus Curiae Electronic
Privacy Information Center*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| NELSON SEQUEIRA, ORSAY ALEGRIA, and ISMAEL CORDERO, individually an on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; WESTERN UNION FINANCIAL SERVICES, INC., a Colorado corporation; CONTINENTAL EXCHANGE SOLUTIONS, INC., a Kansas corporation, d/b/a RIA FINANCIAL SERVICES and AFEX MONEY EXPRESS; VIAMERICAS CORPORATION, a Delaware Corporation; and DOLEX DOLLAR EXPRESS, INC., a Texas corporation,<br><br>Defendants. | Case No.  4:22-cv-07996-HSG<br><br>**BRIEF OF ELECTRONIC PRIVACY INFORMATION CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Date:   May 18, 2023<br>Time:   2:00 p.m.<br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Court: Courtroom 2, 4th Floor, Oakland |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................1

ARGUMENT.......................................................................................2

    I.  The Right to Financial Privacy Act protects customers' financial transaction data at bank and non-bank financial services companies .............2

    II. A narrow interpretation of "consumer finance institution" denies financial privacy to the millions of U.S. immigrants and other vulnerable consumers who rely on money transfer businesses for financial services they otherwise cannot afford to access at banks........................................................8

CONCLUSION ..................................................................................16

1

## TABLE OF AUTHORITIES

2

<u>**Cases**</u>

3

*Bostock v. Clayton Cty.*,
  140 S. Ct. 1731 (2020) ...............................................................................8

4

*California Bankers Ass'n v. Schultz*,
  416 U.S. 21 (1974) ......................................................................................4

5

6

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018) .............................................................................15

7

*United States v. Miller*,
  425 U.S. 435 (1976) ....................................................................................6

8

9

<u>**Statutes**</u>

10

Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311–5330.................................................3

11

Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401–342..............................1

12

<u>**Other Authorities**</u>

13

116 Cong. Rec. 16953 (1970) ......................................................................................2

14

116 Cong. Rec. 16960 (1970) ......................................................................................2

15

118 Cong. Rec. S11298–11315 (daily ed. July 20, 1972) ..........................................4

16

118 Cong. Rec. S11300 (daily ed. July 20, 1972) ......................................................4

17

119 Cong. Rec. H6527 (daily ed. July 23, 1973).......................................................4

18

119 Cong. Rec. H6527–6528 (daily ed. July 23, 1973)..............................................5

19

119 Cong. Rec. S14084 (daily ed. July 19, 1973) ...................................................3, 5

20

120 Cong. Rec. S5166 (daily ed. April 3, 1974).........................................................4

21

122 Cong. Rec. E2863 (daily ed. May 26, 1976) .......................................................6

22

123 Cong. Rec. H313 (daily ed. Jan. 11, 1977).........................................................5

23

123 Cong. Rec. S14884 (daily ed. Sept. 14, 1977).....................................................5

24

123 Cong. Rec. S7098 (daily ed. May 5, 1977)..........................................................7

25

124 Cong. Rec. H11731 (daily ed. Oct. 5, 1978)....................................................3, 6

26

124 Cong. Rec. H11740 (daily ed. Oct. 5, 1978 ........................................................5

27

124 Cong. Rec. H9351–52 (daily ed. Sept. 8, 1978) .................................................7

28

Allied Mkt. Rsch., *Remittance Market Report Overview* (Jan. 2022) .......................10

Alvaro M. Bedoya, *Privacy as Civil Right*, 50 N.M.L. Rev. 301 (2020) ...................................15

Andrew P. Scott, Cong. Rsch. Serv., *Telegraphs, Steamships, and Virtual Currency: An Analysis of Money Transmitter Regulation* (2020) ...................................................................9

Bd. of Governors, Fed. Reserve Sys., *Report on the Economic Well-Being of U.S. Households in 2018* (May 2019).....................................................................................................10

Cecilia Hendrix, *6 Fascinating Things about Western Union's History*, Western Union Blog (Oct. 8, 2019) ...............................................................................................................................9

Christine Bradley et al., *Alternative Financial Services: A Primer*, 3 FDIC Quarterly 39 (2009) .....................................................................................................................................................13

Christy Lowry, *What Information Is Needed for a Wire Transfer?*, Western Union Blog (May 31, 2022)....................................................................................................................................14

*Compliance*, DolEx Fin. Serv. (Jan. 1, 2023) ..............................................................................14

Cong. Rsch. Serv., *Consumer Finance and Financial Technology (Fintech)* (Mar. 15, 2023)....8, 13

Dany Bahar, *Remittances: One More Thing That Economists Failed at Predicting during COVID-19*, Brookings Inst. (July 1, 2021) ..............................................................................10

Dilip Ratha, *Remittances: Funds for the Folks Back Home*, IMF Fin. & Devel. (Apr. 24, 2014) .....................................................................................................................................................10

DolEx*, Oportun Personal Loans* (2022)......................................................................................13

Drake Bennett & Lauren Etter, *Give Us Your Tired, Your Poor, Your Huddled Masses Yearning to Send Cash*, Bloomberg (June 16, 2017)..................................................................9, 12

Emily Guy Birken, *The Costs of Being Unbanked or Underbanked*, Forbes Advisor (Dec. 2, 2022)..........................................................................................................................................11

FDIC, *2009 FDIC National Survey of Unbanked and Underbanked Households* (Dec. 2009)..11

FDIC, *2021 FDIC National Survey of Unbanked and Underbanked Households* (Nov. 14, 2022).........................................................................................................................................11

