UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NELSON SEQUEIRA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>    Defendants. | Case No. 22-cv-07996-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS, AND GRANTING DEFENDANTS' REQUESTS FOR JUDICIAL NOTICE**<br><br>Re: Dkt. Nos. 63, 64, 65, 66, 68, 69, 70, 114 |

Pending before the Court are the motions to dismiss filed by Defendants U.S. Department of Homeland Security; U.S. Immigration & Customs Enforcement; Western Union Financial Services, Inc.; Continental Exchange Solutions, Inc., d/b/a Ria Financial Services and AFEX Money Express; Viamericas Corporation; and DolEx Dollar Express, Inc. Dkt. Nos. 63–65, 68–69. The Court held a hearing on the motions. For the reasons detailed below, the Court **GRANTS** the motions in part and **DENIES** the motions in part. The Court relatedly **GRANTS** Defendants' associated requests for judicial notice. Dkt. Nos. 66, 70, 114.

**I.   BACKGROUND**

Plaintiffs Nelson Sequeira, Orsay Alegria, and Ismael Cordero bring claims individually and on behalf of a proposed class, alleging violations of the Right to Financial Privacy Act ("RFPA") and California's Unfair Competition Law ("UCL") by two groups of Defendants: (1) the "Federal Government Defendants," which include the U.S. Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE"); and (2) the "Money Transfer Defendants," which include Western Union Financial Services, Inc. ("Western Union"), Continental Exchange Solutions, Inc. ("Continental"), DolEx Dollar Express, Inc. ("DolEx"), and Viamericas Corporation ("Viamericas"). *See* Dkt. No. 38 ("FAC") ¶¶ 1, 4–9.

In their First Amended Complaint, Plaintiffs allege that the Money Transfer Defendants violated the RFPA by sharing Plaintiffs' private financial and personal records with law enforcement agencies, including the Federal Government Defendants, and that the Federal Government Defendants in turn violated the RFPA by collecting and obtaining these private financial and personal records. *See id.* ¶¶ 70–74. Plaintiffs allege that the financial records are collected and shared through the Transaction Record Analysis Center ("TRAC"), a collaboration of law enforcement agencies, including several federal government agencies like Defendants DHS and ICE. *Id.* at ¶¶ 13, 15, 30–31, 39–43. Plaintiffs allege that this program, which has existed since approximately 2014, was only recently made public, and that records indicate that it targets immigrants and communities of color. *Id.* at ¶¶ 13, 27. TRAC gathers and makes available consumer financial records from money transfer companies for money transfers greater than $500 sent to or from the Southwest border region, including Arizona, California, New Mexico, Texas, and Mexico. *Id.* at ¶¶ 15, 17, 31, 36. According to the FAC, the information gathered is sweeping, and not intended to focus on particular individuals suspected of criminal activity. *See id.* at ¶ 37. Plaintiffs raise concerns that TRAC can "be weaponized against vulnerable groups based on improper criteria, such as race, religion, or national origin." *Id.* at ¶¶ 38, 49–52. Plaintiffs further allege that the Money Transfer Defendants were aware that multiple federal government agencies could access and obtain the information produced to TRAC. *See id.* at ¶¶ 46–48. Finally, Plaintiffs allege that the Money Transfer Defendants' sharing of their private financial and personal records is in violation of the California Financial Information Privacy Act ("Cal. FIPA") and therefore constitutes an unlawful business practice under the UCL. *See id.* at ¶¶ 78–86. Defendants now move to dismiss the FAC. *See* Dkt. No. 63 ("Viamericas Mot."), 64 ("Continental Mot."), 65 ("DolEx Mot."), 68 ("Federal Mot."), 69 ("Western Union Mot.").

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the

2

complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)); *see also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."). Similarly, "a plaintiff can . . . plead himself out of a claim by including unnecessary details contrary to his claims." *Sprewell*, 266 F. 3d 988–89. Finally, questions that are purely legal in nature, such as statutory interpretation, may properly be resolved on a motion to dismiss. *See Jordan v. Tr.*, No. 16-CV-02122-KAW, 2017 WL 396169, at *5 (N.D. Cal. Jan. 30, 2017) (collecting cases).

