Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
J. Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Julian Zhu (SBN 342744)
jzhu@edelson.com
EDELSON PC
350 North LaSalle, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Sejal Zota (*pro hac vice*)
sejal@justfutureslaw.org
Dinesh McCoy (*pro hac vice*)
dinesh@justfutureslaw.org
Daniel Werner (SBN 322310)
daniel@justfutureslaw.org
JUST FUTURES LAW
95 Washington Street, Suite 104-149
Canton, MA 02021
Tel: 617.812.2822

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| NELSON SEQUEIRA, ISMAEL CORDERO, MARIA HERNANDEZ, and JOSE ANTONIO MANJARREZ individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; WESTERN UNION FINANCIAL SERVICES, INC., a Colorado corporation; CONTINENTAL EXCHANGE SOLUTIONS, INC., a Kansas corporation, d/b/a RIA FINANCIAL SERVICES and AFEX MONEY EXPRESS; and DOLEX DOLLAR EXPRESS, INC., a Texas corporation,<br><br>*Defendants.* | Case No. 4:22-cv-07996-HSG<br>Hon. Haywood S. Gilliam, Jr.<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

1.      This case challenges an unlawful dragnet surveillance program targeting immigrants and communities of color and violating the financial privacy rights of hundreds of thousands of people.  Plaintiffs Nelson Sequeira,  Ismael Cordero, Maria Hernandez, and Jose Antonio Manjarrez, individually and on behalf of similarly situated individuals, bring this Class Action Complaint against the United States Department of Homeland Security and Immigration and Customs Enforcement (together, "Federal Government Defendants"), Western Union Financial Services, Inc., Continental Exchange Solutions, Inc., D/B/A Ria Financial Services and AFEX Money Express, and DolEx Dollar Express, Inc. (together, "Money Transfer Business Defendants" or "MTB Defendants"), seeking damages, restitution, an injunction, and other appropriate relief from Defendants' unlawful sharing and accessing of private financial information and personal records.  Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief.

## I.      PARTIES

2.      Plaintiff Nelson Sequeira is a natural person domiciled in California.  He resides in Concord, California.

3.      Plaintiff Ismael Cordero is a natural person domiciled in California.  He resides in San Jose, California.

4.      Plaintiff Maria Hernandez is a natural person domiciled in California.  She resides in Salinas, California.

5.      Plaintiff Jose Antonio Manjarrez is a natural person domiciled in California.  He resides in San Jose, California.

6.      Defendant United States Department of Homeland Security ("DHS") is a United States federal executive department responsible for public security.  It is headquartered in Washington, D.C.

7.      Defendant United States Immigration and Customs Enforcement ("ICE") is an agency within DHS responsible for enforcing federal immigration laws.  It is headquartered in Washington, D.C.  Homeland Security Investigations ("HSI") is a sub-component of ICE

1  responsible for conducting law enforcement investigations.

2      8.    Defendant Western Union Financial Services, Inc. ("Western Union") is a

3  multinational financial services company incorporated in the State of Colorado.  Its headquarters

4  are in Denver, Colorado.  It regularly transacts business throughout California, including in this

5  district, with over 20 locations in San Francisco alone.  The consumer financial services it

6  provides include money transfer services.  Western Union discloses that it is "working to provide

7  consumers and our business clients with access to an expanding portfolio of payment and other

8  financial services."

9      9.    Defendant Continental Exchange Solutions, Inc. is a Kansas corporation with its

10 headquarters in Buena Park, California, and which regularly does business under fictitious names,

11 including but not limited to Ria Financial Services and AFEX Money Express ("Continental,"

12 "Ria," or "AFEX").  It regularly transacts business throughout California, including in this district,

13 with dozens of locations in the Bay Area and at least six in San Francisco alone.  The consumer

14 financial services it provides include money transfer as well as "bill payment, mobile top-ups,

15 prepaid debit cards, check cashing, and money orders."  Continental is a subsidiary of Euronet

16 Worldwide, Inc. ("Euronet"), a multinational corporation incorporated in Delaware with its

17 headquarters in Kansas.  According to Euronet's public filings, "[w]e provide global money

18 transfer services primarily under the brand names Ria, IME, AFEX, and xe."  Euronet acquired

19 Ria in 2007, establishing its money transfer business segment, which now generates

20 approximately 47% of Euronet's consolidated revenues.

21     10.   Defendant DolEx Dollar Express, Inc. ("DolEx") is a Texas corporation with its

22 headquarters in Arlington, Texas.  It regularly transacts business throughout California, including

23 in this district, with dozens of locations in the Bay Area alone.  The consumer financial services it

24 provides include money transfer, personal lending, check cashing, money order, bill pay, and other

25 services.  It advertises its "quick and easy personal loans," the ability to pay "all your utility bills,

26 cable, mortgage, phone service, internet, credit cards, auto loans, personal loans, and much more,"

27 as well as check cashing as "a simple and convenient way to get your check paid quickly and your

28 money in hand."  DolEx maintains a customer account in each customer's name, and, upon

1   information and belief, it assigns each customer a unique customer id and tracks their names and

2   transactions over time.

