Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
J. Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Natasha J. Fernández-Silber* (*pro hac vice* pending)
nfernandezsilber@edelson.com
Julian Zhu (SBN 342744)
jzhu@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
* Admitted in Michigan and New York only

Sejal Zota (*pro hac vice*)
sejal@justfutureslaw.org
Dinesh McCoy (*pro hac vice*)
dinesh@justfutureslaw.org
Daniel Werner (SBN 322310)
daniel@justfutureslaw.org
JUST FUTURES LAW
95 Washington Street, Suite 104-149
Canton, MA 02021
Tel: 617.812.2822

*Attorneys for Individual and Representative Plaintiffs Nelson Sequeira, Ismael Cordero, Maria Hernandez, and Jose Antonio Manjarrez*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

NELSON SEQUEIRA, ISMAEL CORDERO, MARIA HERNANDEZ, and JOSE ANTONIO MANJARREZ, individually and on behalf of all others similarly situated,

     *Plaintiffs*,

  *v.*

U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; WESTERN UNION FINANCIAL SERVICES, INC., a Colorado corporation; CONTINENTAL EXCHANGE SOLUTIONS, INC., a Kansas corporation, d/b/a RIA FINANCIAL SERVICES and AFEX MONEY EXPRESS; and DOLEX DOLLAR EXPRESS, INC., a Texas corporation,

     *Defendants*.

Case No. 4:22-cv-07996-HSG

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT**

Hearing Date: September 5, 2024
Time: 2:00 PM
Place: Courtroom 2, 4th Floor, Oakland
Judge: Hon. Haywood S. Gilliam, Jr.

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

III.   ARGUMENT ...................................................................................................... 7

       A.   Mr. Manjarrez States a RFPA Claim Against DolEx and the Government ........... 7

            1.   Mr. Manjarrez Adequately Alleges DolEx is a Consumer Finance Institution ...... 7

            2.   The Government's Website Printout Cannot Get DolEx Off the Hook at the Pleading Stage ................................................................................... 10

       B.   The Mandatory Joinder Doctrine Does Not Require Dismissal of Plaintiffs' CalFIPA Claims ................................................................................... 11

       C.   The Money Transfer Business Defendants' Affirmative Defenses Do Not Require Dismissal of the CalFIPA Claims ................................................. 14

            1.   The Annunzio-Wylie Anti-Money Laundering Act Does Not Apply and Is Invoked Prematurely ........................................................................... 14

            2.   CalFIPA's Statutory Exemptions Are Affirmative Defenses That Cannot Be Resolved on the Pleadings ............................................................... 19

       D.   Plaintiffs Adequately Allege Economic Injury Under the UCL ........................... 22

IV.    CONCLUSION ................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*A.H.R. v. Washington State Health Care Auth.*, 469 F. Supp. 3d 1018 (W.D. Wash. 2016) ................................................................................................................. 12

*Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 331 F.R.D. 427 (W.D. Wash. 2019) ......................... 12

*Calpine Constr. Fin. Co. v. Ariz. Dep't of Revenue*, 211 P.3d 1228 (Ariz. Ct. App. 2009) ................................................................................................................. 13

*Campbell v. SZL Props., Ltd.*, 62 P.3d 966 (Ariz. Ct. App. 2003) ..................................... 13

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ..................................... 10

*Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249 (2011) ..................................... 23

*Commodity Futures Trading Comm'n v. Worth Bullion Group, Inc.*, 717 F.3d 545 (7th Cir. 2013) ................................................................................................................. 9

*Coronado v. BankAtlantic Bancorp Inc.*, 222 F.3d 1315 (11th Cir. 2000) ................................... 15, 16

*Cortez v. Purolater Air Filtrations Prods. Co.*, 23 Cal. 4th 163 (2000) ........................... 24

*F.T.C. v. Sterling Precious Metals, LLC*, No. 12-cv-80597, 2013 WL 1442180 (S.D. Fla. Apr. 9, 2013) ................................................................................................................. 9

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ..................................... 11

*Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013) ..................................... 23

*In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083 (9th Cir. 2016) ........................... 17

*In re JUUL Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*, 533 F. Supp. 3d 858 (N.D. Cal. 2021) ................................................................................................................. 24

*In re Sony Gaming Networks & Customer Date Sec. Breach Litig.*, 996 F. Supp. 2d 942 (S.D. Cal. 2014) ................................................................................................................. 23

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ........................... 10, 11

*Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310 (2011) ..................................... 23, 24

*Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307 (9th Cir. 1992) ..................................... 20

*Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186 (11th Cir. 1997) ........................... 15, 16, 18

*Mangiaracina v. BNSF Railway Company*, No. 16-CV-05270, 2018 WL 368600 (N.D. Cal. Jan. 11, 2018) ................................................................................................................. 12

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008) ........................... 7

*Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1 (2012) ..................................... 23

*Moss v. Infinity Ins. Co.*, No. 15-cv-03456, 2016 WL 7178559 (N.D. Cal. Dec. 9, 2016) .................................................................................................................................. 10

*People v. Fisher*, 96 Cal. App. 4th 1147 (2002) ................................................................. 19

*Picayune Rancheria of Chukchansi Indians v. Brown*, 229 Cal. App. 4th 1416 (2014) .................... 22

*Presbyterian Camp & Conf. Centers, Inc. v. Super. Ct.*, 501 P.3d 211 (Cal. 2021) ............................ 22

*Simon v. Carter's, Inc.*, No. 20-cv-01436, 2020 WL 13505608 (N.D. Cal. July 13, 2020) .................................................................................................................................. 23

*Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12 (2010) ............................................... 19

*Stanford v. State of Tex.*, 379 U.S. 476 (1965) ....................................................................... 17

*State ex rel. Goddard v. Western Union Fin. Servs., Inc.*, 166 P.3d 916 (Ariz. Ct. App. 2007) ............................................................................................................................ passim

*State v. Western Union Fin. Servs., Inc.*, 208 P.3d 218 (Ariz. 2009)............................................ 4, 18

*Tinoco v. S.D. Gas & Electric Co.*, 327 F.R.D. 651 (S.D. Cal. 2018) ................................. 13

*Wisdom v. Easton Diamond Sports, LLC*, 824 F. App'x 537 (9th Cir. 2020) ..................................... 11

**Statutes**

12 U.S.C. § 3401 .......................................................................................................................... 7

12 U.S.C. § 3406 .......................................................................................................................... 5

12 U.S.C. § 3407 .......................................................................................................................... 5

12 U.S.C. § 3417(a) ..................................................................................................................... 6

12 U.S.C. § 3405 .......................................................................................................................... 5

31 U.S.C. § 5318(g) ............................................................................................................... 14, 15

Ariz. Rev. Stat. § 13-2315 ...................................................................................................... 3, 4

Cal. Bus. & Prof. Code § 17200 ............................................................................................... 1

Cal. Civ. Proc. Code § 1858 ................................................................................................... 22

Cal. Fin. Code § 4051 .............................................................................................................. 22

Cal. Fin. Code § 4051.5(b)(2) ................................................................................................... 6

Cal. Fin. Code § 4056(b) ........................................................................................................ 20

**Other Authorities**

H.R. Rep. No. 95-1383 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9273 ............................... 5

1

**Rules**

Fed. Rule Civ. Proc. 12(b)(7) .................................................................................................. 14

Fed. Rule Civ. Proc. 19 ........................................................................................................... 12

1    **I.        INTRODUCTION**

2         Plaintiffs here challenge a mass-surveillance program that hoovers up millions of records

3    concerning international and domestic money transfers, and makes them available, warrant-free, to

4    law enforcement agencies across the United States.  This program is facilitated by the regular

5    issuance of subpoenas and other administrative requests from the State of Arizona, which serve to

6    provide a veneer of legality to the program.  But these requests are deeply troubling: they are

7    unconnected to any suspicion of wrongdoing on the part of those whose information is contained in

8    these disclosed records, and the requests lack any specificity or connection to actual investigations.