H. Rep. No. 95-1383 (1978) ...........................................................................................................5

H.R. 16088, 92d Cong., 2d Sess. (July 27, 1972).........................................................................4

H.R. 9424, 93d Cong., 1st Sess. (July 19, 1973) ..........................................................................6

Jacob William Faber, *Segregation and the Cost of Money: Race, Poverty, and the Prevalence of Alternative Financial Institutions*, 98 Social Forces (2019) ...................................................12

Joyce M. Northwood & Sherrie L.W. Rhine, FDIC, *Use of Bank and Nonbank Financial Services: Financial Decision Making by Immigrants and Native Born* (Aug. 2016)............11

Kevin Wack, *Walmart Shakes Up Domestic Money Transfer Market*, Am. Banker (May 4, 2015)..........................................................................................................................................14

Michele Gilman & Rebecca Green, *The Surveillance Gap: The Harms of Extreme Privacy & Data Marginalization*, 42 N.Y.U. Rev. L. & Social Change 253 (2018) .............................16

Mississippi Dep't of Banking & Consumer Finance, *Consumer Finance* (2020).....................13

Paula Boel & Peter Zimmerman, *Unbanked in America: A Review of the Literature*, Fed. Reserve Bank of Cleveland: Economic Commentary (May 26, 2022)...........................11, 12

Ria Fin. Serv., *Global Privacy Notice* (Apr. 2022) ...................................................................14

Ria Help Center, *What Details Do I Need to Send Money?* (July 2022) ...................................14

Ria Money Transfer, *About Us* ................................................................................................10

Right to Financial Privacy Act: Hearing Before Subcomm. on Fin. Inst.'s of the Comm. on Banking, Hous. and Urban Affairs, 94th Cong. (June 16 and 17, 1976). ...............................7

S. 2200, 93d Cong., 1st Sess. (July 19, 1973) ............................................................................6

S. 3828, 92d Cong., 2d Sess. (July 21, 1972) ........................................................................4, 5

SEC, Press Release, Global Payments Completes DolEx Dollar Express Acquisition (Nov. 12, 2003)..................................................................................................................................10

The Motley Fool, *Investing in Consumer Finance Stocks* (Mar. 2, 2023)...................................8

The Safe Banking Act of 1977: Hearing Before Subcomm. on Fin. Inst.'s Supervision, Regul. and Ins. of the Comm. on Banking, Fin. and Urban Affairs, 95th Cong. (Sept. 28, 29; Oct. 3, 1977) (statement of George LeMaistre, FDIC chair).........................................................7

U.S. Dep't of the Treasury, *Assessing the Impact of New Entrant Non-bank Firms on Competition in Consumer Finance Markets* (Nov. 2022);....................................................9, 13

U.S. Privacy Prot. Study Comm'n, *Personal Privacy in an Information Society* (1977)......3, 4, 6

Viamericas Corps, *Viamericas Privacy Statement* .....................................................................14

Wells Fargo, *California Consumer Privacy Notice* (2023) .........................................................15

Wells Fargo, *ExpressSend — Global Remittance Services* (2023)..............................................13

Western Union, *My WU* (2023) ................................................................................................12

Western Union, Press Release, Western Union Celebrates 160 Years of Innovation (May 19, 2011)..................................................................................................................................12

Western Union, *US Consumer Privacy Notice* (2021) ...............................................................15

Western Union, *Western Union Digital Banking* (2023)............................................................12

Western Union, *Western Union Netspend Prepaid Mastercard* (2023).......................................12

Western Union, *Western Union's Global Privacy Statement* (Nov. 1, 2021) ..............................14

Western Union, *What Information Do I Need to Send Money?* (July 13, 2019) ..........................14

# INTRODUCTION

The Right to Financial Privacy Act of 1978 ("RFPA"), 12 U.S.C. §§ 3401–342, created a statutory right to privacy in financial transaction data. Congress passed the RFPA in response to technological and legal changes that drastically impacted individuals' right to privacy in their financial transaction records. In 1970, Congress enacted the Bank Secrecy Act, which required banks to collect and store more information about customers' financial transactions than ever before. At the same time, electronic payment methods, such as credit cards and electronic fund transfers, were becoming widely used, resulting in bank and non-bank financial institutions automatically recording and aggregating more and more transaction data. When the Supreme Court refused to recognize a constitutional right to privacy in transaction data held by financial institutions in *United States v. Miller*, 425 U.S. 435 (1976), it was clear Congress would have to act to prevent endless government fishing expeditions into people's sensitive financial information. Congress included bank and non-bank institutions within the scope of the RFPA's definition of "financial institution" to ensure that companies that held comprehensive records on customers' transactions could not hand that information over to the government without first giving the customers an opportunity to challenge the government's access. This case—where the Government sought years of Plaintiffs' financial transaction data without any notice to Plaintiffs—is precisely the type of situation that the RFPA was meant to protect against.