### III. DISCUSSION

#### A. RFPA

The Court begins with Defendants' primary argument for dismissal of Plaintiffs' RFPA claim: because the Money Transfer Defendants are not "financial institutions" as defined by the RFPA, Plaintiffs have failed to allege a legally cognizable theory upon which relief can be granted. The RFPA provides, in relevant part, that "no Government authority may have access to or obtain copies of, or [sic] the information contained in the financial records of any customer from a *financial institution* unless" certain notice requirements are met. *See* 12 U.S.C. § 3402 (emphasis added). Section 3401 of the RFPA provides that:

3

> "financial institution", except as provided in section 3414 of this title, means any office of a bank, savings bank, card issuer as defined in section 1602(n)[1] of title 15, industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or *consumer finance institution*, located in any State or territory of the United States, the District of Columbia, Puerto Rico, Guam, American Samoa, or the Virgin Islands;

12 U.S.C. § 3401 (1) (emphasis added). Plaintiffs allege that the Money Transfer Defendants are "financial institutions under 12 U.S.C. § 3401(1) because they are consumer finance institutions located in the United States." FAC ¶ 67. Defendants argue that the term "consumer finance institution" should be construed to mean a company whose core function and purpose is the provision of financing and cash loans to the public, and that the allegations against the Money Transfer Defendants do not satisfy that definition. *See* Viamericas Mot. at 7–9; Continental Mot. at 8–10; DolEx Mot. at 7–10; Fed. Mot. at 4–9; Western Union Mot. at 6–9. Plaintiffs counter that "consumer finance institution" should not be construed so narrowly, and that it should at least encompass "institutions whose primary purpose is to assist consumers with financial transactions." Dkt. No. 76 ("Opp.") at 10.[1] This dispute therefore poses a threshold issue for Plaintiffs' RFPA claim.

### i. "Consumer Finance Institution"

The RFPA does not expressly define the term "consumer finance institution." The parties' dispute thus presents what appears to be a statutory interpretation issue of first impression in this circuit. Two other federal courts, including the Seventh Circuit Court of Appeals, have considered this issue in closely related contexts, and both adopted constructions consistent with the Defendants' position here. *See Commodity Futures Trading Comm'n v. Worth Bullion Group, Inc.* ("*Worth Bullion*"), 717 F.3d 545, 550–51 (7th Cir. 2013) (interpreting "consumer finance institution" to mean companies for which the provision of financing and cash loans is a "core function and purpose."); *FTC v. Sterling Precious Metals, LLC ("Sterling")*, 2013 WL 1442180,

---

[1] At the hearing, Plaintiffs conceded that this definition was "a little overbroad," and suggested a narrower focus on "institutions that provide financial services to consumers as a core part of their business that are similar to the kinds of services provided by the other enumerated entities." Dkt. No. 108 at 19:1–6. Because the Court adopts Defendants' proposal, this distinction is ultimately immaterial.

4

1    at *2–5 (S.D. Fl. Apr. 9, 2013) (same).  However, these cases are neither binding nor directly
2    analogous, since none of them decided whether entities that do not provide loan or financing
3    services are nonetheless "consumer finance institutions" under the RFPA.  Accordingly, the Court
4    must conduct its own analysis.
5    　　　　As with all questions of statutory interpretation, the Court begins "with the text of the
6    statute and with the presumption that Congress intended that the words used be given their plain
7    and ordinary meaning." *United States v. Pacheco*, 977 F.3d 764, 767 (9th Cir. 2020).  In
8    determining that plain and ordinary meaning, courts routinely consult dictionary definitions.  *See*
9    *City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019).  If the language is ambiguous, the
10   Court may also look to "canons of construction, legislative history, and the statute's overall
11   purpose to illuminate Congress's intent." *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir.
12   2006).
13   　　　　Defendants cite numerous dictionary definitions in support of their position that "consumer
14   finance institution" requires the provision of financing and loans as a core function of the
15   business.  For example, Black's Law Dictionary defines "finance company" as "[a] nonbank
16   company that deals in loans either by making them or by purchasing notes from another company
17   that makes the loans directly to borrowers" and "consumer finance company" as "[a] finance
18   company that deals directly with consumers in extending credit." FINANCE COMPANY, BLACK'S
19   LAW DICTIONARY (11th ed. 2019); *see also* THE FREE DICTIONARY BY FARLEX, https://financial-
20   dictionary.thefreedictionary.com/Consumer+Finance+Companies (last visited on March 18, 2024)
21   (defining "consumer finance company" as "[a] nonbank lender," and elaborating that "[a]
22   consumer finance company does not receive deposits, but does make loans to customers for
23   business or personal use. It derives its profits from the interest on these loans. It is also called
24   simply a finance company.").  Other dictionaries also support Defendants' position.  *See*
25   VOCABULARY.COM DICTIONARY, https://www.vocabulary.com/dictionary/consumer finance
26   company (last visited on March 18, 2024) (defining "consumer finance company" as "a finance
27   company that makes loans to people who have trouble getting a bank loan."); ENCYCLOPEDIA
28   BRITANNICA, https://www.britannica.com/money/finance-company (last visited on March 18,