3   ## II.   JURISDICTION AND VENUE

4   11.   This Court has subject matter jurisdiction over Plaintiffs' claims arising under the

5   laws of the United States pursuant to 28 U.S.C. § 1331, and, as to all other claims, 28 U.S.C.

6   § 1367.  The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because

7   the amount in controversy exceeds $5 million, there are over 100 members in the proposed Class,

8   and at least one member of the proposed Class is a citizen of a state or country different from at

9   least one Defendant.

10   12.   This Court has personal jurisdiction over Defendants because Defendants regularly

11   transact business in this District and have committed wrongful acts here.

12   13.   Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1391(e)(1)(B)

13   because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

14   and emanated from this District.  In addition, with respect to the Federal Government Defendants,

15   venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Plaintiffs reside within

16   this District and no real property is involved in the action.

17   ## III.   INTRODUCTION

18   14.   The Federal Government and Money Transfer Business Defendants have violated

19   the financial privacy rights of hundreds of thousands of people, secretly collecting and sharing

20   intimate details of millions of financial transactions for nearly a decade.  This mass surveillance

21   program was coordinated by the Transaction Record Analysis Center ("TRAC"), a collaboration

22   of law enforcement agencies, including several federal government agencies like Defendant ICE.

23   Until press reports exposed the program earlier this year, consumers had no idea that money

24   transfer companies were indiscriminately sharing their private financial information with the

25   federal government.  Worse, public records obtained by Plaintiffs' counsel suggest that the

26   program's primary purpose is to target immigrants and communities of color.

27   15.   This type of surreptitious surveillance of financial records is precisely what

28   Congress sought to protect against when it passed the Right to Financial Privacy Act ("RFPA") in

1978, 12 U.S.C. §§ 3401, *et seq.*  The RFPA prohibits consumer finance institutions from disclosing consumers' financial information to the federal government without a valid court order or subpoena, and, even then, consumers must be notified and provided an opportunity to object before the information in question may be disclosed.  The Act also prohibits the federal government from having access to such information unless these statutory protections are honored.

16.    The California Legislature has also acted to protect the privacy of consumers' financial records, passing the California Financial Information Privacy Act ("CalFIPA") into law.  *See* Cal. Fin. Code §§ 4050, *et seq.*  CalFIPA prohibits a consumer's financial information from being disclosed to third parties without the consumer's express consent, except in limited circumstances not applicable here.

17.    Yet Defendants ignored these requirements when they devised a program to regularly collect, scrutinize, and share millions of financial records from unknowing consumers in the Southwest border states.  According to TRAC Board Meeting Minutes obtained by Plaintiffs' counsel, by 2021, the TRAC database contained over 145 million financial records from unsuspecting consumers.  Beginning at least as early as 2014, TRAC began collecting and disseminating records from the MTB Defendants and other money transfer companies about money transfers over $300 sent to or from the Southwest border region.  And since as early as at least 2015, TRAC, with the participation of federal government agencies, has been gathering and accessing consumer financial records from the MTB Defendants and other money transfer companies about money transfers greater than or equal to $500 sent to or from Arizona, California, New Mexico, Texas, or Mexico (hereinafter, "Watchlist States").  These financial records were obtained under the ostensible authority of various TRAC participants, including Arizona and New Mexico law enforcement officials and the federal government.  All requests were intended to result in the production of responsive data to TRAC, so that TRAC could make it accessible to all participants, including the federal government.  The scheme helped facilitate the creation of a mass database that federal government agencies and other TRAC participants would be able to access without limitation, sidestepping the protections of the RFPA and CalFIPA.

18.     Federal involvement in TRAC, including access to the private financial information gathered by TRAC, has a long history.  Although TRAC was not formally incorporated as a stand-alone entity until 2014, its genesis appears to go back decades to 1996.  Numerous federal agencies have had access to financial data gathered by TRAC, enabling them to comb through millions of financial records with no warrant or judicial oversight, and without compliance with RFPA or CalFIPA's requirements.  TRAC also receives federal funding.

19.     TRAC gathers, stores, and shares private financial records in its database even when there is no link to any particularized suspicion of criminal activity.  Instead, money transfer companies like the MTB Defendants disclose, and the government and Federal Government Defendants have access to, information about *any* transfer by any consumer of $500 or more in the Watchlist States, at the very least.

20.     Plaintiffs bring this action to remedy these unlawful surveillance activities.

### IV.     GENERAL ALLEGATIONS

**A.     How Money Transfer Businesses Work**

21.     Money transfer businesses provide an important consumer financial service, enabling people to send and receive money across borders.  Immigrants and other people with friends and relatives abroad are particularly reliant on money transfer businesses to facilitate the sending of remittances.  A remittance is an international wire, often money sent by an immigrant or migrant worker to family members, friends, and close relations in their country of origin.  The United States is the largest source of international remittances in the world.  Approximately $150 billion in remittances are sent annually from the United States, with approximately $30 billion being sent from the United States to Mexico.  Money transfers can also be made domestically.