9    And the record suggests that while these requests provide the formal mechanism by which the

10   disclosures occur, many of the Defendants here are happy to shovel massive amounts of data into this

11   panoptic program.  Moreover, the resulting database is searchable in a manner that allows this

12   warehouse of sensitive data to be wielded against sensitive communities, with no meaningful checks

13   on what was, until very recently, a secretive program.  Plaintiffs here challenge this program under

14   both federal and California laws guaranteeing a right to financial privacy: the federal Right to

15   Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401-3423, and the California Financial Information

16   Privacy Act ("CalFIPA"), Cal. Fin. Code §§4050-4060, which serves here as a predicate for a claim

17   under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200.

18        Already in this case, the Court has concluded that (1) allegations that a money transfer

19   business provides lending services plausibly brings them within the ambit of the RFPA as a

20   "consumer finance institution," (2) allegations that a plaintiff would not have engaged the services of

21   a particular money transmitter had they known that their records would thereafter be funneled to this

22   mass surveillance program sufficed to establish standing to litigate under the UCL, and (3) statutory

23   exemptions under both the RFPA and CalFIPA that exempt companies from liability for disclosures

24   made pursuant to valid subpoenas offered affirmative defenses that cannot be assessed at this stage.

25   *See* Dkt. 116.

26        By and large, these earlier holdings resolve this motion.  Both DolEx and the Department of

27   Homeland Security challenge whether DolEx is a "consumer finance institution" under the RFPA,

28   but Plaintiff Manjarrez alleges that DolEx provides a standalone loan product, and none of the

materials offered by the relevant defendants shows that to be untrue, and certainly not during the time period covered by the complaint.  And the Defendants attempt to suggest that lending products must meet some numerical threshold (of volume, profit, or something else, it isn't totally clear) to qualify DolEx as a "consumer finance institution" is inconsistent with both the relevant case law and the Court's prior order.

As to CalFIPA and the UCL, the money transfer business defendants ("MTB Defendants") re-raise their contentions regarding the exemptions from liability for disclosures made pursuant to subpoenas (and DolEx extends these arguments to the RFPA as well).  But the arguments are premature for precisely the reasons the Court already articulated: these are affirmative defenses and should only be assessed on a developed record.  The MTB Defendants strain to suggest that the record is sufficient to consider these arguments now, but these contentions fail.

The MTB Defendants also re-raise and expand their arguments concerning Plaintiffs' UCL standing.  The issue is fully resolved by the Court's prior orders, and the new arguments pressed by the Defendants appear to concern not UCL standing, but the propriety of restitution, an issue that won't be ripe for consideration until much later in the case.

The MTB Defendants also urge dismissal on the ground that either or both of the State of Arizona and the Arizona Attorney General are necessary parties in this action who cannot be joined. But it is clear that meaningful relief can be fashioned here without subjecting the MTB Defendants to inconsistent obligations, so dismissal for failure to join either Arizona or its Attorney General is unwarranted.

The Court should deny Defendants' motions to dismiss Plaintiffs' Second Amended Complaint.  Dkts. 144 and 157.

## II.     BACKGROUND

This case involves money transfer businesses ("MTBs") and their participation in the collaborative federal and state law enforcement program known as "TRAC" (short for Transaction Records Analysis Center).  Founded in 2014, TRAC is a data analysis center tasked with collecting and analyzing bulk financial data in response to requests from local, state, and federal law enforcement.  Second Amended Complaint ("SAC") ¶¶ 28, 30.

MTBs provide money transfer services to consumers.  SAC ¶¶ 21, 23.  These services allow individuals to send money to friends and family for a fee.  *Id.*  While other types of business, like banks and credit unions, also offer money transfer services (and often charge lower per-transfer fees than MTBs), MTBs do not require their customers to have a traditional bank account (which in some places can only be opened by individuals with a permanent address and U.S. citizenship, and which typically impose a minimum balance requirement and various other account fees).  MTBs also do not require customers to pay any annual fees, as many other companies that provide money transfer services do.  As such, even though MTBs charge higher transactional fees to facilitate money transfers, they are popular among economically vulnerable communities, including some immigrant communities.  *Id.* ¶¶ 23-24.

Today, consumers send (or "remit") approximately $30 billion annually from the United States to Mexico through MTBs.  And remittances to Latin American and the Caribbean grew by 6.5% in 2020 despite global economic struggles.  SAC ¶ 21, 24.

To effectuate a money transfer through an MTB, an individual typically brings cash to the MTB's brick-and-mortar location, where they provide their name and address (and potentially other sensitive information, such as a social security number), and the name and address of the recipient.  SAC ¶ 22.  The MTB then makes the cash available to the recipient at the location nearest to their home.  *Id.*

For years, MTBs disclosed details about facilitated money transfers (and the persons involved those transfers) to the TRAC program, where law enforcement agencies including federal agencies like ICE, had access to them.  SAC ¶¶ 25, 29, 31.  In 2006, the office of the Arizona Attorney General ("Arizona AG") sought to dramatically expand its surveillance of cross-border money transfers.  That year, it issued a subpoena to Western Union for 49 types of data related to all money transfers over $300 to or from Sonora, Mexico (the Mexican state abutting nearly all of Arizona's international border) that Western Union facilitated over a three-year period.  *State ex rel. Goddard v. Western Union Fin. Servs., Inc.*, 166 P.3d 916, 918 (Ariz. Ct. App. 2007).  The subpoena certified that it was issued to investigate racketeering under Arizona law, as required by Ariz. Rev. Stat. § 13-2315.  *See id.*  That same year, the Arizona AG also applied for a seizure warrant for the monies

1  underlying Western Union's "person-to-person wire transfers from twenty-eight states other than

2  Arizona to twenty-six locations in Sonora."  *State v. Western Union Fin. Servs., Inc.*, 208 P.3d 218,

3  219 (Ariz. 2009).

4       Western Union successfully challenged both the subpoena and seizure warrant in Arizona

5  state court.  As to the subpoena, the Court of Appeals of Arizona held that under Ariz. Rev. Stat. §

6  13-2315, "the request for information [must] be 'reasonable,'" the AG must have reasonable grounds

7  for conducting its investigation into racketeering, and the information sought by the subpoena must

8  have a reasonable connection to that investigation and to conduct indictable in Arizona.  *See*

9  *Goddard*, 166 P.3d at 922-26.  While the court credited assertions in an affidavit submitted by the

10 Arizona AG that there was basis to investigate money transfers to five border towns in Sonora, the

11 Court of Appeals found that the subpoena itself was far broader and sought collection of data

12 unconnected to transfers from those five towns.  *Id.* at 923, 925.  On this basis, it rejected the

13 subpoenas as overbroad for requiring the disclosure of data for hundreds of innocent users.  *Id.* at

14 924.  The Court also rejected the Arizona AG's argument that gathering the expansive data was

15 necessary to establish a baseline for "innocent" use of Western Union's services, noting that to credit

16 this reasoning would effectively "require[e] Western Union to open all of its financial records to law-

17 enforcement officials from any of its locations worldwide for the privilege of doing business in

18 Arizona."  *Id.* at 926.

19      Western Union also won a separate challenge to the seizure warrant at the Arizona Supreme

20 Court.  The Arizona Supreme Court held that Arizona courts "lack jurisdiction under the Due Process

21 Clause of the United States to issue "a warrant seizing Western Union money transfers sent from

22 other states to Mexico."  *Western Union Fin. Servs., Inc.*, 208 P.3d  at 219-220.

23      Undeterred by these rulings, the Arizona AG sued Western Union, ostensibly for having an

24 inadequate anti-money-laundering program.  In 2010, the parties settled both that litigation and

25 Western Union's multi-year challenges to the Arizona AG's subpoenas in an agreement requiring

26 Western Union to disclose bulk transaction data to the Arizona AG.  SAC ¶ 27.  The data sought by

27 the Arizona AG under the settlement agreement was precisely the data that Arizona's state courts

28 held were beyond the reach of the Arizona AG's lawful power to demand.  *Id.*  In 2014, the Arizona

1  Financial Crimes Task Force ("AZFCTF")—a collaboration between the Arizona Attorney General's

2  Office, the phoenix Police Department, and Arizona Department of Public Safety in which the U.S.

3  Department of Homeland Security also participated—expanded the existing agreement between the

4  Arizona Attorney General and Western Union to found TRAC.  *Id.* ¶ 28.  Thus, at all times, TRAC

5  has been a joint venture between local, state, and federal law enforcement.  *Id.* ¶¶ 29, 39.  It has also

6  expanded since its founding: between 2014 and 2022, the Arizona AG has requested bulk data from

7  other MTBs and now secured participation of at least 20 MTBs in TRAC's data collection and

8  surveillance program.  *Id.* ¶ 31.