Money transfer businesses provide financial services to millions of people who cannot afford to access the same services at banks. Non-bank financial institutions like money transfer companies offer many of the same services as banks, just unbundled or simplified to be more affordable. Millions of low-income Americans and U.S.-based immigrants rely on money transfer companies to pay bills, make payments through reloadable cards, and contribute to home, education, healthcare, and small business financing. The services provided by non-bank consumer finance institutions generate the same types of sensitive financial transaction data that bank services generate. It would be inconsistent with Congress's intent—and cruelly ironic—to exclude low-income and immigrant communities, who are already disproportionately surveilled, from the RFPA's protections.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ARGUMENT

## I. The RFPA protects customers' financial transaction data at bank and non-bank financial services companies.

The history and evolution of the RFPA show that the definition of "financial institution" includes financial services companies that collect and store customers' financial transaction data—information that could be used to reconstruct a person's habits, obligations, associations, and political views. Whether financial transaction data was held by a traditional depository institution or a non-bank financial services company, Congress intended for people to have a privacy interest in this information and to be protected from government fishing expeditions. By including the broad term "consumer finance institution" instead of the narrower "consumer loan company," Congress intended that the RFPA cover not just companies that provide consumers with loans but also companies that provide other financial products, such as money transfer services. Today, the consumer finance industry includes many different types of companies that store financial transaction data that is just as detailed as—or even more detailed than—the transaction data held at banks. To limit the scope of "consumer financial institution" to loan companies would undermine congressional intent and exclude a subset of financial institutions that serve as a critical resource for the under- and unbanked.

The RFPA was a response to a combination of technological and legal developments that led the financial industry to keep detailed records about their customers' financial transactions—and also upended society's expectations about the privacy of their financial records. In a cash-based society, people completed everyday financial transactions anonymously or near anonymously. To the extent that anyone kept records at all about who paid what and to whom, these records were kept by the parties to the transaction—they were not aggregated by financial institutions. As consumers began to use checks for everyday transactions, new records were created: the physical checks themselves. Some banks kept microfilm copies of checks drawn on their customers' accounts, but the banks that did typically only kept these records for a few months, 116 Cong. Rec. 16960 (1970) (statement of Rep. Rees), and by the late 1960's, many banks were moving away from microfilming, likely due to cost. 116 Cong. Rec. 16953 (1970) (statement of Rep. Patman). To obtain detailed information

about a person's financial transactions, the government needed to serve a warrant on the individual. The need for probable cause limited the government's ability to fish through people's financial records for potentially incriminating information.

All of that changed in 1970 with the enactment of the Bank Secrecy Act. Meant to ensure that companies kept paper trails of financial transactions for criminal investigators, the Bank Secrecy Act gave the Treasury Department the power to impose recordkeeping and disclosure requirements on many different kinds of financial institutions. *See* Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311–5330. The recordkeeping requirements that the Treasury Department imposed on depository institutions pursuant to its authority under Title I of the Act fundamentally changed the way that ordinary individuals' financial transactions were recorded and kept by their banks. The Treasury Department required depository institutions to keep microfilm copies of all checks of $100 or more on hand for at least five years. U.S. Privacy Prot. Study Comm'n, *Personal Privacy in an Information Society* 104, 105 (1977) [hereinafter Privacy Commission Report].[1] The $100 threshold was intended to exempt most checks written for everyday transactions, but in practice, filtering out checks over $99 was so expensive that banks began to microfilm all checks. Privacy Commission Report at 105. The result was that, for the first time, every bank in the United States was required to keep comprehensive records on who paid what and to whom—information that could be used to reconstruct any account holder's private life. 124 Cong. Rec. H11731 (daily ed. Oct. 5, 1978) (statement of Rep. Rousellot).

The Bank Secrecy Act passed Congress with near unanimous support in part because members assumed that investigative agencies could only obtain individuals' bank records through legal process. 119 Cong. Rec. S14084 (daily ed. July 19, 1973) (statement of Sen. Cranston). But when the Treasury Department announced its rules implementing the Act, it became clear that Congress' assumption had been wrong. The Treasury Secretary revealed that it was his position that there was no statutory or constitutional basis to prevent banks from handing account holders' records over to government agencies. 119 Cong. Rec. H6527 (daily

---

[1] *Available at* https://hdl.handle.net/2027/mdp.39015003840728.

ed. July 23, 1973) (statement of Rep. Stark). Bank and government representatives confirmed that banks regularly handed over account holders' records to the government upon request. Privacy Commission Report at 349; 364–65. Because the government made requests informally—either with a phone call or an in-person visit to the bank—there were typically no records of the requests, let alone any notification to the account holder that the government had requested and received their personal records. *Id.* Civil society groups, along with concerned bank representatives, responded by challenging the constitutionality of the Act, which the Supreme Court ultimately rejected. *California Bankers Ass'n v. Schultz*, 416 U.S. 21 (1974). Meanwhile, members of Congress responded by introducing the first iterations of what would become the RFPA. *See, e.g.,* S. 3828, 92d Cong., 2d Sess. (July 21, 1972); H.R. 16088, 92d Cong., 2d Sess. (July 27, 1972); 118 Cong. Rec. S11298–11315 (daily ed. July 20, 1972) (Sen. Mathias introducing S. 3828).

The RFPA's sponsors made clear that the objective of the legislation was to protect financial transaction data because government agencies could—and, in fact, did—use the information to discover sensitive, embarrassing, or incriminating facts about targeted people. According to one of the RFPA's primary architects, Sen. Charles Mathias, the problem with the Bank Secrecy Act was that it enabled government agencies to go to depository institutions and "obtain a complete history of the records of every citizen's financial dealings, no matter how small the amount nor how private the purpose." 118 Cong. Rec. S11300 (daily ed. July 20, 1972) (statement of Sen. Mathias). Sen. Mathias noted that financial transaction information

> is extremely revealing as to details of the customer's personal and political life. The information revealed by checks, other withdrawals, or deposits, mirror the activities of the account holder—the political causes he supports, the publications to which he subscribes, the debts he owes, the purchases he makes, the source of his income, and so forth. It reflects with considerable accuracy the individual's exercise of his rights under our Constitution, and particularly his first amendment rights.