United States District Court
Northern District of California

2024) (describing "consumer finance" as "making loans directly to consumers"); CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/consumer-finance (last visited on March 18, 2024) (defining "consumer finance" as "the business of lending money to individual people, rather than to companies[.]"). And other sources, including other statutes, also lend support to the argument that the plain and ordinary meaning of "consumer finance institution" requires some focus on the provision of loans. *See* PAUL F. SMITH, CONSUMER CREDIT COSTS 6 (Paul F. Smith ed., 1964) ("Consumer finance companies engage primarily in making personal loans to consumers and are identified by their operations under state small-loan laws."); Va. Code. §6.2-1500 ("'Consumer finance company' means a person engaged in the business of making loans to individuals for personal, family, household, or other nonbusiness purposes."). Even a source cited by amicus Electronic Information Privacy Center supports Defendants' position. *See* The Motley Fool, Investing in Consumer Finance Stocks, https://www.fool.com/investing/stock-market/market-sectors/financials/consumer-finance-stocks/ (last visited on March 18, 2024) ("Consumer finance companies allow customers to bypass traditional banks and connect with loans and credit cards tailored to their needs. . . . A consumer finance company is a non-bank company that provides financial products to individuals. Some examples of consumer finance products include: mortgages, automobile loans, student loans, personal loans, credit cards, [and] payday loans and other alternative credit products.").[2]

In contrast, Plaintiffs cite no support for their broader definition of "consumer finance institution," and instead simply assert that "[a]nother reasonable interpretation is that the term covers all institutions that provide services related to consumer finances." Opp. at 10. The Court finds this unpersuasive. Plaintiffs' only argument in support of their assertion is that some of the Money Transfer Defendants describe themselves as providing "financial services," but this argument conflates the term "consumer *finance* institution" with the broader provision of

---

[2] To the extent Plaintiffs object that these definitions do not use the word "institution," the Court finds persuasive the analysis in *Sterling* that "institution means an established organization that is dedicated to or primarily established for a particular cause or purpose [and] . . . a company can come within the definition of 'an established organization,' and . . . can be an institution." *Sterling*, 2013 WL 1442180, at *3.

"*financial* services," which relate to money and investments generally. *Contrast* CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/financial-services (last visited on March 18, 2024) (defining "financial services" as "business services relating to money and investments, for example those offered by banks[.]") *with* CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/consumer-finance (last visited on March 18, 2024) (defining "consumer finance" as "the business of lending money to individual people, rather than to companies[.]"). That some of the Money Transfer Defendants describe themselves as providing *financial* services is thus not probative of whether they are "consumer finance institutions" under the RFPA.

Plaintiffs argue that Defendants' proposed definition relies "solely on technical dictionaries" and is inconsistent with the "common understanding" of the term, but that argument is similarly unavailing. While Plaintiffs are correct that dictionary definitions are not dispositive in questions of statutory interpretation, here they have not cited a single source, dictionary or otherwise, that supports the assertion that their proffered definition is the "common understanding" of the term "consumer finance institution." Instead, the overwhelming weight of authority presented to this Court supports Defendants' position that the ordinary and common meaning of "consumer finance institution" is a company that provides financing and cash loans to consumers as a core function and purpose of its business.

Plaintiffs and amici nonetheless argue that this definition is contrary to Congress's intent in enacting the RFPA. The Court does not find these arguments persuasive for several reasons. First, in a report by the Committee on Banking, Finance and Urban Affairs discussing the bill that would eventually become the RFPA, the Committee stated that "[t]he term 'consumer finance institution' is intended to mean a consumer finance company, a sales finance company, a small loan company, a consumer discount company, or other similar institution." H. Rep. No. 95-1383 at 49 (1978). Thus, it appears that Congress, when enacting the RFPA, intended or at least understood that "consumer finance institution" would mean companies that provide loans.[3] Other

---

[3] *See e.g.*, ENCYCLOPEDIA.COM, https://www.encyclopedia.com/finance/encyclopedias-almanacs-transcripts-and-maps/finance-company (last visited on March 18, 2024) ("A finance company is

reports suggest that Congress, when enacting the RFPA, was focused primarily on depository institutions (e.g., banks) and lenders (e.g., credit card issuers). *See* 123 Cong. Rec. S7098 (daily ed. May 5, 1977) (statement of Sen. Tower) ("The purpose of the bill is to protect the confidential relationship between banks and credit card issuers and their customers."). Defendants' proposed interpretation of "consumer finance institution" is, at minimum, not inconsistent with these statements in the legislative history.