22.     To effectuate a money transfer, a sender typically brings cash to a money transfer business's brick and mortar location.  A business representative will receive the cash and arrange for a transfer to the location specified by the sender.  Once the transaction is processed, the beneficiary or recipient of the transfer need only visit the appropriate branch of a money transfer business, where the money is delivered to them.

23.     Money transfer businesses profit by setting exchange rates above market rates and by charging commission fees.  The transaction costs of a money transfer can reach 10%, and tend to be higher when sending money to remote destinations.  The vast majority of revenue at companies like the MTB Defendants comes from person-to-person transfers, with 90% of that business dealing with cash on both ends.

24.     Many money transfer consumers are unbanked and therefore unable to use cheaper transfer systems like electronic checking or bank wiring instead.  These services are used overwhelmingly by lower-income minority and immigrant communities.  Currently, there are 200 million migrant workers that use money transfer businesses to send financial support to dependent family members in their countries of origin.  During 2020, remittances to Latin America and the Caribbean increased by 6.5% despite the economic downturn caused by the COVID-19 pandemic, indicating the extent to which many family members of immigrants rely on the income from remittances.

25.     At no point did the MTB Defendants inform consumers in the Watchlist States or elsewhere that their private financial records would be routinely divulged to Defendant ICE or other federal agencies.

### B.     The TRAC Program Has Collected Hundreds of Millions of Consumer Financial Records

26.     TRAC, in its current iteration, has existed since 2014.  However, attempts to monitor the activities of people who use money transfer services *en masse* began well before that time.  A 1996 bulletin issued by the Arizona Attorney General's Office, for example, states that TRAC was housed within that office's Financial Remedies Unit.  The bulletin explains that TRAC, at that time, had responsibilities to "input, computerize, and analyze the [financial data] in response to requests from local, state, and federal law enforcement," and that "TRAC is the nucleus of a state/federal Suspicious Transaction Report Project, which coordinates money laundering investigation and prosecutions among [various Arizona agencies], the U.S. Customs Service, and the Drug Enforcement Administration."  In 2006, the Arizona Attorney General attempted to obtain bulk records from Western Union, serving Western Union with a warrant for

data regarding every person-to-person money transfer transaction greater than or equal to $300 in a three-year period sent from all Western Union locations worldwide to Sonora, Mexico. The ensuing legal battle ended with the Arizona Supreme Court holding that the warrant for out-of-state Western Union transaction records was unconstitutional.

27.     Having previously failed to obtain bulk records through litigation, in February 2010, the Arizona Attorney General and Western Union reached an agreement whereby Western Union would turn over bulk transaction data, particularly targeting the southwest border and immigrant populations. Western Union acquiesced to this unlawful arrangement even though it had successfully established that the Arizona Attorney General lacked the authority to obtain out-of-state records *en masse* in prior litigation. From the start, it was evident that the Arizona Attorney General intended to share the data produced by Western Union with other state and federal law enforcement officials, as reflected in the agreement.

28.     In January 2014, the Arizona Financial Crimes Task Force ("AZFCTF")—which is composed of the Arizona Attorney General's Office, the Phoenix Police Department, the Arizona Department of Public Safety, and participation by DHS—expanded the existing agreement with Western Union and founded the Transaction Record Analysis Center.

29.     The TRAC surveillance program was designed to facilitate collaboration between state and federal government agencies, particularly DHS and its predecessors. Early policy documents touted TRAC's goal of leveraging the analytical resources of federal law enforcement agencies. Similarly, Southwest Border Anti-Money Laundering Alliance (an entity TRAC contracted with) documents from as early as 2016 indicated that collaboration with DHS was a primary goal. By 2017, TRAC had cemented a close working relationship with ICE sub-component HSI.

30.     TRAC is staffed by analysts and law enforcement professionals and designed to facilitate law enforcement access to bulk data. It functions as a data analysis center with a web-accessible, searchable, centralized database of money transfer transactions concentrated in southwest border-states and Mexico. The data stored in TRAC include, at the very least, financial records of consumers from Arizona, California, New Mexico, and Texas, as well as Mexico.

31.     Western Union was not the only money transfer business providing bulk transaction data to TRAC after its creation in 2014.  The Arizona Attorney General's office also requested that at least six other companies, including Defendants Continental and DolEx, produce bulk transaction data to TRAC.  Those requests continued through 2022 and have expanded to include at least ten other known companies.  None of these requests complied with the RFPA or CalFIPA, even though their purpose was to provide access to the financial records to the federal agencies participating in TRAC, including the Federal Government Defendants.  At least 20 money transfer businesses are implicated in the program, according to TRAC board meeting minutes.