9       The data collected and contained in the TRAC database is extensive and highly sensitive.  It

10  includes information such as names, addresses, dates of birth, occupations, and other identifying

11  information (such as social security and passport numbers) of both the sender and recipient of

12  millions of money transfers of more than $500 between Mexico and one of the four U.S. border states

13  since 2010.  SAC ¶ 35.  The data in TRAC is stored in a large, searchable database and accessible to

14  all manner of law enforcement, including personnel from dozens of federal entities.  *Id.* ¶ 40.  MTBs

15  that supply information to TRAC know and understand that this information will be provided to

16  federal investigative entities.  *Id.* ¶ 47.  Furthermore, TRAC's data collection is not aimed at any

17  particular crime or investigation, but instead functions as a surveillance dragnet.  *Id.* ¶ 36.

18       TRAC allows participating local, state, and federal law enforcement bodies to target searches

19  at particular areas or even names associated with particular ethnic groups, enabling the database to be

20  weaponized against vulnerable communities.  SAC ¶ 37.

21       Federal and state law protects against this kind of overreaching and intrusive data collection.

22  The Right to Financial Privacy Act was enacted in 1978 and was "intended to protect the customers

23  of financial institutions from unwarranted intrusion into their records while at the same time

24  permitting legitimate law enforcement activity."  H.R. Rep. No. 95-1383, at 28 (1978), *as reprinted

25  in* 1978 U.S.C.C.A.N. 9273, 9305.  Notably, the RFPA requires notice to consumer and an

26  opportunity to object to production of their records even when records are sought pursuant to a court

27  order or subpoena.  *See* 12 U.S.C. §§ 3405, 3406, 3407.  Liability under the RFPA accrues to both the

28  government and financial entity making the disclosure without consent or required notice.  12 U.S.C.

§ 3417(a).  The California Financial Information Privacy Act ("CalFIPA") provides additional protection, requiring financial institutions to seek and acquire the affirmative consent of California consumers prior to sharing their private information with third parties.  Cal. Fin. Code § 4051.5(b)(2).

Plaintiffs Nelson Sequiera, Ismael Cordero, Maria Hernandez, and Jose Antonio Manjarrez contend that bulk disclosure of records to TRAC violates these laws.  Plaintiffs use money transfer businesses (specifically the named MTB Defendants) to send money to their families abroad.  They received no notice that records of these transactions would be shared with the federal government, particularly in the absence of a valid warrant, and would have chosen a different means of sending money abroad were they aware.

The Court previously denied in part Defendants' motion to dismiss these claims (brought initially by a slightly different group of plaintiffs).  Dkt. 116.  First, the Court dismissed some Plaintiffs' RFPA claims, because the then-operative complaint rested on the allegation that the MTB defendants were, by virtue of offering money-transfer services, "consumer finance institutions;" instead only businesses offering lending services as a "core function" of their operations could be deemed "consumer finance institutions."  *Id.* at 4-9. DolEx and Western Union, it was alleged, offered lending services, but claims against the other MTB Defendants failed due to the lack of similar allegations.  *Id.* at 9.  The Court also concluded that Plaintiffs failed to allege that they were "customers" within the meaning of the RFPA because they did not allege that they kept accounts in their names with any of the MTB defendants.  *Id.* at 10-12.

The Second Amended Complaint, which alleges a claim under the RFPA only on behalf of Plaintiff Manjarrez against DolEx and the federal government, responds to these concerns: the now-operative complaint alleges that DolEx offers a standalone loan product, and that Plaintiff Manjarrez has a DolEx account in his own name. The relevant defendants continue to insist that DolEx does not qualify as a "consumer finance institution."

As to Plaintiffs' unfair-competition claims predicated on a violation of CalFIPA, the Court first concluded that Plaintiffs Sequeira and Cordero had statutory standing under the UCL because they alleged that they would not have used Western Union's services if they had known that their sensitive personal data would thereafter be transmitted to the TRAC database.  Dkt. 116 at 13.  But a

1    third plaintiff (Orsay Alegria), who does not have any live claims in the Second Amended Complaint,

2    failed to make such an allegation concerning his use of the services of the other MTB Defendants, so

3    his claims were dismissed.  *Id.*  The Court also rejected Western Union's argument that the lack of a

4    private right of action in CalFIPA precluded a UCL claim predicated on a violation of CalFIPA and

5    ruled that it was premature to consider two affirmative defenses raised by Western Union concerning

6    disclosures ostensibly made to comply with valid law-enforcement requests.  *Id.* at 14-17.

7           In the Second Amended Complaint, Plaintiffs Hernandez and Manjarrez, like Sequeira and

8    Cordero, allege that they would have declined to use the services of the MTB Defendants if they

9    understood that their data would be sent to TRAC, the same theory of UCL standing already blessed

10   by the Court.  In response, the MTB Defendants reraise their contentions regarding UCL standing,

11   and their subpoena-based affirmative defenses, which fail just as they did before.  The MTB

12   Defendants also seek dismissal on the ground that the Arizona Attorney General or the State of

13   Arizona is a necessary party who cannot be joined.

14          In considering these arguments, the Court accepts as true all factual allegations in the Second

15   Amended Complaint and gives Plaintiffs the benefit of all reasonable inferences that can be drawn

16   from those allegations.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th

17   Cir. 2008).

18   **III.    ARGUMENT**

19          **A.    Mr. Manjarrez States a RFPA Claim Against DolEx and the Government**

20                 **1.    Mr. Manjarrez Adequately Alleges DolEx is a Consumer Finance**
21                        **Institution**

22          The Government argues that Mr. Manjarrez fails to adequately allege that DolEx is a

23   "consumer finance institution" within the meaning of 12 U.S.C. § 3401(1) because, it says, the

24   Second Amended Complaint does not allege that lending is a "core function and purpose" of DolEx's

25   business, apparently because the operative complaint neither describes lending as a "core function

26   and purpose" of DolEx's nor establishes that lending contributes sufficiently to DolEx's bottom line

27   (although what threshold needs to be passed is not specified).  *See* Dkt. 144-1 at 6-7.  DolEx joins

28   that argument.  *See* Dkt. 156.

In the prior round of motions to dismiss, the Court was confronted with the question whether a money transfer company like DolEx qualifies as a "consumer finance institution" solely by virtue of the fact that it offers money transfer services.  The Court ruled in the negative, finding that such a business would also have to provide loans to be considered a "consumer finance institution" under the RFPA.  Relying on the statute's text, purpose, and legislative history, the Court agreed with Defendants that "Congress, when enacting the RFPA, intended or at least understood that 'consumer finance institution' would mean companies that provide loans."  Dkt. 116 at 7.  The Court thus "interpret[ed] the term 'consumer finance institution' to mean a company for which the provision of financing and cash loans to consumers is a core function and purpose of its business."  *Id.* at 9.  Accordingly, the Court dismissed the RFPA claim against Continental and Viamericas because no plaintiff alleged those companies provided loans as part of their business, but the Court held that "the FAC does allege . . . that DolEx provides financial services including 'personal lending,' and advertises 'quick and easy personal loans.'"  *Id.*[1]  The Court rejected DolEx's protest that the "allegations are untrue" because "these [are] factual disputes that cannot be resolved on a motion to dismiss."  *Id.*  Thus, "the Court finds that Plaintiffs have sufficiently alleged that . . . DolEx [is a] 'financial institution[]' under the RFPA."  *Id.*[2]

Nothing has changed with respect to DolEx since the Court's holding.  As before, the Second Amended Complaint alleges that DolEx "provides . . . personal lending" services and "advertises its 'quick and easy personal loans.'"  SAC ¶ 10.   The Court should stand by its earlier holding that this suffices to meet Plaintiffs' burden at the motion-to-dismiss stage.  Notwithstanding that the Court

---

[1]  The Court also held that the First Amended Complaint sufficiently alleged that Western Union was a consumer finance institution for the same reasons.  Dkt. 116 at 9.  Before the Second Amended Complaint was filed, Western Union shared additional relevant information with Plaintiffs regarding the services it provides.  As a result, the Second Amended Complaint no longer alleges that Western Union offers lending services.