120 Cong. Rec. S5166 (daily ed. April 3, 1974) (PDF) (statement of Sen. Mathias). The primary concern with open government access to these records was that "basic individual rights and liberties can be trampled by abuse of the information." *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Other RFPA sponsors echoed Sen. Mathias' views. Sen. Alan Cranston, who first introduced the RFPA in the Senate, noted that financial transaction data had to be protected because it "mirror[s] the activities of the account holder. From this information, the details of an individual's life can be re-constructed." 119 Cong. Rec. S14084 (daily ed. July 19, 1973). Rep. John Joseph Cavanaugh, who sponsored several versions of the RFPA in the House, *see* H. Rep. No. 95-1383, at 34 (1978), declared that the RFPA was meant to address customers' "fear of fishing expeditions" through their sensitive financial records. 124 Cong. Rec. H11695-11751 (daily ed. Oct. 5, 1978). Rep. Fortney "Pete" Stark, who was a sponsor of early versions of the RFPA in the House, *see* 119 Cong. Rec. H6527–6528 (daily ed. July 23, 1973), as well as the president of a depository institution in California and a plaintiff in *California Bankers Ass'n v. Schultz*, noted, "Government agencies have, in the past, ravaged through [financial] records on pure fishing expeditions often for political purposes." 124 Cong. Rec. H11740 (daily ed. Oct. 5, 1978). Sen. Cranston pointed to "the cases of Jane Fonda, Dr. Spock, and Daniel Ellsburg," whose "bank accounts were monitored because of their controversial opinions rather than for suspected criminal activity." 123 Cong. Rec. S14884 (daily ed. Sept. 14, 1977). Rep. Newton Steers complained that "[w]e constantly hear of domestic surveillance by Government agencies when there is no record of, or attempt to show, any criminal behavior by a citizen." 123 Cong. Rec. H313 (daily ed. Jan. 11, 1977). Since customers—and not their financial institutions—are the ones most invested in challenging access requests, 123 Cong. Rec. S14884 (daily ed. Sept. 14, 1977) (Sen. Cranston explaining that banks have "no compelling interest to resist" subpoenas), the RFPA gave customers "a right to know when their financial records are being examined" and "an opportunity to challenge disclosure or dissemination of the information." *Id.* (statement of Sen. Cranston); *see also* H. Rep. No. 95-1383, at 34 (describing these as the "two key principles" upon which the RFPA was based).

Because the RFPA was initially a response to the recordkeeping requirements of Title I of the Bank Secrecy Act, which only applied to depository institutions, early versions of the RFPA also only applied to depository institutions. *See, e.g.*, S. 3828, 92d Cong., 2d Sess. (July 21, 1972) ("fiduciary institution" defined the same as "financial institution" in Title I of Bank

Secrecy Act); S. 2200, 93d Cong., 1st Sess. (July 19, 1973) ("financial institution" limited to depository institutions in first bill with name "Right to Financial Privacy"); H.R. 9424, 93d Cong., 1st Sess. (July 19, 1973) (House companion of S. 2200). But in the years that Congress considered a statutory right to financial privacy—from 1972 to 1978—additional technological and legal developments led Congress to expand the RFPA's reach to non-bank financial institutions that, like banks, collected and stored detailed financial transaction data that could be used to reconstruct private information about customers.

In 1976, the Supreme Court announced its decision in *United States v. Miller*, 425 U.S. 435 (1976), which held that individuals had no Fourth Amendment-protected privacy interest in financial information held at banks. The records at issue in *Miller* were the type of records that the Bank Secrecy Act required depository institutions to keep: microfilmed checks and withdrawal and deposit slips. *Id.* at 438. But the RFPA's sponsors took note of the Court's broad pronouncement on individuals' lack of a privacy interest in records kept by third parties, which created a sense of "urgency" for Congress to protect financial transaction data wherever it could be found. 122 Cong. Rec. E2863 (daily ed. May 26, 1976) (statement of Sen. Mathias). As one RFPA sponsor noted, "the reach of the *Miller* decision extends far beyond bank records, it applied to credit card receipts, finance companies, and to every conceivable type of recordkeeper." 124 Cong. Rec. H11731 (daily ed. Oct. 5, 1978) (statement of Rep. Rousellot).

Indeed, by the mid-1970s, new technologies for electronic payment, such as credit cards and electronic fund transfers, meant that non-bank institutions were collecting financial transaction data that was just as detailed as—or more detailed than—the records that the Bank Secrecy Act required depository institutions keep. Privacy Commission Report at 114. As Rep. L. Richardson Preyer explained:

> Financial privacy legislation has its origins in recent structural changes in the management of personal financial affairs. Not too many years ago, credit cards and checking accounts were rare, and most ordinary personal transactions were in cash. Today, we are in the midst of a transition to a so-called cashless society, and an ever-increasing percentage of our purchases of goods and services do not involve the exchange of cash. One of the major consequences of the use of other payment methods is the accumulation of large amounts of personal information in the hands of third parties . . . ."

1    124 Cong. Rec. H9351–52 (daily ed. Sept. 8, 1978). During the RFPA hearings, several

2    witnesses called for Congress to expand the RFPA's definition of financial institutions "to other

3    financial-type institutions." The Safe Banking Act of 1977: Hearing Before Subcomm. on Fin.