Second, and more importantly, Plaintiffs and amici's argument that the RFPA was intended as a statutory response to the Supreme Court's decision in *United States v. Miller*, 425 U.S. 437 (1976), and thus intended to protect consumer privacy in all financial transactions generally does not convince the Court that the specific term "consumer finance institution" should be construed broadly. Even if the Court were to accept Plaintiffs and amici's characterizations of the RFPA's purpose in protecting the privacy of financial transactions generally, that purpose would only serve to inform the Court's view of the RFPA *as a whole*, and provides the Court with no reason to construe a *specific term*—"consumer finance institution"—in a way that would appear contrary to the plain and common understanding of the term. Put another way, Plaintiffs' argument would logically require the Court to read out any specific features in the other exemplar terms used within the RFPA's definition of "financial institution" (e.g., bank, industrial loan company, etc.) as a result of a general policy in favor of protecting the privacy of all financial transactions, regardless of type. Such an approach would be contrary to Congressional intent in defining "financial institution" with reference to specific types of entities, and the Court declines to do so here.

Finally, the Court addresses Plaintiffs' and amici's policy arguments. Ultimately, while the Court finds these arguments to be substantial as a public policy matter, they are insufficient to change the result here. As with their legislative intent arguments, the critical flaw with these

---

an organization that makes loans to individuals and businesses."); Pennsylvania Department of Banking and Securities, https://www.dobs.pa.gov/Businesses/Non-Bank%20Licensees/Consumer%20Discount/Pages/default.aspx (last visited on March 18, 2024) ("A consumer discount company is a business corporation that negotiates or makes loans, or advances of money on credit.").

8

policy arguments is that while they cogently articulate the position that entities such as the Money Transfer Defendants *should* be covered by the RFPA *generally*, they fail to show that the Money Transfer Defendants actually *are* covered as "consumer finance institution[s]," a *specific* term within the RFPA. And because "policy arguments cannot supersede the clear statutory text[,]" *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016), the Court cannot and will not effectively rewrite the RFPA to broaden its scope, even if there might be persuasive public policy reasons for doing so. It could well be that Congress simply did not envision the existence or role of entities such as Money Transfer Defendants when enacting the RFPA, thus leaving a gap in the statute's privacy protections. But remedying any such gap is a task for Congress, not the courts. *See United States v. Nishiie,* 996 F.3d 1013, 1028 (9th Cir. 2021) ("[P]ublic policy is fixed by Congress, not the courts" (quotations omitted)).

Accordingly, the Court interprets the term "consumer finance institution" to mean a company for which the provision of financing and cash loans to consumers is a core function and purpose of its business. Because the FAC does not allege that Continental or Viamericas provide loans as part of their business, Plaintiffs fail to allege that they are "consumer finance institutions," meaning that they have not stated a legally cognizable claim for relief as to these defendants. Plaintiffs' RFPA claim is therefore dismissed as to Continental and Viamericas.

However, the FAC does allege that Western Union provides consumer financial services including "lending services," FAC ¶ 6, and that DolEx provides financial services including "personal lending," and advertises "quick and easy personal loans." FAC ¶ 9. Western Union and DolEx protest that these allegations are untrue, but the Court finds these to be factual disputes that cannot be resolved on a motion to dismiss. Because Plaintiffs' well-pled allegations must be taken as true on a Rule 12(b)(6) motion, the Court finds that Plaintiffs have sufficiently alleged that Western Union and DolEx are "financial institutions" under the RFPA. The Court next turns to these defendants' other arguments for dismissal of the RFPA claim.

### ii. "Customer"

DolEx argues that Plaintiffs' RFPA claim should be dismissed because Plaintiffs have failed to adequately allege they were its "customers" under the RFPA. *See* DolEx Mot. at 5–6.