32.     An AZFCTF PowerPoint presentation dated January 19, 2017 conveys the immense scale of the program:



33.     In 2019, Western Union's data sharing agreement with the Arizona Attorney General expired.  Despite the agreement lapsing, Western Union continued to hand over millions of financial records to TRAC without any lawful basis.

34.     Defendant DHS stepped in to try to fill the void left by the expiration of the Arizona Attorney General's settlement agreement with Western Union.  According to minutes of a September 2019 TRAC board meeting, before the agreement expired, HSI committed to funding

TRAC for one year, with the hope of finding permanent funding going forward.  Additionally, the HSI Special Agent in charge of Phoenix began issuing a series of requests to Western Union every six months directing the company to continue transmitting records of money transfers to TRAC, so that all participants, including the federal agency participants, could continue to have access to the bulk financial records.  Indeed, requests sent by HSI to Western Union and Maxi Transfers swept in over six million additional records over the next three years.  HSI's requests were made without and in excess of any lawful authority.  HSI did not comply with the RFPA's requirements before issuing the requests to Western Union or other money transfer companies, or accessing the underlying data, such as providing notice to the affected consumers, issuing a valid administrative subpoena, or obtaining a court order.  Nor did Western Union comply with the RFPA or CalFIPA's requirements before divulging information to TRAC, or the federal agencies involved in TRAC, in response to HSI's requests.

35.   The information in TRAC's database is extensive and intrusive.  At the very least, it contains information on all transactions in amounts greater than or equal to $500 to or from Arizona, California, New Mexico, Texas, and Mexico since as early as 2010.  The data collected about each transaction may include: sender's name, sender's address, sender's phone number, sender's date of birth, sender's occupation, sender's social security number, payee's name, payee's address, payee's phone number, payee's date of birth, payee's occupation, payee's social security number, sender's and payee's identification numbers and types (passport or other ID numbers), date and times of transactions, operators' names, sending agent's address, paying agent's address, and the sending and paying countries, currencies, and dollar amounts.

36.     The mass information collection is intended to be a dragnet, and is not focused on particular individuals suspected of criminal activity.  An AZFCTF PowerPoint presentation about TRAC's capabilities, for example, emphasizes how federal and state law enforcement participants can use highly general queries, such as "search[ing] a geographic area" for "persons who are sending/receiving the highest volume/dollar amounts," as depicted below:



37.     Further, anxiety about immigration is a focus of the TRAC database.  One slide in a 2017 AZFCTF PowerPoint presentation, for example, focuses on "Middle Eastern Human Smuggling (SI Aliens) along the Arizona Border."  The subsequent slides emphasize that certain transactions captured by TRAC were deemed suspicious because they involved money sent by people with "Middle Eastern names" or "Middle Eastern/Arabic names."  That raises another danger of mass surveillance tools: they may be weaponized against vulnerable groups based on improper criteria, such as race, religion, or national origin.  The RFPA and CalFIPA's protections provide a potential safeguard against such activities, but the MTB Defendants and Federal Government Defendants ignored them.

### C.     DHS and Other Federal Agencies Have Had Years of Illegal Access to Consumer Financial Records

38.     Although the Arizona Attorney General created TRAC, dozens of federal agencies participate in TRAC and have full access to transaction data tracking millions of consumers' financial activities.

39.     TRAC was designed with the goal of collaboration with federal government

agencies, especially DHS.  HSI has been an active user of the database since at least 2017, according to internal TRAC documents, even before HSI began sending its own data requests.

40.     According to TRAC board meeting minutes, an alphabet soup of federal agencies has actively participated in TRAC and has access to the financial data contained therein, in flagrant violation of the RFPA.  The federal agencies with access to TRAC data include ICE, U.S. Customs & Border Protection, U.S. Citizenship and Immigration Services, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Bureau of Indian Affairs Office of Justice Services Law Enforcement Division, the Drug Enforcement Administration, the Internal Revenue Service, the U.S. Department of State, the U.S. Fish and Wildlife Service, the U.S. Postal Inspection Service, the U.S. Marshals Service, the U.S. Secret Service, and the U.S. Department of Agriculture—and this list is not exhaustive.  As discussed above, HSI and its parent agency Defendant ICE not only accessed TRAC, but actively participated in obtaining records for the TRAC database.

41.     HSI's bulk data collection was continuous and extensive until 2022 when Senator Ron Wyden raised concerns about the program, ultimately resulting in a suspension of HSI's role in requesting the data in question from Western Union and Maxi.  However, upon information and belief, HSI continues to be a member of TRAC with access to consumer financial records, and the MTB Defendants and other money transfer businesses have continued to provide the Federal Government Defendants with access to consumer financial records through TRAC without following applicable legal requirements.