[2]  The Court nevertheless proceeded to dismiss the claim against DolEx on the basis that DolEx was not alleged to maintain accounts in the names of its customers, which the Court held was required under the RFPA.  *See* Dkt. 116 at 10-12.  In the Second Amended Complaint, Mr. Manjarrez alleges DolEx does so.  *See* SAC ¶ 10 ("DolEx maintains a customer account in each customer's name, and, upon information and belief, it assigns each customer a unique customer id and tracks their names and transactions over time.").  Neither the Government nor DolEx challenges the sufficiency of this allegation.

1   has already resolved this issue, the Government attempts to fashion a requirement that a plaintiff

2   must also include the talismanic phrase "core function and purpose" in their complaint.  That

3   assertion has no basis in the Court's prior orders or in the case law.  To the contrary, the Court held

4   that Plaintiffs had plausibly alleged DolEx was a "consumer finance institution" *without* such

5   verbiage.

6           To the extent the Government and DolEx imply that a "core function and purpose" of lending

7   somehow turns on the volume of a company's business that relates to lending or financing, that

8   notion is squarely rejected by the cases they cite.  Indeed, in those cases, the companies in question

9   generated a huge portion of their revenues from lending products but were not ultimately deemed to

10  be "consumer finance institutions."  *See Commodity Futures Trading Comm'n v. Worth Bullion*

11  *Group, Inc.*, 717 F.3d 545, 547-48 (7th Cir. 2013) (not even companies that derived 80-90% of their

12  business and revenues from financing qualified as "consumer finance institutions"); *F.T.C. v.*

13  *Sterling Precious Metals, LLC*, No. 12-cv-80597, 2013 WL 1442180, at *4 (S.D. Fla. Apr. 9, 2013)

14  (same where 65-80% of customers used defendant's financing to complete purchases).  To the

15  contrary, what *Commodity Futures* and *Sterling*—which dealt with whether precious metal

16  companies were also "consumer finance institutions"[3] —focus on is whether the lending and finance

17  products were stand-alone services, rather than simply "a means to an end, the real or primary goal

18  of the transaction being a sale of precious metals."  *Commodity Futures*, 717 F.3d at 551.  That

19  distinguishes DolEx's lending products from the ones at issue in *Commodity Futures* and *Sterling*.

20  Mr. Manjarrez does not allege, and has no reason to believe, that DolEx's lending product is solely

21  offered for the purpose of facilitating money transfers—a situation that might be more similar to

22  *Commodity Futures* and *Sterling*, because it might suggest that the financing product was simply

23  ancillary to DolEx's other core product, money transfers.  Here, however, both money transfers and

24  financing appear to be stand-alone, core products sold by DolEx.  Indeed, DolEx's "personal loan"

25  product appears to be unrestricted in purpose, as evidenced by the extrinsic materials submitted by

---

[3] *Commodity Futures*, 717 F.3d at 547 (considering whether precious metal wholesaler, dealer and retailer, and depository was a "consumer finance institution"); *Sterling*, 2013 WL 1442180 at *4 (precious metals broker).

the Government.  *See* Dkt. 144-2.  That's enough to qualify DolEx as a "consumer finance

institution" at the motion-to-dismiss stage, just as the Court held last time.  *See* Dkt. 116 at 9.

> ### 2.      The Government's Website Printout Cannot Get DolEx Off the Hook at the Pleading Stage

The Government also argues that the lending service discussed on one DolEx website is not

actually a DolEx product, but a product offered by a different company, Oportun.  *See* Dkt. 144-1 at

8-9.  This argument fails for a number of reasons.

First, the role that DolEx plays in providing and facilitating the service it advertises on its

website is an inherently factual issue that requires discovery and should not be adjudicated on a

motion to dismiss.

Second, the materials submitted by the Government from DolEx's website are plainly

insufficient to resolve that question at the motion-to-dismiss stage.  California licensing records

indicate that DolEx had a lenders' license from September 2018 until at least December 14, 2022—

two days after Plaintiffs filed their first complaint on December 12, 2022.  Dkt. 1.  These licensing

records confirm Plaintiffs' allegation that DolEx provides lending services.  *See* Salahi Decl., Ex.

A.[4]  By contrast, the website print-out the Government seeks to incorporate by reference is dated

June 6, 2024, one and a half years after the misconduct alleged in this case.  And rather than

"dooming" Plaintiffs' claims, the website print-out actually *confirms* that DolEx plays a significant

role in the lending process.  It reads: "By applying ***through DolEx***, you agree that DolEx can use the

contact information for a loan application ***to also open a DolEx customer account for you.***"  Dkt.

144-2, Ex. 1 at 2 (emphasis added).  The same print-out contains no express representation that

DolEx is *not* involved in the lending process, and offers no information whatsoever about the

relationship between DolEx and Oportun.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988,

1002 (9th Cir. 2018) (noting that incorporation-by-reference doctrine is designed to "prevent[]

plaintiffs from selecting only portions of documents that support their claims, while omitting

---

[4]  The Court may take judicial notice of these licensing records.  *See, e.g., Moss v. Infinity Ins. Co.*, No. 15-cv-03456, 2016 WL 7178559, at *2-3 (N.D. Cal. Dec. 9, 2016) (taking judicial notice of search results on state agency's licensing database website); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute.").

1    portions of those very documents that weaken—or doom—their claims").

2          In short, the Court should be wary to rely on the Government's website print-out, which post-

3    dates the relevant events by a year and a half, to reach conclusions about the four-year period

4    *preceding* the filing of initial complaint, particularly where that document leaves many open

5    questions about DolEx's lending products.  *See Khoja*, 899 F.3d at 1003 ("[W]hat inferences a court

6    may draw from an incorporated document should also be approached with caution. . . .  [I]t is

7    improper to assume the truth of an incorporated document.").  The extent of DolEx's involvement in

8    lending and its precise relationship with Oportun are issues properly resolved through discovery, not

9    prematurely at the pleading stage based on incomplete information.  *Id.* at 1002-03 ("[I]f the

10    document merely creates a defense to the well-pled allegations in the complaint, then that document

11    did not necessarily form the basis of the complaint" and "[s]ubmitting documents not mentioned in

12    the complaint to create a defense is nothing more than another way of disputing the factual

13    allegations in the complaint").  Indeed, "the [incorporation-by-reference] doctrine is not a tool for

14    defendants to short-circuit the resolution of a well-pleaded claim."  *Id.* at 1003.  The Court should

15    not dismiss on this basis.[5]

16

17      **B.**      **The Mandatory Joinder Doctrine Does Not Require Dismissal of Plaintiffs' CalFIPA Claims**

18          Next, the MTB Defendants seek dismissal of the entire case on the ground that the State of

19    Arizona and the Arizona Attorney General are "required parties" under Federal Rule of Civil

20

21    _____

22    [5]      Finally, the Government seeks to dismiss RFPA claims concerning the receipt of information from "unnamed 'other' companies."  Dkt. 144-1 at 9-10.  This is a premature attack on class

23    certification.  The Second Amended Complaint's references to other companies are linked to the proposed, and tentatively defined, "RFPA Class," which is defined to include "[a]ll persons who sent

24    or received a money transfer via DolEx . . . or any other money transfer business that offers credit or lending services, and whose transaction data a federal government agency had access to or obtained

25    copies of through TRAC since 2010."  SAC ¶ 56.  Whether such a class meets the requirements of class certification, and whether Mr. Manjarrez can represent such a class, are all questions for another

26    day.  *See, e.g.*, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly

27    encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."); *Wisdom v. Easton*

28    *Diamond Sports, LLC*, 824 F. App'x 537, 538 (9th Cir. 2020) (reversing dismissal of class allegations at pleadings, calling the move "premature").