4    Inst.'s Supervision, Regul. and Ins. of the Comm. on Banking, Fin. and Urban Affairs, 95th

5    Cong. (Sept. 28, 29; Oct. 3, 1977), at 2364 (statement of George LeMaistre, FDIC chair). Sen.

6    Bill Brock, who supported adding credit card issuers and other non-bank financial services

7    institutions to the RFPA, said that "we are a cash-less society, whether we admit it or not and, if

8    we don't take into account noncash transaction devices, we are not going to get to the root of

9    this problem." Right to Financial Privacy Act: Hearing Before Subcomm. on Fin. Inst.'s of the

10    Comm. on Banking, Hous. and Urban Affairs, 94th Cong. (June 16 and 17, 1976), at 33.

11       Congress added credit card issuers and consumer finance institutions to the RFPA

12    because it recognized that these companies offered services similar to those offered by banks—

13    and thus, created similar financial transaction records as banks. Sen. John Tower explained why

14    he added credit card issuers to his version of the RFPA: "[a]lthough the non-bank credit card

15    issuers are not subject to the recordkeeping requirements of the Bank Secrecy Act, the cards are

16    used in a manner similar to a checking account. The breach of the confidentiality of these

17    records can seriously injure the credit card customer." 123 Cong. Rec. S7098 (daily ed. May 5,

18    1977) (statement of Sen. Tower). Money transfer services are also used in a similar way as

19    checking accounts—they are, essentially, the checking accounts of the under- and unbanked.

20    *See § II*. Electronic fund transfers, such as wire transfers, are also clearly covered by the RFPA

21    when performed through a depository institution; it would undercut the purposes of the RFPA

22    to exclude wire transfers performed by non-bank institutions.

23       Thus, the very clear interests underlying the RFPA are not served by limiting the term

24    "consumer finance institution" to companies that offer loans to consumers. The term "consumer

25    finance institution" covers a broad range of non-bank financial services companies that collect

26    and store detailed financial transaction records on their customers. If Congress wished to limit

27    the RFPA's obligations to companies that issued loans to consumers, Congress could have

28    instead used the term "consumer loan institution" or "loan company." The consumer finance

industry "isn't just limited to companies that originate loans or issue credit cards." The Motley Fool, *Investing in Consumer Finance Stocks* (Mar. 2, 2023).[2] A consumer finance company is "a non-bank company that provides financial products to individuals." *Id.* While loans may have been the primary financial product on offer in the 1970's, that is not the case anymore. Today, consumer finance companies include both traditional and fintech companies that provide a wide variety of services, such as budgeting and payment. *Id.* Indeed, a recent Congressional Research Service report explicitly includes money transfer companies and remittances as part of the consumer finance industry. Cong. Rsch. Serv., *Consumer Finance and Financial Technology (Fintech)* 4 (Mar. 15, 2023).[3] What consumer finance companies have in common is that they collect detailed financial transaction data about their users. This is precisely the kind of data the RFPA was meant to cover and to protect from unbounded government scrutiny. Even if Congress could not have foreseen the expansion of the consumer finance industry into a panoply of electronic financial services, a court should not "decline to enforce the plain terms of the law" when a "new application emerges that is both unexpected and important." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1750 (2020).

As the next section explains, money transfer companies occupy an important space in the consumer finance industry today, particularly for those who are unable to access services at depository institutions. This Court should recognize that the plain text and congressional intent show that money transfer companies are consumer finance institutions under the RFPA.

II.    **A narrow interpretation of "consumer finance institution" denies financial privacy to the millions of U.S. immigrants and other vulnerable consumers who rely on money transfer businesses for financial services they otherwise cannot afford to access at banks.**

Financial inclusion should not come at the expense of privacy. Millions of low-income, minority Americans and U.S. immigrants rely on money transfers daily to buy food and clothing, pay bills, and contribute to home, education, healthcare, and small business financing. Excluding money transfer businesses from the definition of "consumer finance institution" is

---

[2] https://www.fool.com/investing/stock-market/market-sectors/financials/consumer-finance-stocks/.

[3] https://sgp.fas.org/crs/misc/R47475.pdf.

1   inconsistent with how and why consumers use money transfer services. It also undermines the

2   purpose of the RFPA by limiting the reach of financial privacy to only those who can afford to

3   access traditional lending and depository institutions and exposing populations that are already

4   disproportionately vulnerable to privacy violations by the government to further unwarranted

5   surveillance.

6          Non-bank financial institutions compete in the consumer finance market by "offering

7   unbundled bank-like services, specializing in a single product or service or targeting a specific

8   customer segment." U.S. Dep't of Treasury, *Assessing the Impact of New Entrant Non-bank*

9   *Firms on Competition in Consumer Finance Markets* 15 (Nov. 2022).[4] Money transfer

10  companies have historically targeted the U.S. immigrant population for its specific customer

11  segment. In the early 20th century, money transmitters were "informally referred to as

12  'immigrant banks,'" having "gr[own] out of local businesses, like grocery stores and butcher

13  shops, to facilitate ticket sales for immigrants entering the United States via steamship" and to

14  provide to immigrants "access to financial services." Andrew P. Scott, Cong. Rsch. Serv.,

15  *Telegraphs, Steamships, and Virtual Currency: An Analysis of Money Transmitter Regulation* 2

16  (2020).[5]

17         From the humble beginnings of the first wire transfer in 1871, *see* Cecilia Hendrix, *6*

18  *Fascinating Things about Western Union's History*, Western Union Blog (Oct. 8, 2019),[6]