The RFPA defines "customer" as "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in relation to an account maintained in that person's name."  12 U.S.C. § 3401(5).  DolEx argues that, because Plaintiffs have failed to allege that they utilized DolEx's services "in relation to an account maintained in [their] name," they have failed to state a cognizable claim for relief under the RFPA.  DolEx Mot. at 5–6.

This dispute raises yet another question of statutory interpretation: whether the modifying phrase "in relation to an account maintained in that person's name" modifies both preceding clauses of Section 3401(5), or only the immediately preceding clause "for whom a financial institution is acting or has acted as a fiduciary."  DolEx urges the former, while Plaintiffs urge the latter.  Again, the Ninth Circuit has not spoken on this question, but the weight of authority appears to support DolEx's position.  *See Chao v. Cmty. Tr. Co.*, 474 F.3d 75, 81 (3d Cir. 2007), as amended (Mar. 7, 2007) (applying common rules of grammar in finding that account requirement applies to RFPA's definition of "customer"); *Duncan v. Belcher*, 813 F.2d 1335, 1338 (4th Cir. 1987) (finding that plaintiffs were "customers" under RFPA because they "are 'persons' who 'utilized' a 'service of a financial institution,' and that service was related to "'an account maintained in [their] name.'"); *Young v. Union*, No. 06-CV-00114-CRB (PR), 2012 WL 12844773, at *7 (N.D. Cal. Aug. 29, 2012), *aff'd sub nom. Young v. Trans Union*, 616 F. App'x 301 (9th Cir. 2015) (granting summary judgment on RFPA claim where plaintiff failed to present evidence rebutting contention that defendant "VISA does not maintain accounts in cardholders' names and does not enter into direct relationships with cardholders.").  However, at least one case has adopted Plaintiffs' position.  *See In re Blunden,* 896 F. Supp. 996, 1000 n.1 (C.D. Cal. 1995) ("The Taons half-heartedly suggest that because they do not have accounts with Bank, they are not Bank's customers. This argument is without merit. Section 3401(5) defines 'customer' as 'any person . . . who utilized . . . any service of a financial institution . . . .' This definition is broad enough to include loan applicants.").

1   While the Court disagrees with DolEx's characterization of the statute as "unambiguous,"[4]
2   it nonetheless agrees with the weight of authority in concluding that, to be a "customer" under the
3   RFPA, a plaintiff must allege that the financial institution in question maintains an account in their
4   name. Plaintiffs' only argument in favor of their interpretation is that the Court should apply the
5   rule of last antecedent, under which "a limiting clause or phrase . . . should ordinarily be read as
6   modifying only the noun or phrase it immediately follows.'" Opp. at 18 (quoting *Hall v. U.S.
7   Dep't of Agric.*, 984 F.3d 825, 837 (9th Cir. 2020)). But as the Third Circuit in *Chao* noted, this
8   rule is "not absolute and can . . . be overcome by other indicia of meaning." *Chao*, 474 F.3d at 81;
9   *accord United States v. Wasson,* 627 F. App'x 604, 607 (9th Cir. 2015). In *Chao*, the court
10  rejected the rule of last antecedent as inapplicable to the RFPA's definition of "customer," based
11  upon the common grammatical rule that "a phrase that is set off by commas can be excised from a
12  sentence." *Chao*, 474 F.3d at 81. Thus, under common grammatical interpretation, the phrase "or
13  for whom a financial institution is acting or has acted as a fiduciary," should be excisable from the
14  RFPA's definition of "customer," leaving the phrase "any person or authorized representative of
15  that person who utilized or is utilizing any service of a financial institution . . . in relation to an
16  account maintained in that person's name." 12 U.S.C. § 3401(5). This Court finds that reasoning
17  persuasive. And another form of "indicia of meaning"—legislative history—also supports this
18  interpretation: in its report on the RFPA, the Committee on Banking, Finance and Urban Affairs
19  stated explicitly that "[t]he definitions of 'financial records' and 'customer,' taken together, are
20  intended to *preclude application of the bill to anyone other than the person to whose account*
21  *information the government seeks access*. They would exclude, for example, the endorsers of
22  checks and guarantors of loans." H. Rep. No. 95-1383 at 49 (1978) (emphasis added). Such an
23  express statement of legislative intent, combined with the weight of authority and the Third
24  Circuit's persuasive reasoning in *Chao*, leads this Court to conclude that the term "customer," as

---

[4] DolEx cites *Chao* for this proposition, but the *Chao* court was in turn citing to *Pittsburgh Nat. Bank v. United States*, 771 F.2d 73, 75 (3d Cir. 1985), which held that the RFPA's definition of customer "unambiguously . . . pertains only to the financial records of individuals and small partnerships," but did not speak to whether those individuals must have accounts maintained in their name. *See Chao*, 474 F.3d at 82.