42.     TRAC, with information provided by the MTB Defendants and other money transfer businesses, allows federal government agencies to conduct warrantless searches on the millions of financial records stored in its database.  Customers making money transfers in the Watchlist States have no way of knowing their information will be taken and provided to the federal government without notice or due process.  The over 145 million financial records stored in TRAC's databases and made available to the federal government break the promise of financial privacy laid out in the RFPA and CalFIPA.

43.     The MTB Defendants were well aware that, by disclosing financial records to TRAC, they were also disclosing them to the federal government agencies participating in TRAC—even when data requests did not come directly from a federal government agency.

44.     According to a January 18, 2023 letter from Senator Ron Wyden to the United States Department of Justice Inspector General, "[b]etween October and December of 2022, my office received information from three other money transfer companies—Euronet (RIA Envia), MoneyGram, and Viamericas[1]—which confirmed that they also delivered customer data in bulk to TRAC, in response to legal demands from HSI and other government entities." In the letter, Senator Wyden stated that "[o]utside counsel for Viamericas informed my office that in addition to the requests from HSI San Juan, the company also received legal demands from the Arizona AG, the DEA, and the FBI," and "did not identify the transactions requested by each agency, but did reveal that it had received a demand for data about transactions originating in North Carolina and going to any other country."

45.     Viamericas, like other money transfer companies, has a long tradition of providing bulk data to TRAC. On February 17, 2017, Viamericas' Legal Counsel & Compliance Officer, Joe Massie, e-mailed Dan Kelly, the TRAC Analytical Supervisor for the Arizona Financial Crimes Task Force, stating: "You and I exchanged emails last summer regarding TRAC. . . . I have attached sample SAR data and hope that you will once again consider allowing Viamericas to start exchanging information with TRAC." Mr. Kelly then coordinated the issuance of a data request on TRAC's behalf through the Arizona Attorney General's office. As the correspondence demonstrates, Viamericas knew that it was producing data to the multi-agency task force TRAC, which included federal government agencies. Indeed, according to a January 18, 2023 Wall Street Journal article, "Viamericas said data disclosures were ongoing" in response to customs summonses issued by Defendant ICE. According to the same article, the HSI custom summonses requested that the data at issue be delivered to TRAC.

---

[1] The Court previously dismissed Plaintiff Orsay Alegria's claims against Viamericas. *See* Dkt. 116. Although not re-alleged in this Complaint, Mr. Alegria expressly preserves those claims for purposes of appeal.

46.     DolEx has similarly been providing bulk money transfer information to TRAC for years, since at least 2014.  As with Viamericas, although the formal data requests came from the Arizona Attorney General's office, DolEx was well aware that the information was being produced to TRAC, including the federal agencies who participate in TRAC.  For example, in a January 4, 2018 e-mail concerning one data request, Marco Naranjo, DolEx's Chief Compliance Officer, stated the company would continue sending the money transfer data to the "TRAC team."

47.     Like Viamericas and DolEx, Western Union and Euronet's subsidiary Continental (including Ria and AFEX) have also been providing mass transaction data to TRAC for years, knowing that TRAC's membership included multiple federal government agencies who would obtain the financial records produced to TRAC.  They produced that data in response to requests from federal agencies, as well as state law enforcement agencies acting on behalf of TRAC and its membership.  Those requests were made without and in excess of any lawful authority, and Western Union and Continental's disclosures were all made without complying with CalFIPA's requirements.  By disclosing the financial records to TRAC, the MTB Defendants were also disclosing it, and knew they were disclosing it, to the federal government agencies who participate in TRAC, as well as all other TRAC members.

**D.     TRAC Poses Particular Harm to Immigrant and Vulnerable Communities**

48.     TRAC's collection of sensitive personal information from MTB consumers and law enforcement agencies' unfettered access to those records cause particular harm to immigrant communities and others who disproportionately rely on money transfer services.  Using the sensitive address information that is contained within money transfer records, ICE and other law enforcement agencies can track and locate people and conduct arrests or raids that lead to detention and deportations.

49.     TRAC collects information that poses additional risk to noncitizens by revealing details relevant to their immigration status.  For example, whether a person has a valid social security number can be used as a proxy for assessing a person's status as a citizen or visa holder.

50.     Regardless of a money sender's immigration status, because TRAC collects data about both the sender and recipient of remittances, TRAC provides ICE with information about a

person's network of family members and other associates living in other countries.  This raises the additional fear of surveillance and targeting of the overseas recipients, especially if they decide to come to the United States in the future.

51.     TRAC's collection of consumer financial information from the MTB Defendants and other money transfer companies, and its sharing of these records with ICE and other federal agencies, causes harm because the underlying information is both private and sensitive. Immigrants have expressed specific fears related to TRAC surveillance and ICE targeting, noting that ICE's tracking of their information from remittances is "scary to think about" given the threat of potential detention.  TRAC's data collection also poses a threat to First Amendment association rights and creates a chilling effect among immigrant communities who rely on these necessary services to support their families in Mexico and beyond.  These remittance payments help provide for basic family needs, as people have planned their lives around working and sending money back to family as a means of consistent support.  Such payments and the use of essential services should not be used by ICE as a basis to target immigrants and others.  To minimize the risk of such abuses, the Federal Government Defendants and MTB Defendants must be required to comply with the law.