1  Procedure 19 (because their absence would expose the MTB Defendants to the risk of "inconsistent

2  obligations" in the event these governmental bodies issued new subpoenas or enforced existing ones),

3  but cannot be joined because of sovereign immunity.  Dkt. 157 at 8-9.

4          As an initial matter, the MTB Defendants' hypothetical concern about "inconsistent

5  obligations" only arises if certain forms of injunctive relief are granted.  The argument does not

6  implicate—and cannot serve as a basis for dismissing—Plaintiffs' claims for monetary damages.

7  Rule 19 guards against litigants incurring inconsistent legal obligations and duties; it is unconcerned

8  with the possibility of "inconsistent *adjudications or results*."  *Bombardier Inc. v. Mitsubishi Aircraft*

9  *Corp.*, 331 F.R.D. 427, 433 (W.D. Wash. 2019) (emphasis added, citation omitted).  And courts have

10 made clear that inconsistent *adjudications* are acceptable, even if they put the defendant at risk of

11 having to pay monetary damages in one case, but not another.

12         *Mangiaracina v. BNSF Railway Company*, No. 16-CV-05270, 2018 WL 368600 (N.D. Cal.

13 Jan. 11, 2018), is instructive.  There, the plaintiff Mangiaracina and his wife were injured when an

14 Amtrak train, traveling along track maintained by BNSF, struck the plaintiff's vehicle at a crossing

15 that was not equipped with warning devices like lights or bells.  *Id.* at *1.  The accident caused the

16 plaintiff's vehicle to fall into a nearby river, where it struck a third person, Ms. Crane.  *Id.*

17 Mangiaracina and Crane filed separate lawsuits, and Amtrak removed the *Mangiaracina* action to

18 federal court.  *Id.* at *2.  The defendants contended that failure to join Crane in the *Mangiaracina*

19 action left them at risk of inconsistent obligations, because the two cases might result in "inconsistent

20 determinations of the legal duties owed."  *Id.* at *5.  But the court disagreed that this put the

21 defendants at risk of inconsistent obligations, stating, "even if a state court and a federal court came

22 to opposite conclusions regarding Defendants' legal duties, it would result in inconsistent findings as

23 to liability, but not necessarily inconsistent obligations," because the defendants could simply pay the

24 money damages ordered in one case or the other, and there was no risk that the defendants would be

25 "unable to comply with one court's order without breaching another court's order."  *Id.*; *see also*

26 *A.H.R. v. Washington State Health Care Auth.*, 469 F. Supp. 3d 1018, 1036 (W.D. Wash. 2016) ("the

27 fact that HCA . . . may be subject to the payment of contractual damages to the MCOs as a byproduct

28 of this litigation does not constitute being subject to 'inconsistent obligations' under Rule 19(a).");

1   *Tinoco v. S.D. Gas & Electric Co.*, 327 F.R.D. 651, 658-59 (S.D. Cal. 2018) (request for money

2   damages did not leave defendant at risk of independent obligations, or impair rights of parties not

3   before court).

4           In this case, it follows that Rule 19 is not offended by a judgment ordering Defendants to pay

5   statutory damages for violating the RFPA and/or CalFIPA, even if part of the basis of that judgment

6   is a determination that the subpoenas and summonses at issue are invalid because they go beyond the

7   authority conferred by the statutes under which they were supposedly issued.  Such a determination

8   would not risk placing the MTB defendants in a situation in which they might be unable to comply

9   with competing court orders.  The MTB defendants could simply continue to comply with an order to

10  produce the subject records and also pay whatever damages or restitution are ordered under the RFPA

11  or CalFIPA.  Those are not inconsistent obligations within the meaning of Rule 19.

12          Furthermore, it is clear that there is some injunctive relief the Court could award that would

13  address Plaintiffs' injuries without subjecting the Defendants to inconsistent obligations.  For

14  instance, Rule 19 would not require joinder to implement an order requiring the MTB defendants to

15  notify customers that their records would be made available to law enforcement agencies across the

16  country.  The MTB Defendants could easily comply both with an order requiring them to turn over

17  certain records from a state court, and an order from this Court informing customers that such

18  disclosure would or could occur.

19          Moreover, the Arizona Attorney General's apparent interest in Plaintiffs' financial records

20  would not be impaired by a ruling ordering the payment of money damages, restitution, or the above-

21  described injunctive relief.  An order of this Court would not bind the Arizona Attorney General or

22  the Arizona courts.  *See, e.g.*, *Calpine Constr. Fin. Co. v. Ariz. Dep't of Revenue*, 211 P.3d 1228,

23  1234 (Ariz. Ct. App. 2009) (collateral estoppel unavailable against the government); *Campbell v. SZL*

24  *Props., Ltd.*, 62 P.3d 966, 968 (Ariz. Ct. App. 2003) (collateral estoppel only available against a party

25  that had a full and fair opportunity to litigate the issue in a previous case).  So the Attorney General

26  could continue to issue its information requests, and the MTB Defendants could continue to comply,

27  without running afoul of a judgment from this Court directing the above-described relief.  (The MTB

28  Defendants, of course, are also free to challenge the Arizona Attorney General's requests, just as

1    Western Union did for years before finally volunteering to abide by them.)

2        At bottom, this Court has not yet decided whether injunctive relief is appropriate, and, if so,

3    what form it will take.  As the foregoing demonstrates, the Court will be able to fashion meaningful

4    relief that addresses Plaintiffs' injuries without subjecting the MTB Defendants to inconsistent

5    obligations.  Dismissal under Federal Rule of Civil Procedure 12(b)(7) is not warranted.

6        **C.      The Money Transfer Business Defendants' Affirmative Defenses Do Not Require
             Dismissal of the CalFIPA Claims**

7
                **1.      The Annunzio-Wylie Anti-Money Laundering Act Does Not Apply and Is
8                         Invoked Prematurely**

9        The MTB Defendants also rehash arguments for immunity under the Annunzio-Wylie Anti-

10   Money Laundering Act of 1992 ("Annunzio-Wylie Act") (*i.e.*, that a safe harbor provision in the Act

11   immunizes MTB Defendants from liability under the UCL for producing money transfer records in

12   ostensible response to subpoenas and court orders), which the Court has already rejected as

13   premature.  Specifically, the Court held that "[t]hese arguments raise affirmative defenses, which the

14   Court does not have an adequate factual record to resolve at this stage."  Dkt. 116 at 16.  The Court

15   re-affirmed that holding when it denied Western Union's motion for leave to seek reconsideration,

16   stating that "as to Western Union's defenses under the Annunzio-Wylie Act and Cal. FIPA, the Court

17   did not fail to consider Western Union's arguments, but instead found them insufficient to support

18   dismissal of Plaintiffs' UCL claim as a matter of law."  Dkt. 142 at 2.  Nothing supports changing

19   that ruling now.

20       The Annunzio Act immunizes three types of disclosures from civil liability: (1) "a voluntary

21   disclosure of any possible violation of law or regulation to a government agency"; (2) "a disclosure

22   pursuant to this subsection"; and (3) "a disclosure pursuant to . . . any other authority."  31 U.S.C. §

23   5318(g)(3)(A).  The MTB Defendants invoke only the third category, arguing that the Arizona

24   Attorney General's administrative subpoenas constitute "other authority" within the meaning of this

25   provision.  Western Union additionally argues that its settlement agreement with the Arizona

26   Attorney General constitutes "other authority" because it took the form of a consent decree.  Both

27   arguments should be rejected, especially at this juncture.