19  money transfer companies have continued to rely on migrants to drive their industry. When

20  Western Union's once-prosperous communications business declined to the point of bankruptcy

21  in the mid-1990s, the company pivoted completely to money transfer, beginning with a

22  marketing campaign aimed at the Mexico-U.S. migration corridor; it is now the largest money

23  transfer business in the world. Drake Bennett & Lauren Etter, *Give Us Your Tired, Your Poor,*

24  *Your Huddled Masses Yearning to Send Cash*, Bloomberg (June 16, 2017).[7] Looking to

25

26  [4] https://home.treasury.gov/system/files/136/Assessing-the-Impact-of-New-Entrant-Non-bank-
    Firms.pdf.
27  [5] https://sgp.fas.org/crs/misc/R46486.pdf.
    [6] https://www.westernunion.com/blog/en/6-fascinating-things-about-western-unions-history/.
28  [7] https://www.bloomberg.com/news/features/2017-06-16/for-western-union-refugees-and-
    immigrants-are-the-ultimate-market.

1    capitalize on the financial needs of newly arriving immigrants, several competitors sprang up.

2    Ria Money Transfer opened in New York in 1987 "as a money transfer institution for Latin

3    American countries," Ria Money Transfer, *About Us*,[8] and DolEx Dollar Express was founded

4    in 1996 to provide "consumer-to-consumer electronic money transfer services to the large and

5    rapidly growing Latino community living in the U.S. and their Latin American families

6    abroad." SEC, Press Release, Global Payments Completes DolEx Dollar Express Acquisition

7    (Nov. 12, 2003).[9] By 2019, personal money transfers, or remittances, had become "the largest

8    financial flow in the world," Dany Bahar, *Remittances: One More Thing That Economists*

9    *Failed at Predicting during COVID-19*, Brookings Inst. (July 1, 2021),[10] reaching a market

10   value of $700 billion by 2020. Allied Mkt. Rsch., *Remittance Market Report Overview* (Jan.

11   2022).[11] Used primarily for personal, family, and household purposes, remittances are a lifeline

12   for U.S. immigrants and their families abroad and serve as a form of peer-to-peer consumer

13   finance. *See* Dilip Ratha, *Remittances: Funds for the Folks Back Home*, IMF Fin. & Devel.

14   (Apr. 24, 2014).[12]

15        Immigrants' reliance on money transfer companies speaks to the larger customer

16   segment of which they are a part: the unbanked and underbanked. The Federal Reserve defines

17   "unbanked" as lacking any form of checking, savings, or money market account, while

18   "underbanked" refers to those who possess a bank account but still rely on alternative financial

19   services. Bd. of Governors, Fed. Reserve Sys., *Report on the Economic Well-Being of U.S.*

20   *Households in 2018* at 25 (May 2019).[13] As of 2019, 5.9 million people in the U.S. were

21   unbanked and 18.7 million people were underbanked, with higher rates of both among Black

22   and Hispanic households, FDIC, *2021 FDIC National Survey of Unbanked and Underbanked*

23

24   [8] https://riacapital.me/en/about-us/.

25   [9] https://sec.edgar-online.com/global-payments-inc/8-k-current-report-
     filing/2003/11/12/section5.aspx.

26   [10]  https://www.brookings.edu/blog/future-development/2021/07/01/remittances-one-more-
     thing-that-economists-failed-at-predicting-during-covid-19/.

27   [11] https://www.alliedmarketresearch.com/remittance-market.

28   [12] https://www.imf.org/en/Publications/fandd/issues/Series/Back-to-Basics/Remittances.

     [13] https://www.federalreserve.gov/publications/files/2018-report-economic-well-being-us-
     households-201905.pdf.

*Households* 1 (Nov. 14, 2022),[14] and especially high rates among immigrant households. *See* Joyce M. Northwood & Sherrie L.W. Rhine, FDIC, *Use of Bank and Non-bank Financial Services: Financial Decision Making by Immigrants and Native Born* 3 (Aug. 2016);[15] Paula Boel & Peter Zimmerman, *Unbanked in America: A Review of the Literature*, Fed. Reserve Bank of Cleveland: Economic Commentary 6 (May 26, 2022).[16]

Because they are under- or unbanked, low-income immigrant communities and communities of color often rely on less traditional financial institutions like money transfer companies. The vast majority of those who are under- or unbanked are poor: the most cited reason for not having or using a bank account is not having enough money to maintain the minimum balance requirements. FDIC, *2021 FDIC National Survey of Unbanked and Underbanked Households* 3 (Nov. 14, 2022).[17] Depository institutions' requirements are, in the long run, often less financially onerous than the predatorily high fees associated with money transfer businesses and other non-bank financial services. But for the under- and unbanked, "the differences between the clearly posted (but incomplete) fees at alternative financial services providers and the difficult-to-find fees at banks make the choice an easy one. Go for the alternative financial service, so you know what you are getting into." Emily Guy Birken, *The Costs of Being Unbanked or Underbanked*, Forbes Advisor (Dec. 2, 2022).[18] Individuals have also reported that they do not have a bank account because they "don't trust banks" and believe that "avoiding a bank gives more privacy." FDIC, *2021 FDIC National Survey of Unbanked and Underbanked Households* 3 (Nov. 14, 2022).[19] For immigrants, such beliefs often stem from language barriers and stricter documentation requirements. FDIC, *2009 FDIC National Survey of Unbanked and Underbanked Households* 25 (Dec. 2009).[20]

---

[14] https://www.fdic.gov/analysis/household-survey/2021report.pdf.
[15] https://www.fdic.gov/analysis/cfr/consumer/2016/documents/northwood-paper.pdf.
[16] https://www.clevelandfed.org/publications/economic-commentary/2022/ec-202207-unbanked-in-america-a-review-of-the-literature.
[17] https://www.fdic.gov/analysis/household-survey/2021report.pdf.
[18] https://www.forbes.com/advisor/banking/costs-of-being-unbanked-or-underbanked/.
[19] https://www.fdic.gov/analysis/household-survey/2021report.pdf.
[20] https://www.fdic.gov/analysis/household-survey/2009/2009report.pdf.