11

defined in the RFPA, was meant to exclude persons who "utilized or [are] utilizing any service of a financial institution" but not "in relation to an account maintained in that person's name." Because the FAC does not allege that Plaintiffs "utilized or [are] utilizing any service" of Money Transfer Defendants "in relation to an account maintained in [their] name[s]," Plaintiffs have failed to plead a cognizable claim for relief under the RFPA.[5]

### iii. RFPA Conclusion

The Court finds that Plaintiffs have failed to allege a cognizable claim for relief under the RFPA for two separate reasons. First, Plaintiffs fail to adequately allege that Continental and Viamericas are "consumer finance institutions" under the RFPA, and second, Plaintiffs fail to adequately allege that they are "customers" under the RFPA. Accordingly, the Court **GRANTS** Defendants' motion to dismiss as to Plaintiffs' RFPA claim.

### B. UCL

The Court turns next to Plaintiffs' UCL claim. Plaintiffs' UCL claim is predicated on Money Transfer Defendants' alleged violation of the California Financial Information Privacy Act, Cal. Fin. Code §§ 4050, *et seq.* ("Cal. FIPA"). Unlike the RFPA, Cal. FIPA explicitly covers money transfer businesses. *See* Cal. Fin. Code § 4052(c) ("'Financial institution' means any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 of the United States Code and doing business in this state."); 12 U.S.C. § 1843(k)(4)(A) (providing that "the following activities shall be considered to be financial in nature," including "[l]ending, exchanging, *transferring*, investing for others, or safeguarding money or securities" (emphasis added)).

### i. Standing

First, Continental argues that Plaintiffs have failed to allege facts sufficient to establish

---

[5] Plaintiffs argue briefly that they used Money Transfer Defendants' services in relation to accounts in their names, and that "DolEx's own filings indicate that it maintains 'accounts' for its customers." Opp. at 18. But these arguments are not allegations in the FAC, and the Court does not consider them on a Rule 12(b)(6) motion to dismiss. *See Schneider v. Cal. Dep't. of Corr.,* 151 F.3d 1194, 1197 n. 1 (9th Cir.1998). That said, the Court would not be surprised if Plaintiffs are correct that "[i]f . . . a more specific allegation is required, Plaintiffs can easily provide it in an amended complaint . . . ." Opp. at 18.

standing for a UCL claim. *See* Continental Mot. at 16–17. In order to establish standing under the UCL, as amended by California Proposition 64, a plaintiff must demonstrate that he has "suffered injury in fact and *has lost money or property as a result of the unfair competition.*" Cal. Bus. Prof. Code § 17204 (emphasis added); *see also Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323 (2011). In other words, "a plaintiff must demonstrate some form of economic injury[,]" such as if he "(1) surrender[ed] in a transaction more, or acquire[d] in a transaction less, than he or she otherwise would have; (2) ha[d] a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Kwikset*, 51 Cal. 4th at 323. Here, Plaintiffs Sequeira and Cordero satisfy that burden by alleging that, had they known of Western Union's alleged violations of the Cal. FIPA, they "would not have paid Western Union to process the transaction[s], and would instead have searched for alternative ways of sending [their] money." FAC ¶¶ 53, 55. However, Plaintiff Alegria, the only plaintiff alleged to have used Continental, Viamericas, or DolEx's services, does not allege any such economic injury. *Cf.* FAC ¶ 54. Instead, Plaintiff Alegria only alleges that he "feels distress and that his privacy has been violated because of the companies' sharing of his personal information with law enforcement." *Id.*

Because Plaintiff Alegria has alleged no loss of *money or property* as a result of the unlawful conduct alleged in Plaintiffs' UCL claims, Plaintiff Alegria does not have standing to pursue a UCL claim. Accordingly, Plaintiffs' UCL claim is dismissed as to Continental, Viamericas, and DolEx. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 319 (2009) (holding that UCL's statutory standing requirements conforms with established class action requirement that named plaintiffs must demonstrate standing in order to pursue class action claim); *In Re Kizer v. Tristar Risk Mgmt.*, 13 Cal. App. 5th 830, 849 (2017), *as modified* (July 26, 2017) ("To bring a class action claim under the UCL, the representative plaintiff must establish he or she has standing under the UCL, as amended by Proposition 64, and that all of the foregoing requirements for a class action are satisfied, including that common issues of fact or law predominate and that the representative's claim is typical of the class."). Plaintiffs' only remaining UCL claim is against

13

Western Union, and so the Court next turns to Western Union's other arguments for dismissal.