## FACTS SPECIFIC TO PLAINTIFFS

52.     Plaintiff Nelson Sequeira regularly used Western Union to send money from California (including from this District) to his family abroad, including in the amount of $500 or more.  Mr. Sequeira was never informed that records from these transactions would be shared with the federal government without a valid warrant, subpoena, or court order, and would remain in a mass database accessible by hundreds of government agencies indefinitely.  If Mr. Sequeira had known about this invasion of his privacy, he would not have paid Western Union to process the transaction, and would instead have searched for alternative options for sending his money.  Mr. Sequeira is disturbed that his personal financial information, along with information about his family abroad, was shared with the federal government without his knowledge.

53.     Plaintiff Ismael Cordero regularly used Western Union to send money from California to his family abroad, including in the amount of $500 or more.  Mr. Cordero was never

informed that records from these transactions would be shared with the federal government without a valid warrant, subpoena, or court order, and would remain in a mass database accessible by hundreds of government agencies indefinitely.  If Mr. Cordero had known about this invasion of his privacy, he would not have paid Western Union to process the transaction, and would instead have searched for alternative options for sending his money.  Mr. Cordero is disturbed that his personal financial information, along with information about his family abroad, was shared with the federal government without his knowledge.

54.     Plaintiff Maria Hernandez used Continental's money transfer services to Mexico, including in in the amount of $500 or more.  She was never informed that records from these transactions would be shared with third-parties or government entities, including the federal government, without a valid warrant, subpoena, or court order, and would remain in a mass database accessible by hundreds of government agencies indefinitely.  If Ms. Hernandez had known about this invasion of her privacy, she would not have paid Continental to process her transactions, and would instead have searched for alternative options for sending her money.  Ms. Hernandez feels distress and that her privacy has been violated because of the companies' sharing of her personal information with law enforcement.

55.     Plaintiff Jose Antonio Manjarrez used DolEx's money transfer services to Mexico, including in the amount of $500 or more.  He was never informed that records from these transactions would be shared with third-parties or government entities, including the federal government, without a valid warrant, subpoena, or court order, and would remain in a mass database accessible by hundreds of government agencies indefinitely.  If Mr. Manjarrez had known about this invasion of his privacy, he would not have paid DolEx to process his transactions, and would instead have searched for alternative options for sending his money.  Mr. Manjarrez feels distress that his privacy has been violated because of DolEx's sharing of his personal information with law enforcement.

## V.      CLASS ALLEGATIONS

56.     **Class Definitions**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and a class of similarly situated individuals, defined as follows:

**RFPA Class (Plaintiff Manjarrez):** All persons who sent or received a money transfer via DolEx or any of its subsidiaries, or any money transfer business that offers credit or lending services, and whose transaction data a federal government agency had access to or obtained copies of through TRAC since 2010.

**CalFIPA Class (Plaintiffs Sequeira, Cordero, Hernandez, and Manjarrez):** All California residents who sent or received a money transfer via Western Union, Continental, DolEx, or any of their subsidiaries, and whose transaction data was provided to TRAC since 2010.

People who sent money from outside the United States to within the United States are not included in the proposed Classes. The following people are also excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

57.     **Numerosity**: On information and belief, the proposed Classes include hundreds of thousands, if not millions, of people. Members of the Classes can be identified through Defendants' records.

58.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs and each Class members' claims, and those questions predominate over any questions that may affect individual class members. Common questions include but are not limited to the following:

a.      Whether the MTB Defendants unlawfully provided access to or copies of the information contained in the proposed Class Members' financial records to a government authority;

b.      Whether the Federal Government Defendants unlawfully had access to, or obtained copies of, the information contained in the proposed RFPA Class Members' financial records;

c.  Whether the proposed RFPA Class Members are entitled to injunctive relief, statutory damages, actual damages, punitive damages, and reasonable costs and attorney's fees from Defendants under the Right to Financial Privacy Act; and,

d.  Whether the proposed CalFIPA Class Members are entitled to restitution and injunctive relief from the MTB Defendants under California's Unfair Competition Law.

59.  **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes in that Plaintiffs and the members of the Classes were harmed, and face ongoing harm, arising out of Defendants' wrongful conduct.

60.  **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions.  Plaintiffs' claims are representative of the claims of the other members of the Classes, as Plaintiffs and each member of the Classes suffered privacy violations because of Defendants' unlawful conduct.  Plaintiffs also have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

61.  **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendants have acted on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final injunctive relief appropriate with respect to the Classes as a whole.  The policies that Plaintiffs challenge apply to and affect members of the Classes uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.  The factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Classes are the same.