28       The MTB Defendants are seeking a radical expansion of the scope of Annunzio-Wylie Act

1    immunity, and one which finds virtually no support in existing case law.  The MTB Defendants cite

2    not one U.S. Supreme Court or Ninth Circuit decision supporting their expansive reading of the

3    "other authority" provision of Section 5138(g)(3)(A).  Instead, they rely exclusively on two Eleventh

4    Circuit decisions, and even then, ask the Court to stretch the holding of these cases well beyond their

5    narrow circumstances to the unique facts of this case.  *See Lopez v. First Union Nat'l Bank of Fla.*,

6    129 F.3d 1186, 1193-94 (11th Cir. 1997); *Coronado v. BankAtlantic Bancorp Inc.*, 222 F.3d 1315,

7    1320 (11th Cir. 2000).

8            A brief overview of those cases is instructive.  In *Lopez*, the question before the Court was

9    whether the "verbal instructions" of federal government officials to a financial institution and a

10   "seizure warrant" qualified as "other authority" within the meaning of Section 5138(g)(3)(A)'s safe

11   harbor provision.  129 F.3d 1186 at 1192-93.  The Eleventh Circuit reasoned that this safe harbor

12   "protect[s] [defendants] from liability in situations where the government *has* and *exercises* the legal

13   authority to demand disclosure of financial records."  *Id.* (emphasis added).  The court specified that

14   "[t]he 'other authority' must be *legal* authority, because authority means '[r]ight to exercise powers,'

15   and in our system based on rule of law, the right to exercise power is derived from law, e.g., statutes,

16   regulations, court orders, etc. Hence, for a financial institution's disclosure to fall within the confines

17   of the third safe harbor, the financial institution must be able to point to a statute, regulation, court

18   order, or other source of law that *specifically* or *impliedly* authorized the disclosure.  If it cannot do

19   so, the disclosure is not entitled to the protection of the safe harbor."  *Id.* at 1193-94 (emphases

20   added).  The Eleventh Circuit then applied that rule to the verbal instructions and seizure warrants at

21   issue.  The court explained that "[c]learly, a disclosure in response to a seizure warrant is protected

22   by the third safe harbor" because "[t]he seizure warrant represented a judicial determination that the

23   government had a legal right to obtain Lopez's financial records."  *Id.* at 1194.  However, the court

24   contrasted the judicial determination undergirding a search warrant from the agents' "verbal

25   instructions," reasoning that "under existing law and regulations, a government official's verbal

26   instructions do not constitute legal authority."  *Id.*  It noted the absence of "any statute or regulation

27   which gives a government official's verbal request . . . the force of law" or "a statute or regulation

28   authorizing a financial institution to release an individual's financial records in response to mere

1    verbal instructions of government officials." *Id.*  Clearly, the protections inherent in judicial

2    oversight of the issuance of a warrant was important to the *Lopez* court in defining the contours of the

3    "other authority" safe harbor.

4          The same was true in *Coronado*, which represents a limited extension of the Eleventh

5    Circuit's earlier holding in *Lopez*.  Whereas *Lopez* involved verbal instructions and a seizure warrant,

6    *Coronado* involved properly-issued grand jury subpoenas.  The court explained that "[a] grand jury

7    has the power to compel the production of evidence because 'a federal grand jury subpoena is issued

8    under the authority of a court'" and, "under Federal Rule of Criminal Procedure 17(a), the clerk of a

9    district court is authorized to issue blank subpoenas (marked with the seal of the court) to a

10   prosecutor working with a grand jury."  *Coronado*, 222 F.3d at 1320.  And while the court

11   acknowledged that grand jury subpoenas have the potential to be quashed, and that they may not

12   reach otherwise privileged material, the court cited policy reasons particular to the grand jury context

13   to nevertheless find immunity.  Specifically, the court explained that the recipient "was subpoenaed

14   merely as a witness, and long-standing grand jury policy and practice suggests that we do not want

15   witnesses (who are not even targets of the grand jury) testing the limits of the grand jury's authority."

16   *Id.* at 1321.  Undoubtedly, the *Coronado* court's familiarity with and respect for the longstanding

17   traditions of the federal grand jury were also at play.

18         Both *Lopez* and *Coronado* addressed and accepted immunity only in connection with

19   investigations under federal law and backed by the federal judicial system—either a properly-issued

20   search warrant or a grand jury subpoena.  Neither case addressed demands for information issued by

21   state authorities, nor demands nearly as broad, un-predicated, and unconnected to any particularized

22   suspicion of criminal activity as those at issue here.  (In *Lopez*, the search warrant was prompted by

23   two specific suspicious transactions, *see* 129 F.3d at 1188, and in *Coronado*, the grand jury

24   investigation was focused on accounts under the supervision of a corrupt bank official suspected of

25   facilitating money laundering, *see* 222 F.3d at 1317-18.)

26         This case is very different.  Federal search warrants and grand jury subpoenas have centuries

27   of experience behind them and are governed by an intricate set of rules and check-and-balances that

28   help minimize abuse and mis-use.  Importantly, they must also be particularized and tailored in scope

1    to legitimate criminal investigations and prosecutions.  *See Stanford v. State of Tex.*, 379 U.S. 476,

2    481 (1965) (explaining that the Fourth Amendment's prohibition on "general warrants" was

3    motivated by the much-despised use of "writs of assistance" by the Crown which "had given customs

4    officials blanket authority to search where they pleased for goods imported in violation of the British

5    tax laws"); *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1088-89 (9th Cir. 2016) ("When

6    the government crafts subpoenas, it must 'make a reasonable effort to request only those documents

7    that are relevant and non-privileged, consistent with the extent of its knowledge about the matter

8    under investigation,'" and "a subpoena may be quashed when no effort is made to tailor the request to

9    the investigation, even if some fraction of the material the subpoena seeks is relevant.").  The Arizona

10   AG's administrative demands, on their face, flunk both of these tests, and given that the practice has

11   apparently continued unabated for over a decade, there is no reason to think that the Arizona AG or

12   Arizona courts can provide adequate checks and balances such that extending Annunzio-Wylie Act

13   immunity to compliant (or pliant) financial institutions would serve a legitimate law enforcement

14   goal.  To the contrary, the entire program is apparently unrestrained and unchecked.

15       Moreover, the information requests at issue here were issued by state authorities, not federal

16   authorities.  The MTB Defendants do not cite a single case applying the Annunzio-Wylie Act's

17   "other authority" safe harbor to requests from state or local authorities.  There are good reasons not to

18   extend this "safe harbor" to state demands.   Imagine a state attorney general or other local law

19   enforcement official were to direct the issuance of administrative subpoenas under state law to a

20   financial institution to obtain records related to a political opponent who is a candidate for federal

21   office or perhaps based in another state entirely.  Imagine a financial institution were to comply with

22   that request.  The party that issued the subpoena never undertakes a criminal prosecution, but the

23   information obtained ends up being used for other purposes.  According to the MTB Defendants, the

24   Annunzio-Wylie Act would immunize any legal challenges to the financial institutions' disclosures,

25   regardless of how suspect or inappropriate the state law enforcement officials' requests were—so

26

27

28

1    long as the demands purported to be issued pursuant to some state law.[6]   The MTB Defendants cite

2    no reason to believe that Congress intended Annunzio-Wylie Act immunity to extend so broadly.  *See*

3    *Lopez*, 129 F.3d at 1192 ("The Annunzio-Wylie Act does not provide a financial institution blanket

4    immunity for any disclosure of an individual's financial records.").  Indeed, they do not even cite a

5    case applying the Annunzio-Wylie Act safe harbors to disclosure requests under *state* law.

6            Even if state-issued requests could constitute "other authority" within the meaning of the

7    Annunzio-Wiley Act, those requests were facially invalid here.  As the Arizona Court of Appeals

8    ruled in *Goddard*, 166 P.3d at 922-26, the subpoena issued to MTB Defendant Western Union (which

9    sought information only about transfers from one Mexican state bordering Arizona, *see* SAC ¶ 17)

10   was overbroad because it sought information not reasonably connected to an investigation into

11   conduct indictable in Arizona.  Likewise, the Arizona Supreme Court ruled in *Western Union Fin.*

12   *Servs., Inc.*, 208 P.3d at 227, that Arizona courts lack in rem jurisdiction to issue an order seizing

13   monies sent via Western Union from states other than Arizona to Mexico because those assets were

14   not located in Arizona.  The administrative requests issued to the MTB Defendants were even

15   broader than those issued to Western Union, as they also sought records of money transfers of $500

16   of greater to or from, California, New Mexico, Texas, or Mexico (as well as to and from Arizona).