1   Moreover, the "long history of racialized exclusion from mainstream financial products"

2   has created an inverse trend of racialized exploitation by alternative financial institutions. Jacob

3   William Faber, *Segregation and the Cost of Money: Race, Poverty, and the Prevalence of*

4   *Alternative Financial Institutions*, 98 Social Forces (2019). A 2020 study found that the costs of

5   opening a bank account are higher in areas with larger Black and Hispanic populations, Paula

6   Boel & Peter Zimmerman, *Unbanked in America*, while at the same time, alternative financial

7   institutions like money transfer businesses are "significantly more common in neighborhoods

8   with larger [B]lack and Latino populations, poorer residents, and more immigrants"—so much

9   so that in some cities, they are more common than McDonalds. William Faber, *Segregation and*

10  *the Cost of Money.*

11      Recognizing that "the world's financial industry is built for those with credit, plastic,

12  stable income," Western Union and its competitors target "everyday consumers with financial

13  needs and few others to whom they can turn," Western Union, Press Release, Western Union

14  Celebrates 160 Years of Innovation (May 19, 2011)[21]—not just through money transfer, but

15  through a whole array of financial services. Western Union, for instance, "has pushed into the

16  payments business, helping people settle their mortgages and electric bills." Bennett & Etter,

17  *supra*.[22] In addition to a prepaid debit card that offers direct deposit and a digital savings

18  account, *see* Western Union, *Western Union Netspend Prepaid Mastercard*, (2023); Western

19  Union, *Western Union Digital Banking*, (2023),[23] Western Union also has a points system—My

20  WU—that lets consumers earn rewards, cash back, and retail store loyalty deals. Western

21  Union, *My WU* (2023).[24] DolEx goes even further: in partnership with Oportun, the money

22

23

24

25  [21] https://ir.westernunion.com/news/archived-press-releases/press-release-details/2011/Western-Union-Celebrates-160-Years-of-Innovation/default.aspx.

26  [22] https://www.bloomberg.com/news/features/2017-06-16/for-western-union-refugees-and-immigrants-are-the-ultimate-market.

27  [23] https://www.wunetspendprepaid.com/. https://www.westernunion.com/ro/en/wuplus.html#:~:text=Bank%20in%20multiple%20currencies%20and,0%20RON%20transfer%20fee3.

28  [24] https://www.westernunion.com/us/en/mywu/home.html.

transfer business offers consumers personal loans of up to $10,000. DolEx, *Oportun Personal Loans*, (2022).[25]

Contrary to what the term "alternative financial services" suggests, as the FDIC has noted, "many of the products and services [AFS] provide are not 'alternative'; rather, they are the same or similar to those offered by banks." Christine Bradley et al., *Alternative Financial Services: A Primer*, 3 FDIC Quarterly 39, 39 (2009).[26] For example, banks allow their customers to send remittances, the core of money transfer companies' business. *See, e.g.*, Wells Fargo, *ExpressSend — Global Remittance Services*, (2023).[27] While companies like Western Union expand their services to the point of increasingly resembling depository institutions, under a narrow interpretation of "consumer finance institution," they can avoid providing their financially and otherwise vulnerable customers with baseline privacy protections.

Regulators and consumer finance institutions themselves recognize that money transfer companies are alternatives to, not separate species from, banks and other depository institutions. The U.S. Treasury Department has explained that the "core consumer finance market[]" includes "(non-bank) firms that largely focus[] on singular products and services, such as . . . money transmission." U.S. Dep't of the Treasury, *Assessing the Impact of New Entrant Non-bank Firms on Competition in Consumer Finance Markets* 8 (Nov. 2022);[28] *see also, e.g.*, Mississippi Dep't of Banking & Consumer Finance, *Consumer Finance* (2020) (regulating money transfer companies as consumer finance institutions).[29] Meanwhile, banks identify competitive threats by evaluating actors disrupting money transfer companies and other non-bank financial institutions. *See, e.g.*, Cong. Rsch. Serv., *Consumer Finance and Financial Technology (Fintech)* 2–3 (Mar. 15, 2023) ("Fintech has the potential to continue to change consumer finance products and services, including in consumer payments and lending

---

[25] https://www.dolex.com/loans/.
[26] https://www.fdic.gov/analysis/quarterly-banking-profile/fdic-quarterly/2009-vol3-1/fdic140-quarterlyvol3no1-afs-final.pdf.
[27] https://www.wellsfargo.com/international-remittances/.
[28] https://home.treasury.gov/system/files/136/Assessing-the-Impact-of-New-Entrant-Non-bank-Firms.pdf.
[29] https://dbcf.ms.gov/consumer-finance/.