### ii. Legislative Bar

Western Union argues that because the Cal. FIPA does not provide a private right of action, Plaintiffs cannot bring a UCL claim predicated on an alleged violation of that statute. *See* Western Union Mot. at 13–14. But the California Supreme Court has made clear that a predicate statute need not itself be independently actionable for a plaintiff to bring a claim under the UCL's unlawful prong. *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002), *as modified* (May 22, 2002) ("A private plaintiff may bring a UCL action even when the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action." (quotations omitted)). Instead, "the UCL cannot be used to state a cause of action the gist of which is absolutely barred under some other principle of law." *Zhang v. Superior Court*, 57 Cal. 4th 364, 377 (2013) (quoting *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566 (1998)). Such a bar can come from the statutory language itself, *see, e.g.*, Cal. Civ. Code § 1798.150(c) ("Nothing in this title shall be interpreted to serve as the basis for a private right of action under any other law."), or from some other source of law, s*ee Stop Youth Addiction*, 17 Cal. 4th at 564 (litigation privilege would bar UCL action). "The rule does not, however, prohibit an action under the [UCL] merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999).

Western Union argues that Cal. FIPA absolutely bars enforcement under any other law by explicitly stating that "the civil penalties provided for in this section shall be *exclusively* assessed and recovered in a civil action brought in the name of the people of the State of California . . . by any of the following: (1) The Attorney General (2) the … regulator … of the financial institution." *See* Cal. Fin. Code § 4057(e) (emphasis added). The Court disagrees. In *Stop Youth Addiction*, the California Supreme Court considered a closely analogous issue, where the defendants argued that California Penal Code Section 308(a)'s statutory scheme providing that whosoever sells, gives or furnishes tobacco to a minor "is subject to either a criminal action for a misdemeanor or to a civil action brought by a city attorney, a county counsel, or a district

14

1   attorney" acted as a legislative bar to the plaintiffs' UCL claim.  There, the California Supreme
2   Court rejected the argument, finding that the California Penal Code did not act as an absolute
3   legislative bar, because the defendants had failed to show that the California legislature intended
4   Section 308 to be the exclusive means of combating sales of tobacco to minors, and that its
5   language did not "expressly provide" that its remedies would not be cumulative of remedies under
6   the UCL.  *Stop Youth Addiction*, 17 Cal. 4th at 572–73.
7   Western Union argues that the term "exclusively" in Cal. FIPA distinguishes this case
8   from *Stop Youth Addiction*, but a closer inspection of the statutory language does not support that
9   conclusion.  Here, the language Western Union relies upon states that "the civil penalties provided
10  for *in this section* shall be exclusively assessed and recovered in a civil action brought in the name
11  of the people of the State of California . . . ."  Cal. Fin. Code § 4057(e) (emphasis added).
12  Notably, this section does not say that the remedies provided shall be the *only* civil remedies
13  available for a violation of the Cal. FIPA's protections.  Instead, the Court reads this to establish
14  that the civil penalties assessed under Cal. Fin. Code § 4057(a) (e.g., $2,500 per individual
15  violation) may only be assessed and recovered in a civil action brought by the government, but not
16  to make those remedies the *exclusive* means for obtaining any relief for violations of the Cal.
17  FIPA.  As was the case in *Stop Youth Addiction*, there is no evidence here that the Cal. FIPA
18  "expressly provides" that the civil penalties of Section 4057 are not cumulative of remedies under
19  the UCL.  Absent any such express provision, Plaintiffs are entitled to pursue their UCL claim
20  under the unlawful prong.  *See* Cal. Bus. & Prof. Code § 17205 ("Unless otherwise expressly
21  provided, the remedies or penalties provided by this chapter are cumulative to each other and to
22  the remedies or penalties available under all other laws of this state."); *Stop Youth Addiction*, 17
23  Cal. 4th at 573 ("[E]ven were we to conclude . . . that Penal Code section 308 and the STAKE Act
24  are a comprehensive scheme for combating teen smoking, we would still confront the fact that in
25  neither of these provisions is it 'expressly provided' that remedies under the UCL and those
26  statutes are not cumulative to each other.").
27  \\
28  \\