62.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct.  Absent a class action, it would be difficult for the individual members of the Classes to obtain effective relief from Defendants.  Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court.  Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

63.     Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

### <u>COUNT I</u>

**RIGHT TO FINANCIAL PRIVACY ACT**
**12 U.S.C. §§ 3401, *et seq.***
**(Plaintiff Manjarrez, on behalf of himself and the RFPA Class, against the Federal Defendants and DolEx)[2]**

64.     Plaintiff incorporates by reference all previous paragraphs of this Complaint.

65.     Plaintiff and the members of the RFPA Class are persons under 12 U.S.C. § 3401(4).

66.     Plaintiff and the members of the RFPA Class  are customers under 12 U.S.C. § 3401(5) because they utilize the services of  DolEx and  DolEx maintains accounts in their names.

---

[2]  The Court previously dismissed Plaintiffs' RFPA claims against Western Union, Viamericas, and Continental.  *See* Dkt. 116.  Although not re-alleged herein, Plaintiffs expressly preserve those claims for purposes of appeal only.

67.     DolEx is a financial institution under 12 U.S.C. § 3401(1) because it is a consumer finance institution located in the United States.[3]

68.     The Federal Government Defendants are a government authority under 12 U.S.C. § 3401(3).

69.     Plaintiff and the RFPA Class Members transacted with DolEx, or another money transfer company that offers lending or credit services, when using their money transfer services.

70.     When Plaintiff and the RFPA Class Members send money transfers through Dolex or other money transfer companies that offer lending or credit services, they provide detailed personally identifiable information about themselves and the recipient of the money transfer.

71.     The transaction information that DolEx and other money transfer companies that offer lending or credit services store are financial records under 12 U.S.C. § 3401(2) because it is information pertaining to a customer's relationship with the financial institution.

72.     DolEx acted willfully and intentionally each time it provided financial records to federal government agencies through TRAC because that information was shared with and/or made available to government authorities, including the Federal Government Defendants.  12 U.S.C. § 3417(a)(3).

73.     The Federal Government Defendants violated the RFPA by gaining access to or obtaining copies of the financial information in the TRAC database.  12 U.S.C. § 3402.

74.     The Federal Government Defendants acted willfully and intentionally in having access to and obtaining copies of the information in Plaintiff's and the RFPA Class Members' financial records through TRAC.  12 U.S.C. § 3417(a)(3).

75.     At no point did the Federal Government Defendants, or any government authority participating in TRAC, provide Plaintiff or the RFPA Class with notice and information about how to object to the disclosure of their financial records as required under the RFPA.  12 U.S.C. §§ 3405(2), 3407(2).

---

[3] In light of the Court's dismissal order holding that a money transfer business must also offer credit or lending services to qualify as a consumer finance institution under RFPA, Plaintiffs have not re-named Continental or Viamericas as Defendants for the RFPA claim.  However, Plaintiffs expressly preserve those claims for purposes of appeal only.

76.     Plaintiff and the RFPA Class are entitled to statutory damages, punitive damages, and reasonable attorney's fees and costs for violations of the RFPA by the Federal Government Defendants and DolEx.  12 U.S.C. § 3417(a).

77.     Plaintiff and the RFPA Class are also entitled to injunctive relief, including but not limited to barring the Federal Government Defendants from accessing financial records in violation of the RFPA, requiring the federal government to destroy all copies of such information obtained in violation of the RFPA, and prohibiting DolEx from providing access to or copies of information in the financial records to the federal government without complying with the RFPA. 12 U.S.C. § 3418.

## COUNT II

### California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq*.
### (Plaintiffs, on behalf of themselves and the CalFIPA Class, against the MTB Defendants)

78.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

79.     The MTB Defendants engage in unlawful business practices by violating the California Financial Information Privacy Act, Cal. Fin. Code §§ 4050, *et seq*. ("CalFIPA").

80.     CalFIPA prohibits financial institutions from sharing nonpublic personal information with any nonaffiliated third party, without the explicit prior consent of the consumer. Cal. Fin. Code § 4052.5.

81.     The purpose of CalFIPA is to ensure that consumers have a meaningful choice about whether their private financial information is shared with third parties.  Cal. Fin. Code § 4051.  When consumers are not given notice and the ability to decline to have their information shared as required by CalFIPA, consumers' privacy rights are violated.

82.     The MTB Defendants are financial institutions because they engage in money transfers.  Cal. Fin. Code § 4052.

83.     Plaintiffs and the CalFIPA Class Members are consumers because they are individuals who reside in California and obtain financial services from the MTB Defendants.

84.     Plaintiffs and the CalFIPA Class Members were harmed when the MTB Defendants shared their private financial data with TRAC, the Federal Government Defendants,

and other third-parties or law enforcement agencies participating in TRAC because their privacy rights were violated.

85.     Had Plaintiffs and the CalFIPA Class Members known that their private financial records would be shared with state and federal law enforcement agencies around the country through TRAC, they would not have chosen to use and pay for the MTB Defendants' services. The fact that private financial records would be shared with TRAC and dozens of state and federal law enforcement agencies would have been material to a reasonable consumer's choice whether to use a particular money transfer service.  Plaintiffs and the Classes were harmed because they paid for a service they would not have paid for had they known the MTB Defendants would violate their privacy rights.  Alternatively, the value of the MTB Defendants' money transfer services would have been worth less than Plaintiffs and the CalFIPA Class Members paid for it, had they known of the illicit data sharing and invasions of privacy.

86.     Plaintiffs and the CalFIPA Class have all been harmed by the MTB Defendants' unlawful practices.  Plaintiffs and the CalFIPA Class seek restitution of the transaction and service fees they paid to the MTB Defendants in connection with any transfers that were shared with TRAC, a permanent injunction to stop the MTB Defendants from continuing these policies and practices, and to require the MTB Defendants to request that TRAC delete all transaction data pertaining to Plaintiffs and the CalFIPA Class collected in violation of the UCL and CalFIPA.

## PREVIOUSLY DISMISSED COUNTS

87.     In its March 21, 2024 order, the Court (1) dismissed Plaintiffs Cordero and Sequeira's claims under the Right to Financial Privacy Act against Western Union; (2) dismissed Orsay Alegria's claims under the Right to Financial Privacy Act against Viamericas, DolEx, and Continental; and (3) dismissed Orsay Alegria's claims under CalFIPA and the UCL against Viamericas, DolEx, and Continental.

88.     Plaintiffs Cordero, Sequeira, and Alegria expressly re-incorporate and re-allege herein Paragraphs 64 to 77 of the First Amended Complaint, Docket No. 77, against Western Union, DolEx, Viamericas, and Continental, to the extent they alleged a claim under the Right to Financial Privacy Act.

89.     Mr. Alegria expressly re-incorporates and re-alleges herein Paragraphs 78-86 of the First Amended Complaint, Docket No. 77, against DolEx, Viamericas, and Continental, to the extent they alleged a claim under the UCL/CalFIPA.

90.     These allegations are made solely to preserve the previously dismissed claims and allegations for purposes of appeal.  Plaintiffs do not intend to re-litigate issues already decided by this Court with respect to these claims in the district court.

### PRAYER FOR RELIEF

Plaintiffs Sequeira, Cordero, Hernandez, and Manjarrez, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a)     Certifying this case as a class action on behalf of the RFPA Class and the CalFIPA Class defined above, appointing Plaintiff Manjarrez as a representative of the RFPA Class, and Plaintiffs Sequeira, Cordero, Hernandez, and Manjarrez as representatives of the CalFIPA Class, and appointing their counsel as Class Counsel;

b)     Declaring that the conduct of the Federal Government Defendants and DolEx, as set out above, is unlawful under the RFPA, 12 U.S.C. §§ 3401, *et seq.*

c)     Declaring that the MTB Defendants' conduct, as set out above, is unlawful under the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

d)     Enjoining DolEx from continuing to provide access to or copies of the RFPA Class's consumer financial information to a federal government agency through TRAC or otherwise without complying with RFPA;

e)     Enjoining the Federal Government Defendants from continuing to have access to or obtain copies of the RFPA Class's consumer financial information through TRAC or otherwise without complying with RFPA, and requiring them to destroy any copies of such information currently in their possession;

f)     Awarding the RFPA Class statutory damages for each violation of the RFPA;

g)     Awarding the RFPA Class punitive damages for violations of the RFPA;

h)     Awarding the CalFIPA Class monetary restitution for violations of the UCL and CalFIPA, not to exceed the amount paid by them to the MTB Defendants in transaction or service

fees;

      i)     Awarding reasonable attorney's fees and expenses;

      j)     Awarding pre- and post-judgment interest, to the extent allowable;

      k)     Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Classes; and

      l)     Awarding such other and further relief as equity and justice require, including but not limited to all forms of relief provided for under the UCL.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**NELSON SEQUEIRA, ISMAEL CORDERO, MARIA HERNANDEZ, and JOSE ANTONIO MANJARREZ,** individually and on behalf of all others similarly situated,

Dated: May 9, 2024          By: _/s/ Yaman Salahi_____

Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
J. Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Julian Zhu (SBN 342744)
jzhu@edelson.com
EDELSON PC
350 North LaSalle, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Sejal Zota (*pro hac vice*)
sejal@justfutureslaw.org
Dinesh McCoy (*pro hac vice*)

dinesh@justfutureslaw.org
Daniel Werner (SBN 322310)
daniel@justfutureslaw.org
JUST FUTURES LAW
95 Washington Street, Suite 104-149
Canton, MA 02021
Tel: 617.812.2822

*Counsel for Individual and Representative Plaintiffs Nelson Sequeira, Ismael Cordero, Maria Hernandez, and Jose Antonio Manjarrez*