17   SAC ¶ 17.  The MTB Defendants cannot claim immunity on the basis of governmental requests that

18   were plainly ultra vires, were understood to be improper by a major money transfer business

19   (Western Union), and which were functionally ruled to be invalid over a decade ago by Arizona's

20   highest court.

21           The unsettled legal questions about the appropriate scope of the Annunzio-Wiley Act's "other

22   authority" safe harbor present another reason why the Court should withhold adjudication of this

23   defense until a full factual record has been developed, as it has already twice held is the appropriate

24   path here.  *See* Dkt. 116 at 16 and Dkt. 142 at 2-3.  It may be, for example, that the financial

25

---

26   [6] It could get even broader.  If the MTB Defendants are right, any city, county, or state could pass any

27   law requiring financial institutions to respond to administrative demands, and then issue them for
     whatever reason they wanted.  And the financial institutions could invoke the Act to obtain immunity

28   for any disclosures, regardless of how legally suspect the information requests are.  This is ripe for
     abuse and there is no reason to think it is the outcome Congress expected or intended.

institutions here colluded with the Arizona AG to develop administrative subpoenas as fig leaves for an otherwise extremely questionable, unprecedented, and, Plaintiffs allege, unlawful mass surveillance program.  Certainly, Western Union's mysterious decision to drop its increasingly successful legal challenges to the Arizona AG's overbroad subpoenas and to instead to pay tens of millions of dollars to the AG while outsourcing its transactional data to the AG for analysis seems to suggest as much.  And not only would it be wise to avoid resolving a complex question of law without a factual record, deferring resolution of this issue is also amply supported by the case law.  As this Court has noted, "[t]hese arguments raise affirmative defenses, which the Court does not have an adequate factual record to resolve at this stage."  Dkt. 116 at 16.[7]

### 2. CalFIPA's Statutory Exemptions Are Affirmative Defenses That Cannot Be Resolved on the Pleadings

As with the Annunzio-Wiley Act, the MTB Defendants repeat their arguments that CalFIPA itself provides exceptions to certain disclosures.  The Court already rejected those arguments, holding that they raised affirmative defenses that could not be resolved at the pleading stage.  *See* Dkt. 116 at 16 (quoting *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 23 (2010) ("In California, it has been declared that where the statute has exemptions, exceptions or matters which will avoid the statute the burden is on the claimant to show that he falls within that category." (quotations omitted)) and *People v. Fisher*, 96 Cal. App. 4th 1147, 1151 (2002) ("It is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the

---

[7]      Western Union insists that no additional facts are necessary.  That argument is inconsistent with both the allegations of the Second Amended Complaint and the Court's prior orders.  The argument appears bottomed on the notion that Plaintiffs have misstated the content and import of the *Goddard* and *State of Arizona* decisions discussed above the line in their complaint.  Plaintiffs acknowledge that ¶ 26 of the Second Amended Complaint mistakenly ascribes the holding of *Goddard*, a decision of the Arizona Court of Appeals, to the Arizona Supreme Court.  But Plaintiffs do not otherwise misstate the holdings of these decisions, and for the reasons stated in the brief, there are ample reasons to wait for a more developed factual record before assessing the merit of these affirmative defenses.

1    exception is an affirmative defense to be raised and proved by the defendant." (citation omitted)).[8]

2            The MTB Defendants argue that the Court has sufficient facts before it to conclusively decide

3    the issue now, namely, copies of the administrative demands in question.  But that's incorrect and not

4    different from the situation previously.  This time, the MTB Defendants focus on two of the

5    affirmative defenses in CalFIPA:

6        •   Paragraph (b)(5), which exempts the release of nonpublic information "to the extent

7            specifically required or specifically permitted under other provisions of law and in

8            accordance with the Right to Financial Privacy Act of 1978, to law enforcement agencies,

9            including a federal functional regulator, the Secretary of the Treasury . . . ., the California

10           Department of Insurance or other state insurance regulators, or the Federal Trade

11           Commission, and self-regulatory organizations, or for an investigation on a matter related

12           to public safety."  Cal. Fin. Code § 4056(b)(5) (internal citation omitted).

13       •   Paragraph (b)(7), which permits disclosures "to comply with federal, state, or local laws,

14           rules, and other applicable requirements; to comply with a *properly authorized* civil,

15           criminal, administrative, or regulatory investigation or subpoena or summons by federal,

16           state, or local authorities; or to respond to judicial process or government regulatory

17           authorities having jurisdiction over the financial institution for examination, compliance,

18           or other purposes as authorized by law."  Cal. Fin. Code § 4056(b)(7) (emphasis added).

19           As before, neither the SAC nor MTB Defendants' submissions conclusively establish their

20   entitlement to either exception.  Paragraph (b)(7), for example, only applies when disclosures are

21   made to a "properly authorized" subpoena.  Disclosures made in response to subpoenas issued

22   without proper authorization are not exempted.  *See Longview Fibre Co. v. Rasmussen*, 980 F.2d

23   1307, 1312-13 (9th Cir. 1992) ("Most strongly put, the *expressio unius*, or *inclusio unius*, principle is

24   that when a statute limits a thing to be done in a particular mode, it includes a negative of any other

---

[8]  The MTB Defendants appear to make a bid to shift the burden of proof back to Plaintiffs by
characterizing their arguments concerning the validity of the subpoenas and summonses as "an
exception to the express disclosure authorization."  Dkt. 157 at 15.  But the MTB Defendants
elsewhere acknowledge that this Court has already rules that § 4056(b), which sets forth a series of
exemptions to the general prohibition about the disclosure of financial records, is an affirmative
defense.  See *id.* at 18.

1    mode." (cleaned up, citation omitted)).  Arizona law, at best, permits the Arizona AG to seek

2    information that is connected to conduct indictable in Arizona.  *See generally Goddard*, 166 P.3d at

3    918-26.  The investigative requests here, in contrast, are wildly overbroad: they seek an array of

4    information about *all* money transfers over $500 sent or received *anywhere in Mexico* or in any of

5    four U.S. states, including California, even if there is no apparent connection to or relationship with

6    conduct indictable in Arizona, let alone any connection to Arizona whatsoever.  In fact, the

7    subpoenas at issue here are even more overbroad than the subpoena in *Goddard*, which sought

8    information only about transfers from one Mexican state bordering Arizona.  *See* SAC ¶ 17.  Given

9    the Arizona Court of Appeal's holding in *Goddard*, the MTB Defendants cannot establish, as a matter

10   of law at the pleading stage, that the subpoenas in question are "properly authorized."  And there are

11   numerous factual questions to resolve that could shed light on the Court's analysis, including whether

12   in the decade of such overbroad subpoenas being utilized, any conduct has ever actually been

13   indicted and prosecuted in Arizona using this information.[9]

14          Regardless of whether the Arizona AG subpoenas were valid under Arizona law, the ensuing

15   disclosures were unlawful under federal law insofar as they involved DolEx given the applicability of

16   the RFPA to DolEx's disclosures.  The Arizona AG subpoenas directed production to the federal

17   government through TRAC, as DolEx allegedly knew, and the Arizona AG's data requests were

18   apparently made with the federal government's knowledge, support, and acceptance.  This is another

19   basis why application of the (b)(7) exemption does not apply to DolEx.

20          Paragraph (b)(5) does not apply here either.  That paragraph does not explicitly refer to

21   subpoenas at all.  At best, it only indirectly reaches situations involving the sharing of financial

22   records in response to a subpoena.  Because one exception from CalFIPA directly addresses

---

24   [9]  One theme of the MTB Defendants' brief is that this CalFIPA exception allows for no room for
25   Plaintiffs to challenge whether the subpoenas were proper, despite the language of the statute.
     Defendants' position makes no sense as a practical matter.  For aught that appears, Defendants
26   handed over the records of California citizens without providing them any notice or ability to
     challenge these disclosures before they happened.  How else would a citizen be able to vindicate their
27   rights except through a lawsuit such as this one, litigating whether the legal basis for those
     disclosures was sound?  CalFIPA is designed to *protect* the financial privacy of Californians, not
28   permit companies to collude with other actors to engineer work arounds that eviscerate those same
     financial privacy rights.

1   subpoenas, ordinary canons of statutory construction instruct that the same subject matter is not likely

2   covered by other exceptions.  *See Picayune Rancheria of Chukchansi Indians v. Brown*, 229 Cal.

3   App. 4th 1416, 1428 (2014) (noting longstanding canon of construction that, if possible, meaning is

4   to be given to every word); *see also* Cal. Civ. Proc. Code § 1858 ("In the construction of a statute or

5   instrument . . . where there are several provisions or particulars, such a construction is, if possible, to

6   be adopted as will give effect to all.").  And while this canon is only a "starting point," California

7   courts will adopt constructions that involve some linguistic redundancy only if necessary to give

8   effect to "statutory purpose" or "legislative intent."  *Presbyterian Camp & Conf. Centers, Inc. v.*

9   *Super. Ct.*, 501 P.3d 211, 221 (Cal. 2021).  An interpretation of paragraph (b)(5) that permits

10  disclosures in response to improper, dragnet-style subpoenas, however, would undermine rather than

11  advance legislative intent.  CalFIPA itself declares that the legislature's intent was to "provide their

12  consumers notice and meaningful choice about how consumers' nonpublic personal information is

13  shared" and "to afford persons greater privacy protections" than those guaranteed by the federal

14  Gramm-Leach-Bliley Act.  *See* Cal. Fin. Code § 4051.

15      In short, both the paragraph (b)(5) and (b)(7) exemptions are affirmative defenses that the

16  Court has already held cannot be definitively resolved at the pleading stage.  Nothing has changed to

17  justify altering that holding now.

18      **D.      Plaintiffs Adequately Allege Economic Injury Under the UCL**

19      The MTB Defendants last launch a bizarre attack on Plaintiffs' theory of restitution, *i.e.*, that

20  they would not have sent money through the MTB Defendants had they been aware that their records

21  would be disclosed to law enforcement as part of a mass surveillance program.  The Court previously

22  ruled that Plaintiffs Sequeira and Cordera adequately alleged an entitlement to restitution from

23  Western Union, a ruling that goes unmentioned in the MTB Defendants' motion to dismiss.  *See* Dkt.

24  116 at 13.  Nevertheless, the MTB Defendants suggest three reasons why no Plaintiff has UCL

25  standing.  None of these arguments merits the Court revisiting its earlier ruling.

26      First, Defendants suggest that the timing of the disclosures (which occurred after Plaintiffs

27  paid for the MTB Defendants' money transfer services) somehow vitiates causation.  But the problem

28  is that Plaintiffs weren't made aware of the fact of these disclosures *at the time they transacted* with

1   Defendants.  Defendants knew these subpoenas were coming—as described elsewhere, they agreed to

2   accept them on a regular basis.  It isn't as though this was an eventuality no one could have seen

3   coming.  So Defendants' causation argument goes nowhere.

4         Second, Defendants contend that Plaintiffs do not allege any affirmative misrepresentation.

5   Strictly speaking, that's true: the relevant theory is based on an omission.  But courts regularly hold

6   that plaintiffs can seek restitution under the UCL when they allege that the disclosure of certain

7   information would have caused them to behave differently at the time of purchase.  *See*, *e.g.*, *In re*

8   *Sony Gaming Networks & Customer Date Sec. Breach Litig.*, 996 F. Supp. 2d 942, 988 (S.D. Cal.

9   2014); *Simon v. Carter's, Inc.*, No. 20-cv-01436, 2020 WL 13505608, at *4 (N.D. Cal. July 13,

10  2020); *see also Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 330 (2011); *Hinojos v. Kohl's Corp.*,

11  718 F.3d 1098, 1104 n.5 (9th Cir. 2013).  The omission of material facts—like "when you send

12  money with us, we will provide your name and a record of this transaction to a database that is

13  accessible to every law enforcement agency in the nation"—is plainly a type of actionable

14  misrepresentation under the UCL.  *See*, *e.g.*, *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 258

15  (2011) (failure to disclose material fact actionable as misrepresentation under UCL).

16        More fundamentally, Plaintiffs contend that Defendants' actions violate the UCL's *unlawful*

17  prong—not its *fraudulent* prong.  So argument concerning the presence or absence of a

18  misrepresentation is beside the point.  *See Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1,

19  12 (2012) ("Because, as discussed below, we find that Medrazo presented sufficient evidence to

20  establish standing under the unlawful prong of the UCL, we need not address whether the fact that

21  HNH disclosed all of the dealer-added charges precludes her from establishing actual reliance under

22  the fraud or false advertising prong of the UCL.").

23        Third, Defendants contend that it would be bad policy to permit restitution in cases of a

24  customer's "dissatisfaction with a business's response to a subpoena."  Dkt. 157 at 20.  Of course,

25  what Plaintiffs seek restitution for is Defendants' violation of California's financial privacy laws, not

26  generalized dissatisfaction.  In any event, it appears that what Defendants are making is an argument

27  that the Court should exercise its discretion to minimize any award of restitution.  The Court does

28  possess the equitable authority to fashion an award of restitution that best accounts for the equities of

1    the case.  *See, e.g.*, *Cortez v. Purolater Air Filtrations Prods. Co.*, 23 Cal. 4th 163, 179-80 (2000).

2    But whether restitution is appropriate as an equitable matter is generally not a pleadings-stage

3    inquiry. *See, e.g.*, *In re JUUL Labs, Inc., Mktg., Sales Practices, & Prods. Liab. Litig.*, 533 F. Supp.

4    3d 858, 876 (N.D. Cal. 2021).  And such inquiry is entirely distinct from the question of whether the

5    plaintiff has UCL standing, which is what Defendants challenge here.  *See Kwikset*, 51 Cal. 4th at

6    335-36.  Defendants' policy arguments are best addressed, if at all, at a much later stage of this case.

7    **IV.    CONCLUSION**

8         Defendants' motions to dismiss should be denied in full.

9

10                                      Respectfully Submitted,

11                                      **NELSON SEQUEIRA, ISMAEL CORDERO,**
                                        **MARIA HERNANDEZ, and JOSE ANTONIO**
12                                      **MANJARREZ,** individually and on behalf of all others
                                        similarly situated,
13

14    Dated: July 11, 2024         By:   */s/ Yaman Salahi*

15                                      Rafey S. Balabanian (SBN 315962)
                                        rbalabanian@edelson.com
16                                      Yaman Salahi (SBN 288752)
                                        ysalahi@edelson.com
17                                      J. Aaron Lawson (SBN 319306)
                                        alawson@edelson.com
18                                      EDELSON PC
                                        150 California Street, 18th Floor
19                                      San Francisco, California 94111
                                        Tel: 415.212.9300
20                                      Fax: 415.373.9435
21

22                                      Natasha J. Fernández-Silber* (*pro hac vice*
                                        pending)
23                                      nfernandezsilber@edelson.com
                                        Julian Zhu (SBN 342744)
24                                      jzhu@edelson.com
                                        EDELSON PC
25                                      350 North LaSalle Street, 14th Floor
                                        Chicago, Illinois 60654
26                                      Tel: 312.589.6370
                                        Fax: 312.589.6378
27                                      * Admitted in Michigan and New York only
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sejal Zota (*pro hac vice*)
sejal@justfutureslaw.org
Dinesh McCoy (*pro hac vice*)
dinesh@justfutureslaw.org
Daniel Werner (SBN 322310)
daniel@justfutureslaw.org
JUST FUTURES LAW
95 Washington Street, Suite 104-149
Canton, MA 02021
Tel: 617.812.2822

*Attorneys for Individual and Representative*
*Plaintiffs Nelson Sequeira, Ismael Cordero,*
*Maria Hernandez, and Jose Antonio Manjarrez*