markets.");[30] Kevin Wack, *Walmart Shakes Up Domestic Money Transfer Market*, Am. Banker (May 4, 2015) ("Walmart's dramatic impact on what Western Union and MoneyGram charge certain customers offers a reminder of why banks remain so fearful of the megastore's ambitions in consumer finance.").[31]

Regardless of whether at a bank or a money transfer business, money transfer transactions create financial records that expose a great deal of personal information. When a consumer transfers money, a money transfer business will collect, at the very least, the sender's full name and phone number, monetary amount, information associated with the payment and payout method, and the recipient's full name, phone number, and address. *See* Christy Lowry, *What Information Is Needed for a Wire Transfer?*, Western Union Blog (May 31, 2022);[32] Ria Help Center, *What Details Do I Need to Send Money?* (July 2022).[33] Oftentimes, companies will also require copies of identity verification documents like a driver's license or passport, and may even ask for secondary identification information, including citizenship or residence status and country of birth. Western Union, *What Information Do I Need to Send Money?* (July 13, 2019).[34] Several money transfer businesses indicate that when consumers use their services, they may additionally collect the following personal data: biometric information, criminal conviction information, social security numbers, phone and email communications, and device and internet data such as IP address, browsing history, search history, and geolocation information. *See* Western Union, *Western Union's Global Privacy Statement*, (Nov. 1, 2021);[35] DolEx Fin. Serv., *Compliance* (Jan. 1, 2023);[36] Ria Fin. Serv., *Global Privacy Notice* (Apr. 2022); [37] Viamericas Corps, *Viamericas Privacy Statement* [38] Money transfer businesses also

---

[30] https://sgp.fas.org/crs/misc/R47475.pdf.
[31] https://www.americanbanker.com/news/walmart-shakes-up-domestic-money-transfer-market.
[32] https://www.westernunion.com/blog/en/us/what-information-needed-for-wire-transfer/.
[33] https://help.riamoneytransfer.com/hc/en-us/articles/4406286465297-What-details-do-I-need-to-send-money-.
[34] https://wucare.westernunion.com/s/article/What-do-I-need-to-send-money?language=en_US.
[35] https://www.westernunion.com/global/en/privacy-statement.html.
[36] https://www.dolex.com/legals/#privacy_policy.
[37] https://app.riamoneytransfer.com/en-us/app-privacy-policy/#personalData.
[38] https://s3.amazonaws.com/cdn.govianex.com/privacy-policy/www/viamericas_privacy-policy.pdf.

collect sensitive financial data such as "[a]ccount balances, transaction and payment history, loyalty program information, wire transfer instructions, credit information, debit and other bank account information." Western Union, *U.S. Consumer Privacy Notice* (2021).[39] This information is nearly indistinguishable from what many banks collect. *See* Wells Fargo, *California Consumer Privacy Notice* (2023) (explaining that Wells Fargo will collect "account number and balance," "transaction histories," "purchase information," and "credit and debit card numbers," along with the same demographic information as listed above).[40] And the information that money transfer companies collect today is much more detailed than the information financial institutions collected at the time the RFPA was passed.

Money tells a story, and in the context of money transfers it can reveal the private details of a person's life. Depending on to whom money is sent, money transfers can reveal family and other personal and potentially undisclosed relationships; religious affiliations; philanthropic interests; and political affiliations and activities. Money transfer transactions provide the kind of "intimate window into a person's life" that the Supreme Court said carries with it a strong privacy interest in *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018). The privacy interests of individuals who wire money through their bank or credit union and the privacy interests of individuals who wire money through a money transfer company are identical; a statute intended to extend privacy protections to financial information should not be read to exclude the latter, simply because the people who use the services lack the financial means to open and maintain a bank account.

The cruel irony of denying the RFPA protections to marginalized individuals relying on money transfer businesses and other non-traditional financial institutions for their money needs is that people of color, immigrants, and the poor are already disproportionately targeted by federal government surveillance and experience the harms of privacy violations more immediately and more acutely. *See* Alvaro M. Bedoya, *Privacy as Civil Right*, 50 N.M.L. Rev. 301 (2020). In addition to deportation, wrongful arrest and incarceration, and the myriad

---

[39] https://www.westernunion.com/staticassets/R22-09.02.0/media/US_Consumer_Privacy_Notice_en_sp_Version_020419.pdf.
[40] https://www.wellsfargo.com/privacy-security/california-consumer-privacy-notice/.

collateral housing, employment and other consequences associated with surveillance and criminalization, "surveillance systems result in 'system avoidance,' or deliberate efforts by individuals to avoid institutions that gather and keep formal records." Michele Gilman & Rebecca Green, *The Surveillance Gap: The Harms of Extreme Privacy & Data Marginalization*, 42 N.Y.U. Rev. L. & Social Change 253, 265 (2018). Thus, the same people who distrust banks may now distrust money transfer businesses, leaving them with no alternative source of consumer finance and putting them—and for immigrants, their friends and relatives abroad who rely on remittances—at an even greater economic disadvantage. It is untenable that Congress intended for income level to dictate one's level of privacy rights under the RFPA.

## CONCLUSION

*Amicus* respectfully requests that the Court deny the Defendants' motions to dismiss.

Dated: April 19, 2023                    Respectfully submitted,

By: */s/ Alan Butler*

Alan Butler (SBN 2812891)
butler@epic.org
Enid Zhou (SBN 321361)
zhou@epic.org
Electronic Privacy Information Center
1519 New Hampshire Avenue NW
Washington, DC 20036
Tel: 202.483.1140

*Attorneys for Amicus Curiae Electronic Privacy Information Center*