### iii. Statutory Immunity Under Cal. FIPA and the Annunzio–Wylie Anti–Money Laundering Act

Western Union argues that Plaintiffs cannot allege a cognizable UCL claim under the unlawful prong, because its conduct was not unlawful under the Cal. FIPA or alternatively, immunized by the Annunzio–Wylie Anti–Money Laundering Act. *See* Western Union Mot. at 10–12; 14–17. These arguments raise affirmative defenses, which the Court does not have an adequate factual record to resolve at this stage.[6] *See Coronado v. Bank Atl. Bancorp, Inc.,* 222 F.3d 1315, 1319 (11th Cir. 2000) ("The plain language of [Annunzio–Wylie Act Section 5318(g)(3)] supplies an affirmative defense to claims against a financial institution for disclosing an individual's financial records or account-related activity." (quotations omitted)); *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 23 (2010) ("In California, it has been declared that where the statute has exemptions, exceptions or matters which will avoid the statute the burden is on the claimant to show that he falls within that category." (quotations omitted)); *People v. Fisher*, 96 Cal. App. 4th 1147, 1151 (2002) ("It is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant." (quotations omitted)). Accordingly, the Court **DENIES** Western Union's motion to dismiss on these grounds. *See Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019) ("Rule 8 does not require plaintiffs to plead around affirmative defenses" because "dismissal based on an affirmative defense is permitted when *the complaint* establishes the defense." (emphasis original)).

### iv. UCL Conclusion

Because the Court finds that Plaintiffs have failed to allege they have standing to pursue a UCL claim against Continental, Viamericas, or DolEx, the Court **GRANTS** Continental, Viamericas, and DolEx's motions to dismiss as to Plaintiffs' UCL claim. The Court **DENIES**

---

[6] For instance, Western Union argues that it is entitled to absolute immunity under the Annunzio–Wylie Act because its disclosures were pursuant to Arizona court orders. However, Western Union's argument glosses over the fact that these court orders reflect a settlement agreement that Western Union entered into (presumably voluntarily) with the State of Arizona. *See* Dkt. No. 70-2. The factual circumstances of that settlement, and Western Union's subsequent disclosures, are thus material to whether it is entitled to absolute immunity under the Annunzio–Wylie Act.

Western Union's motion to dismiss as to Plaintiffs' UCL claim.

### C. Leave to Amend

Defendants argue at various points that dismissal should be with prejudice. Whether to grant leave to amend is within the discretion of the district court, which may deny leave to amend "due to 'undue delay, bad faith or dilatory motive on the part of the [party seeking leave to amend], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182, (1962)). Because the Court cannot conclude at this stage that amendment would be futile, the Court grants Plaintiffs leave to amend.

### D. Requests for Judicial Notice

Related to their motions to dismiss, Western Union, DolEx, and Continental request the Court take judicial notice of subpoenas, court orders, and other publicly available documents relating to their production of financial records to the Arizona state government and/or TRAC. *See* Dkt. Nos. 66, 70, 114. Plaintiffs do not challenge these requests or argue that the existence of the documents cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Accordingly, the Court **GRANTS** Defendants' requests for judicial notice and takes notice of the existence of the documents, without accepting their underlying factual contents as true. *See Parks v. Port of Oakland*, No. 16-CV-04061-HSG, 2017 WL 2840704, at *2 n.1, 2 (N.D. Cal. July 3, 2017).

\\

\\

\\

\\

\\

\\

\\

\\

## IV. CONCLUSION

Continental, Viamericas, DolEx, and Federal Government Defendants' motions to dismiss are **GRANTED WITH LEAVE TO AMEND**.  Dkt. Nos. 63–65, 68.  Western Union's motion to dismiss is **GRANTED WITH LEAVE TO AMEND** as to Plaintiffs' RFPA claim, and **DENIED** as to Plaintiffs' UCL claim.  Dkt. No 69.  Any amended complaint must be filed within 28 days from the date of this Order.  The Court also **GRANTS** Defendants' requests for judicial notice.  Dkt. Nos. 66, 70, 114.

**IT IS SO ORDERED.**

Dated: 3/21/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge